No. 24-2801

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

YOLANY PADILLA, et al.
Plaintiffs-Appellees,

v.

IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ R. REUVENI
SARAH S. WILSON
*Assistant Directors*
LAUREN C. BINGHAM
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-616-4458
DAVID KIM
*Senior Litigation Counsel*
BICHNGOC T. DO
*Trial Attorney*

## TABLE OF CONTENTS

INTRODUCTION ................................................................1

STATEMENT OF JURISDICTION.................................................3

STATEMENT OF THE ISSUES..................................................4

PERTINENT STATUTES AND REGULATIONS ...................................4

STATEMENT OF THE CASE....................................................4

    I.    Legal Background ...............................................4

    II.   Procedural History.............................................10

SUMMARY OF THE ARGUMENT ...............................................19

STANDARD OF REVIEW .......................................................21

ARGUMENT .................................................................21

    I.    Plaintiffs' claims challenge the government's implementation of the expedited removal statute and are therefore barred by 8 U.S.C. § 1252(a)(2)(A) and (e)(3). ...................................21

    II.   Plaintiffs lack a due process right to bond hearings after seven days of detention pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii)...............30

        a.    *Thuraissigiam* reaffirms the principle that Plaintiffs are entitled to no more process than what statute provides. ...........31

        b.    Even if *Thuraissigiam* were not dispositive, Plaintiffs' claim of a constitutional entitlement to bond hearings within a strict seven-day time limit lacks any basis in law.......41

        c.    The availability of parole and individual habeas petitions reinforces the constitutionality of 8 U.S.C. § 1225(b)(1)(B)(ii) ...............................................48

CONCLUSION.................................................................53

STATEMENT OF RELATED CASES .............................................55

i

CERTIFICATE OF SERVICE ...............................................................56

CERTIFICATE OF COMPLIANCE .....................................................57

# TABLE OF AUTHORITIES

**Cases**

*Am. Immigration Lawyers Ass'n v. Reno* (*AILA*),
 199 F.3d 1352 (D.C. Cir. 2000) ............................................... 5, 22, 29

*Banda v. McAleenan*,
 No. 18-cv-1841-JLR, 2019 WL 2473815 (W.D. Wash. June 12, 2019) .............52

*Barrera-Echavarria v. Rison*,
 44 F.3d 1441 (9th Cir. 1995) ...................................................43

*Biden v. Texas*,
 597 U.S. 785 (2022) ...........................................................13

*Cancino Castellar v. Mayorkas*,
 No. 17-cv-00491-BAS-AHG, 2021 WL 4081559 (S.D. Cal. Sept. 8, 2021).......23

*Carlson v. Landon*,
 342 U.S. 524 (1952) ...................................................... 30, 45

*Castro v. DHS*,
 835 F.3d 422 (3d Cir. 2016) ...................................................29

*Clark v. Martinez*,
 543 U.S. 371 (2005) ...........................................................21

*Clark v. Smith*,
 967 F.2d 1329 (9th Cir. 1992) ................................................39

*Demore v. Kim*,
 538 U.S. 510 (2003) .................................................... 16, passim

*Department of Homeland Security v. Thuraissigiam*,
 591 U.S. 103 (2020) .................................................... 1, passim

*Deutsche Bank Nat'l Trust Co. v. FDIC*,
 744 F.3d 1124 (9th Cir. 2014) ................................................21

*Florida v. Mayorkas*,
 No. 23-cv-09962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023).....52

*Garland v. Aleman Gonzalez*,
 596 U.S. 543 (2022) .................................................... 2, 13

iii

*Guerrier v. Garland,*
  18 F.4th 304 (9th Cir. 2021)...............................................................40

*Hernandez v. Sessions,*
  872 F.3d 976 (9th Cir. 2017) ..................................................... 17, 18

*Immigration and Customs Enforcement v. Padilla,*
  141 S. Ct. 1041 (2021) ................................................................ 1, 13

*Jennings v. Rodriguez,*
  583 U.S. 281 (2017) .............................................................. 2, passim

*Kaplan v. Tod,*
  267 U.S. 228 (1925) ........................................................................45

*Landon v. Plasencia,*
  459 U.S. 21 (1982) ................................................................... 31, 33

*Las Americas Immigrant Advoc. Ctr. v. Wolf,*
   507 F. Supp. 3d 1 (D.D.C. 2020) ...................................................30

*Leng May Ma v. Barber,*
  357 U.S. 185 (1958) ........................................................................45

*M.M.V. v. Garland,*
  1 F.4th 1100 (D.C. Cir. 2021) .......................................................26

*Make the Road New York v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) ................................................. 23, 29

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ........................................................................17

*Matter of E-R-M- & L-R-M-,*
  25 I. & N. Dec. 520 (BIA 2011)........................................................5

*Matter of M-S-,*
  27 I. & N. Dec. 509 (A.G. 2019)............................................ 2, passim

*Matter of X-K-,*
  23 I. & N. Dec. 731 (BIA 2005)........................................................8

*Mendoza Linares v. Garland,*
  51 F.4th 1146 (9th Cir. 2022)................................................... 28, 40

*Morrissey v. Brewer,*
  408 U.S. 471 (1972) ........................................................................53

iv

*Nishimura Ekiu v. United States*,
   142 U.S. 651 (1892) ...................................................................36

*Padilla v. Immigration and Customs Enforcement*,
   41 F.4th 1194 (9th Cir. 2022)....................................................13

*Padilla v. Immigration and Customs Enforcement*,
   953 F.3d 1134 (9th Cir. 2020)...................................................12

*Reno v. Flores*,
   507 U.S. 292 (1993) ...................................................................45

*Rodriguez v. Marin*,
   909 F.3d 252 (9th Cir. 2018)............................................... 48, 52

*Rodriguez v. Robbins* (*Rodriguez II*),
   804 F.3d 1060 (9th Cir. 2015)...................................................43

*Rossi v. United States*,
   289 U.S. 89 (1933) .....................................................................51

*Sanchez v. Mayorkas*,
   593 U.S. 409 (2021) ...................................................................35

*Shaughnessy v. United States ex rel. Mezei*,
   345 U.S. 206 (1953) .............................................................. 35, 40

*Shunaula v. Holder*,
   732 F.3d 143 (2d Cir. 2013) ......................................................29

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ........................................................ 4, 36, 40

*United States v. Barajas-Alvarado*,
   655 F.3d 1077 (9th Cir. 2011)...................................................32

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ...................................................................31

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ...................................................................46

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ....................................................... 16, 43, 44, 45

**Statutes**

6 U.S.C. § 251 ...................................................................................21

6 U.S.C. § 202(5) ...............................................................................5

6 U.S.C. § 552(D) ..............................................................................21

8 U.S.C. § 1101(a)(1) .........................................................................8

8 U.S.C. § 1103(a)(3) .........................................................................5

8 U.S.C. § 1101(g) ..............................................................................8

8 U.S.C. § 1158 ..............................................................................5, 6

8 U.S.C. § 1182(a)(6)(C) ...................................................................5

8 U.S.C. § 1182(a)(7) .........................................................................5

8 U.S.C. § 1182(d)(5)(A) ........................................ 7, 9, 18, 38, passim

8 U.S.C. § 1225 ..................................................................................9

8 U.S.C. § 1225(b) ................................................. 7, 10, 11, 21, passim

8 U.S.C. § 1225(b)(1)............................................... 5, 6, 7, 19, passim

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................5

8 U.S.C. § 1225(b)(1)(A)(ii) ...................................... 1, 5, 6, 7, 8 passim

8 U.S.C. § 1225(b)(1)(B)(iii)(I) .......................................................6, 7

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ................................................... 6, 33

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ................................. 32, 33, 37, 38

8 U.S.C. § 1225(b)(1)(B)(v) ......................................... 6, 37, 40

8 U.S.C. § 1225(b)(1)(C) ...................................................................7

8 U.S.C. § 1225(b)(2)..........................................................................7

8 U.S.C. § 1226 ...............................................................................8, 9

8 U.S.C. § 1226(a) .................................................... 8, 10, 25

8 U.S.C. § 1226(c) .................................................... 44, 47

8 U.S.C. § 1231 ................................................................................43

8 U.S.C. § 1229a ....................................................... 5, 6, 28, 33

8 U.S.C. § 1229a(b)(4).................................................................33

8 U.S.C. § 1229a(c)(5)................................................................33

8 U.S.C. § 1252(a)......................................................................33

8 U.S.C. § 1252(a)(1)...................................................................6

8 U.S.C. § 1252(a)(2)...................................................................2

8 U.S.C. § 1252(a)(2)(A) ....................................... 4, 13, 14, 19, passim

8 U.S.C. § 1252(a)(2)(A)(ii) ......................................... 14, 19, 21

8 U.S.C. § 1252(a)(2)(A)(iii) .............................................. 7, 28

8 U.S.C. § 1252(a)(2)(A)(iv) .............................. 19, 21, 23, 26, passim

8 U.S.C. § 1252(e)(3) ........................................ 4, 13, 15, 19 passim

8 U.S.C. § 1252(b)(9)....................................................... 27, 28

8 U.S.C. § 1252(e) .......................................................... 21, 29

8 U.S.C. § 1252(e)(2)......................................................................7

8 U.S.C. § 1252(e)(3)(A)...........................................................22

8 U.S.C. § 1252(e)(3)(A)(ii) ....................................................22

8 U.S.C. § 1252(e)(3)(D)..........................................................22

8 U.S.C. 1534................................................................................33

8 U.S.C. § 1534...........................................................................33

28 U.S.C. § 1331.........................................................................3

28 U.S.C. § 1292(b) ..................................................................4

28 U.S.C. § 2241.........................................................................3

**Regulations**

8 C.F.R. § 208.30(f) ............................................................... 6, 33

8 C.F.R. § 212.5(b)(1)-(4) .............................................................50

8 C.F.R. § 235.3(b)(1) ...................................................................31

8 C.F.R. § 236.1(c)(8) .....................................................................8

8 C.F.R. § 1003.42(f) .......................................................................7

8 C.F.R. § 1208.30(g)(2) .................................................................7

8 C.F.R. § 1208.30(g)(2)(iv)(A) .....................................................7

8 C.F.R. § 1208.30(g)(2)(iv)(B) .....................................................7

8 C.F.R. § 1236.1(d)(1) ...................................................................8

Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004) .. 5

Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022) ....................................................5

Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078 (Mar. 29, 2022) ..........................................................6

**Legislative Materials**

H.R. 2202, "Immigration in the National Interest Act of 1995," Aug. 4, 1995, https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih .............50

H.R. Rep. No. 104-469 (1995) ...................................................... 37, 46

**Other Authorities**

Mem. from Matthew T. Albence, Exec. Assoc. Dir., ICE, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017), https://www.ice.gov/doclib/foia/ eoRecords/eoRecordsEnforcement_01-20-2017_03-14-2017.pdf. .....................51

## INTRODUCTION

In 2021, the Supreme Court granted the government's petition for a writ of certiorari in this case. *See Immigration and Customs Enforcement v. Padilla*, 141 S. Ct. 1041 (2021). It vacated this Court's decision, which had affirmed a nationwide injunction invalidating a provision of the expedited removal statute, 8 U.S.C. § 1225(b)(1)(B)(ii), and had required, as a matter of due process, bond hearings for Plaintiffs, a certified class of all noncitizens who entered the country unlawfully, were placed in expedited removal, and were found to have a credible fear of persecution. *See id.* The Supreme Court remanded for further consideration in light of *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), which reaffirmed the settled principle "that Congress is entitled to set the conditions for an alien's lawful entry into this country," and noncitizens seeking to enter the country have "no entitlement to procedural rights *other than those afforded by statute*." 591 U.S. at 107 (emphasis added).

Upon remand to analyze Plaintiffs' latest complaint—which they had newly amended in light of the shifting legal landscape—the district court denied the government's motion to dismiss. The district court rejected the applicability of jurisdiction-stripping statutes by relying on its earlier, flawed analysis of different claims. *See* 1-ER-2–19. On the merits of Plaintiffs' due process claim, it disregarded the impact of *Thuraissigiam* by taking an overly narrow view of the Supreme Court's

1

analysis. *Id.* Upon the government's motion, however, the district court recognized that there was a substantial ground for difference of opinion on both of its holdings, and certified both issues for interlocutory appeal.

The district court's rulings on both issues are wrong and must be corrected. Those rulings fail to recognize that the legal foundation underpinning Plaintiffs' claims has eroded since they filed their initial complaint in 2018. At that time, they were entitled to bond hearings under a Board of Immigration Appeals (BIA) decision. After this case was filed, that BIA decision was overturned in the wake of *Jennings v. Rodriguez*, 583 U.S. 281 (2017), which eliminated any claim to a statutory entitlement to bond hearings for noncitizens like the class members here. *Thuraissigiam* then dealt a further blow by eliminating any constitutional claim that Plaintiffs are entitled to more process than what statute affords. Not only that, the kinds of claims for injunctive relief that Plaintiffs had initially raised were determined to be improper by *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). What is left of Plaintiffs' claims at this point collides with *Matter of M-S-*, 27 I. & N. Dec. 509, 515 (A.G. 2019), a decision by the Attorney General interpreting the expedited removal statute and establishing that noncitizens placed under expedited removal remain ineligible for bond through the completion of removal proceedings. As a result, Plaintiffs' challenge to the expedited removal system must be dismissed or transferred to the District of Columbia pursuant to 8 U.S.C. § 1252(a)(2) and

2

(e)(3), which expansively bar or channel challenges to the expedited removal system, such as this one.

Plaintiffs filed this suit in 2018. Since then, there have been a slew of legal developments, all of which cut against Plaintiffs. It is time for this litigation to end. This Court should reverse the district court's denial of the government's motion to dismiss, and remand with instructions to dismiss what is left of Plaintiffs' years-old case.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 2241, and Article I, § 9, clause 2 of the Constitution. *See* 2-ER-29, ¶ 12.

The government moved to dismiss on the grounds that (1) the district court lacks jurisdiction in light of 8 U.S.C § 1252(a)(2)(A) and § 1252(e)(3), and that (2) Plaintiffs fail to state a claim where the Supreme Court has made clear that individuals at the threshold of entry into this country (like Plaintiffs) have "no entitlement to procedural rights other than those afforded by statute." *Thuraissigiam*, 591 U.S. at 107. The district court denied the motion to dismiss in relevant part. *See* 1-ER-2–19. The government moved to certify both issues for interlocutory appeal, and the district court granted the motion, based on its determination that a substantial ground for difference of opinion exists on both the jurisdictional and due process questions. *See* 2-ER-21–25. This Court granted the government's petition for

3

interlocutory appeal under 28 U.S.C. § 1292(b), and has jurisdiction under that statute.

## STATEMENT OF THE ISSUES

The issues presented in this appeal are as follows:

I.    Whether the jurisdictional bars in 8 U.S.C § 1252(a)(2)(A) and § 1252(e)(3) preclude judicial review of Plaintiffs' claim relating to the implementation of the expedited removal statute, including its mandatory detention provision.

II.   Whether the Due Process Clause of the Fifth Amendment grants Plaintiffs the right to bond hearings after only seven days of detention (and with certain procedural requirements), despite a statutory requirement that Plaintiffs be detained throughout their immigration proceedings, unless paroled.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Legal Background.

Expedited removal. The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see,*

4

*e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). Congress has authorized the Department of Homeland Security (DHS) to expeditiously remove from the United States certain inadmissible noncitizens.[1] *See* 8 U.S.C. § 1225(b)(1). Under this process—known as expedited removal—noncitizens arriving in the United States or certain other noncitizens (as designated by the Secretary of Homeland Security) who entered illegally[2] and lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (a)(7); *see also Thuraissigiam*, 591 U.S. at 107-110 (discussing expedited removal); *Am. Immigration Lawyers Ass'n v. Reno* (*AILA*), 199 F.3d 1352, 1354-55 (D.C. Cir. 2000) (same). If the noncitizen "indicates either an intention to apply for asylum . . . or a fear of

---

[1] DHS also has the authority to place applicants for admission in removal proceedings pursuant to 8 U.S.C. § 1229a even if they may also be subject to expedited removal. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011).

[2] At the time the class was certified, expedited removal applied to those noncitizens who were encountered at or within 100 miles of the border and were unable to prove that they had been in the United States for more than the prior 14 days. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48879-80 (Aug. 11, 2004). This scope was briefly expanded but that expansion has been rescinded. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).

persecution," the inspecting officer must "refer the alien for" an interview by an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii). The asylum officer will then assess whether the noncitizen has a "credible fear of persecution," meaning "that there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. § 1158]." 8 U.S.C. § 1225(b)(1)(B)(v). If the officer determines that the noncitizen has a credible fear, the officer may refer the noncitizen to removal proceedings under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).[3] These removal proceedings provide more extensive procedures than expedited removal, *compare* 8 U.S.C. § 1229a *with* 8 U.S.C. § 1225(b)(1), including a right to appeal to the BIA and a federal appellate court. 8 U.S.C. § 1252(a)(1).

If the asylum officer determines that the noncitizen lacks a credible fear, the noncitizen may seek *de novo* review before an immigration judge (IJ). 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III); *see Thuraissigiam*, 591 U.S. at 110. If the IJ concludes that the noncitizen has a credible fear, the noncitizen is placed into removal

---

[3] In 2022, DHS and the Department of Justice adopted an interim final rule that permits asylum officers, following a positive credible fear determination, to conduct an initial asylum merits interview instead of referring the case for removal proceedings under 8 U.S.C. § 1229a. Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078 (Mar. 29, 2022).

proceedings. 8 C.F.R. § 1208.30(g)(2).[4] If, on the other hand, the IJ finds that the noncitizen lacks a credible fear, the noncitizen is "removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(iii)(I); 8 C.F.R. § 1208.30(g)(2)(iv)(A). The Immigration and Nationality Act (INA) precludes further review by the BIA or any court of the credible fear determination. 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii), 1252(e)(2); 8 C.F.R. § 1003.42(f).

<u>Detention</u>. Noncitizens who demonstrate a credible fear "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii); *Jennings*, 583 U.S. at 297 ("Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded."). The only exception to § 1225(b)(1)'s detention mandate is found in 8 U.S.C. § 1182(d)(5)(A), which allows DHS to parole noncitizens into the United States for "urgent humanitarian reasons or significant public benefit." *See Jennings*, 583 U.S. at 300 (holding that the existence of § 1182(d)(5)(A)'s "express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released"). The statute does not impose "any limit on the length of detention" pending a decision on the asylum application, and does not authorize bond hearings or release on bond. *Id.* at 297.

---

[4] Alternatively, an asylum officer may conduct an initial asylum merits interview. 8 C.F.R. § 1208.30(g)(2)(iv)(B).

Following *Jennings,* the Attorney General, exercising his authority under 8 U.S.C. § 1103(a)(l) and (g), referred to himself a case involving bond hearings under *Matter of X-K-*, 23 I. & N. Dec. 731 (BIA 2005). In *Matter of X-K-*, the BIA, finding ambiguity in the statute and regulations, had concluded that 8 C.F.R. § 1236.1(d)(1), which implements 8 U.S.C. § 1226(a)[5], also applied to certain applicants for admission under § 1225(b)(1). On April 16, 2019, the Attorney General issued a precedential decision in *Matter of M-S-*, addressing "whether aliens who are originally placed in expedited [removal] proceedings and then transferred to full [removal] proceedings after establishing a credible fear become eligible for bond upon transfer." 27 I. & N. Dec. at 515. The Attorney General "conclude[d] that such aliens remain ineligible for bond, whether they are arriving at the border or are apprehended in the United States." *Id.* The starting point was the statutory text: "Section 235(b)(l)(B)(ii) provides that, if an alien in expedited proceedings establishes a credible fear, he 'shall be detained for further consideration of the application for asylum.'" *Id.* (quoting 8 U.S.C. § 1225(b)(l)(B)(ii)). The Attorney

---

[5] Section 1226 provides that the Secretary may arrest noncitizens who are removable from the United States and either detain them "pending a decision" on whether they will be removed or "release" them on "bond" or "conditional parole." 8 U.S.C. § 1226(a); *see Jennings*, 583 U.S. at 281 (describing § 1226). Under that authority, noncitizens are released pending their removal proceedings, "provided that" they can "demonstrate to the satisfaction of [an] officer that such release would not pose a danger to property or persons, and that [they are] likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8).

General rejected the argument that the word "for" applied only to the lead-up to full removal proceedings: "[T]hat latter definition makes little sense in light of the surrounding provisions of the [INA]. If section 235(b)(l)(B)(ii) governed detention only 'in preparation for' . . . full proceedings, then another provision, [8 U.S.C. § 1226], would govern detention during those proceedings. Section 1226, however, permits detention only on an arrest warrant issued by the Secretary. The result would be that if an alien were placed in expedited proceedings, DHS could detain him without a warrant, but, if the alien were then transferred to full proceedings, DHS would need to issue an arrest warrant to continue detention. That simply cannot be what the Act requires." *Id.* at 515-16 (internal citations omitted). The Attorney General accordingly concluded that § 1226, which confers discretion to release noncitizens on bond after arrest pursuant to a warrant, applies to a "different class[] of aliens" than the class governed by § 1225. *Id.* at 516. Indeed, because the latter provides for mandatory detention, the two provisions could "be reconciled only if they apply to different classes of aliens." *Id.*

The Attorney General observed that "[t]he conclusion that section [1225] requires detention does not mean that every transferred alien must be detained from the moment of apprehension until the completion of removal proceedings," given that the INA "separately provides" for parole for "urgent humanitarian reasons or significant public benefit." *Id.* at 516-17 (citing 8 U.S.C. § 1182(d)(5)(A)). The

availability of parole supported the conclusion that the INA "cannot be read to contain an implicit exception for bond" because that "'express exception to detention'" "'implies that there are no *other* circumstances under which aliens detained under [§ 1225(b)] may be released.'" *Id.* at 517 (quoting *Jennings*, 583 U.S. at 283).

## II.    Procedural History.

Initial complaints, class certification, preliminary injunctions, and appellate proceedings. Plaintiffs are inadmissible noncitizens who illegally entered this country without inspection, were apprehended and placed into expedited removal, and have been found to have a credible fear of persecution or torture. *See, e.g.*, 2-ER-30. In their Second Amended Complaint (where preliminary injunctive relief was first requested), Plaintiffs challenged alleged delays in providing credible fear interviews and bond hearings and claimed they were entitled to certain bond procedures. At that time of filing, Plaintiffs were treated as if they were detained under 8 U.S.C. § 1226(a), pursuant to *Matter of X-K-*. Because Plaintiffs were treated as if they were statutorily entitled to a bond hearing, their bond hearing claims focused on the timing and sufficiency of the procedures employed at those hearings and in any subsequent bond appeal. *See generally* 2-ER-111–45. They alleged a constitutional entitlement to bond hearings within seven days of request—after establishing a credible fear of persecution or torture—at which the government

10

would have to bear the burden of proof, record the bond hearing, produce a recording or transcript upon appeal, and produce a written decision containing particularized findings the same day as the hearing. 2-ER-136–38, ¶¶ 146-152.

After filing their Second Amended Complaint, Plaintiffs sought—and the district court granted—the certification of two nationwide classes: the Credible Fear Class and the Bond Hearing Class. The Bond Hearing Class is the only class relevant here, and is defined as the following: "All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing." 2-ER-96. As noted above, at the time the class was certified, its members received bond hearings pursuant to *Matter of X-K-*, but they were not afforded bond hearings on a particular timeline and IJs were not required to record or transcribe the hearings.

After the class was certified, the district court granted Plaintiffs' first motion for preliminary injunction, requiring the government to (1) conduct bond hearings within seven days of request, and release any class member whose detention exceeds that limit; (2) place the burden of proof on DHS to demonstrate why the class member should not be released; (3) record the bond hearing and produce the recording or verbatim transcript upon appeal; and (4) produce a written decision with

11

particularized determinations of individualized findings at the conclusion of the bond hearing. 2-ER-76–94.

Before that preliminary injunction went into effect, the Attorney General decided *Matter of M-S-*, which overruled *Matter of X-K-* and concluded that noncitizens subject to expedited removal proceedings are not entitled to bond hearings under the INA. *See Matter of M-S-*, 27 I. & N. Dec. at 515. After the government sought to vacate the injunction in light of the Attorney General's decision, Plaintiffs amended their complaint and sought to modify the injunction. ECF 114, 130, 131. The district court denied the government's motion, and modified the injunction to find that § 1225(b)(1)(B)(ii), which requires detention for noncitizens pending further consideration of an asylum application, violates the Due Process Clause of the Constitution. 2-ER-56–75. The government appealed and sought a stay of the injunction, which was granted in part. *Padilla v. Immigration and Customs Enforcement*, No. 19-35565 (9th Cir.), Dkt. 18. This Court affirmed the district court's decision in part, and vacated and remanded it in part, holding that Plaintiffs have a due process right to bond hearings, but remanding for further findings with respect to the particular procedures due. *Padilla v. Immigration and Customs Enforcement*, 953 F.3d 1134 (9th Cir. 2020), *cert. granted Immigration and Customs Enforcement v. Padilla*, 141 S. Ct. 1041 (2021). The government petitioned for a writ of certiorari, and the Supreme Court granted the petition, vacated, and

12

remanded for further proceedings in light of *Thuraissigiam*. *Padilla*, 141 S. Ct. 1041. Subsequently, this Court remanded to the district court with instructions to vacate the injunction. *Padilla v. Immigration and Customs Enforcement*, 41 F.4th 1194 (9th Cir. 2022).

Current complaint. After remand from this Court, Plaintiffs again amended their complaint. In their Fourth Amended Complaint, Plaintiffs dropped their requests for class-wide injunctive relief in light of *Aleman Gonzalez*, 596 U.S. 543, and *Biden v. Texas*, 597 U.S. 785 (2022)—though they still asked for sweeping nationwide declaratory relief on their claims that due process entitles any noncitizen found to have a credible fear after being placed in expedited removal to a bond hearing within seven days of request, along with all of their preferred procedures. *See* 2-ER-47–49, ¶¶ 132-149; 51–52, ¶¶160-171. They also repeated their credible fear claims. *See* 2-ER-50–51, ¶¶ 155-165. The government moved to dismiss, arguing that the legal landscape had shifted against Plaintiffs' claims since the case was filed in 2018, and that Plaintiffs' claims should be dismissed pursuant to 8 U.S.C. § 1252(a)(2)(A) or, in the alternative, transferred to the District of Columbia under 8 U.S.C. § 1252(e)(3). The government also argued that Plaintiffs failed to state a claim because the Due Process Clause gives them no right to a bond hearing, let alone a bond hearing within seven days of a request for one. The government grounded its argument on *Thuraissigiam*'s holding that noncitizens apprehended

13

shortly after their illegal entry have only those due process rights provided by statute. *See* 591 U.S. at 140.

After the motion to dismiss was filed, the parties negotiated a settlement agreement on Plaintiffs' claims regarding the administration of credible fear interviews, which the district court approved. ECF 215, 216, 221, 225.

The district court denied the motion to dismiss in relevant part. *See* 1-ER-2–19. After recounting this case's history and legal background, the district court first examined whether it had jurisdiction. 1-ER-8–10. The district court found that it did, concluding that Plaintiffs' claims lay beyond the reach of § 1252(a)(2)(A)—which bars jurisdiction over any challenge to "decision[s] by the [Secretary] to invoke" the expedited removal provisions or to review any "procedures and policies adopted . . . to implement the provisions of section 1225(b)(1)," 8 U.S.C. § 1252(a)(2)(A)(ii), (iv). 1-ER-8–9. The district court reasoned that the jurisdictional bar applied only to "the procedures and policies necessary to implement the removal process," while Plaintiffs' bond hearing claims did "not challenge the removal process—just whether they should be afforded a bond hearing after obtaining a positive credible fear finding." 1-ER-9. Relying on its prior order refusing to reconsider its denial of the government's earlier (2018) motion to dismiss the credible fear claims in this case, the district court stated that it had "previously explained" that "[t]he gravamen of Plaintiffs' lawsuit is that Defendants have not adopted any formal procedure or

14

policy regarding when . . . the bond hearings of which they complain will be held; hence the issue of impermissible 'indefinite detention.'" *Id.* (quoting 2-ER-109). On that basis, the district court concluded that it had "no reason to reconsider" its jurisdictional determination. *Id.*

The district court also ruled that it was not subject to the jurisdictional bar at 8 U.S.C. § 1252(e)(3), again noting that it had "previously explained that § 1252(e)(3) addresses 'challenges to the removal process itself, not to detentions attendant upon that process.'" 1-ER-10 (quoting 2-ER-65). In both rulings, the district court relied on *Jennings*, which it read to reject the application of a "similar" jurisdiction-stripping provision to claims challenging detention for those facing removal. The district court reasoned that "the same logic applie[d] here" because Plaintiffs challenge "only the constitutionality of their detention." *Id.*

Next, the district court ruled that Plaintiffs had stated a due process claim. 1-ER-10–17. It was "unconvinced" that *Thuraissigiam* required dismissal because of the "narrow holding" of that precedent. 1-ER-11. According to the district court, the government's argument that Plaintiffs were only entitled to the procedural rights afforded them by statute was "untethered" to *Thuraissigiam*, which in the district court's view "constrained" its "discussion of due process" to challenges purely related to "admissibility." 1-ER-12 (citing *Thuraissigiam*, 591 U.S. at 140). The district court found that this case was distinguishable from *Thuraissigiam* because

Plaintiffs were not challenging "the admission process in any way or assert[ing] a right to remain in the United States," but "merely seek[ing] a chance to apply for release on bond pending resolution of their bona fide asylum claims." 1-ER-13.

The district court further determined that Plaintiffs had alleged a substantive due process right to bond hearings, relying on this Court's vacated decision in the government's appeal of the preliminary injunction orders, and on language from the Supreme Court that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." 1-ER-14 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). The district court relied on non-immigration detention cases to reason that "non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals." *Id.* The district court conceded that *Demore v. Kim*, 538 U.S. 510, 513 (2003), was an "exception" to that "line of Supreme Court cases" in non-immigration contexts, specifically acknowledging *Demore*'s holding that a "narrow detention policy . . . during a limited period necessary to arrange for removal was reasonably related to the government's purpose of effectuating removal and protecting public safety." *Id.* (internal quotation marks omitted). But the district court maintained that *Demore* was "distinguishable" because the Supreme Court

16

"considered a narrow category of noncitizens who had committed certain enumerated crimes and found that the voluminous Congressional record before it justified denying bail given the substantial rate at which such individuals either reoffended or absconded." 1-ER-15. The district court found that the government could "point to no similar public safety concerns or flight risk that might apply to those, like Plaintiffs, with bona fide asylum claims and who desire to remain in the United States." *Id.* Furthermore, the district court found that the length of detention in *Demore*, approximately 47 days, "was far briefer than the length of detention at issue here," invoking admittedly "dated information" that suggested bond hearing class members "face a median time of five to six months for adjudication of their claim by an immigration judge, nearly a year for cases appealed to the BIA, and still longer for judicial review." *Id.*

The district court also found, in an analysis under *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976),[6] that Plaintiffs had alleged a procedural due process interest. 1-ER-15–17. Guiding its analysis was *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th

---

[6] In *Mathews*, the Supreme Court articulated a three-part test to determine whether established procedures provide constitutionally sufficient due process. 424 U.S. at 334-35. To determine the specific dictates of due process in a given situation, *Mathews* requires consideration of (1) the private interest affected by government action; (2) the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value, if any, of additional or alternative procedures; and (3) the government's interest, including the function involved and the burdens that additional or alternative procedures would entail. *Id.*

Cir. 2017), a case where the class's entitlement to bond hearings was not in dispute. *Id.*at 15. The district court relied on *Hernandez* for the proposition that procedural protections in the immigration detention context "ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint." 1-ER-16; *Hernandez*, 872 F.3d at 990. The district court accordingly held that "[t]o satisfy procedural due process, non-punitive detention must be accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure the detention serves the government's legitimate goals." *Id.* And under this standard, the district court determined that Plaintiffs alleged a substantial liberty interest "in being free from confinement and an interest in preventing arbitrary detention." *Id.* As for "the parole process available to them under 8 U.S.C. § 1182(d)(5)(A)," the district court found that it is "not a constitutionally adequate substitute for a bond hearing particularly since it does not test the necessity of detention" and "does not afford the noncitizen an in-person adversarial hearing before a neutral decisionmaker where he or she may present witness testimony or evidence." *Id.* at 15-16. The district court also determined that "the government's interest in protecting the public or avoiding additional administrative burdens do not outweigh the countervailing liberty interest at stake." *Id.* at 16.

The district court noted that it was not resolving "whether Plaintiffs are entitled to a bond hearing within the seven day time-frame they have requested in their complaint," but simply finding that "Plaintiffs ha[d] sufficiently alleged that they are entitled to a bond hearing in an expedited fashion." *Id.*

The government moved to certify both issues—subject matter jurisdiction and the due process question—for interlocutory appeal. ECF 233. The district court granted the government's motion based upon its agreement that substantial grounds for difference of opinion exist on both the jurisdictional and due process questions. 2-ER-21–25. This Court then granted the government's petition for interlocutory appeal.

## SUMMARY OF THE ARGUMENT

Plaintiffs' Fourth Amended Complaint makes clear that they challenge *Matter of M-S-* as an alleged "*policy* of not providing bond hearings to class members." 2-ER-49, ¶ 148 (emphasis added). Such claims, however, are foreclosed by 8 U.S.C. § 1252(a)(2)(A), which bars "jurisdiction over any challenge to "a decision by the [Secretary] to invoke" the expedited removal provisions, and also precludes review of any "procedures and policies adopted by the [Secretary] to implement the provisions of section 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A)(ii), (iv). To the extent any review exists over such claims, it would only be in the District of Columbia pursuant to 8 U.S.C. § 1252(e)(3). The district court construed Plaintiffs' complaint

19

as if they were alleging a failure by the government to enact *any* policy related to bond hearings, but that understanding plainly conflicts with Plaintiffs' own framing of their bond hearing claims—particularly their targeting of *Matter of M-S-* as an authoritative policy undertaken pursuant to the expedited removal statute. For these reasons, the district court erred in denying the motion to dismiss.

Even if the district court had jurisdiction, Plaintiffs failed to state a claim on which any relief can be granted. Plaintiffs are inadmissible noncitizens apprehended at or near the border. They are part of a class of noncitizens "at the threshold of initial entry" that the Supreme Court has repeatedly held are entitled to only those procedural rights specifically provided by statute. There is no provision for bond hearings in § 1225(b)(1)(B)(ii), and so their claim of entitlement to bond hearings must fail. Not only that, even if they could somehow justify an entitlement to bond hearings, their claim for bond hearings within seven days (accompanied by their preferred procedures) is unsupported by even the handful of cases where the Supreme Court has recognized the need for some checks on prolonged detention in other statutory contexts. Finally, to the extent this Court might be concerned about possibly leaving some inadmissible noncitizens without any recourse to securing release from detention, multiple safety valves exist—parole and also individual habeas actions—that, in addition to being congruent with the mandatory detention

provision in § 1225(b)(1), allow this Court to uphold the statutory scheme that governs expedited removal. The district court erred in denying the motion to dismiss.

## STANDARD OF REVIEW

The Court reviews *de novo* the district court's jurisdictional rulings, as well as its "interpretation and construction of a federal statute." *Deutsche Bank Nat'l Trust Co. v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014).

## ARGUMENT

**I.    Plaintiffs' claims challenge the government's implementation of the expedited removal statute and are therefore barred by 8 U.S.C. § 1252(a)(2)(A) and (e)(3).**

The unambiguous text of 8 U.S.C. § 1252(a)(2)(A) and § 1252(e)(3) forecloses jurisdiction over Plaintiffs' claims. Section 1252(a)(2)(A) provides that, "notwithstanding any other provision of law" and "except as provided in subsection (e)," no court has jurisdiction over any challenge to "decision[s] by the [Secretary] to invoke" the expedited removal provisions or to review any "procedures and policies adopted by the [Secretary] to implement the provisions of section 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A)(ii), (iv).[7] Section 1252(e), in turn, provides that "[j]udicial review of determinations under section 1225(b) of this title *and its implementation* is available in an action instituted in the United States District Court

---

[7] Sections 1225(b) and 1252(e) refer to the Attorney General, but those functions have been transferred to the Secretary. *See* 6 U.S.C. §§ 251, 552(D); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

21

for the District of Columbia." 8 U.S.C. § 1252(e)(3)(A) (emphasis added); *see id.* § 1252(e)(3)(A)(ii) (stating that such review covers determinations of "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the [Secretary] to implement such section, is not consistent with application provisions of this subchapter or is otherwise in violation of law"). Put simply, any regulation, rule, or policy implementing § 1225(b) may be challenged, if at all, only in the District Court for the District of Columbia. *See AILA*, 199 F.3d at 1358 ("The statute permits judicial review of the 'implementation' of 8 U.S.C. § 1225(b), the provision spelling out the procedures for inspecting applicants for admission" "only in the United States District Court for the District of Columbia."). Indeed, given the importance of the expedited removal system to the overall functioning of the border, courts have concluded that Congress meant to "cabin judicial review and to have the validity of the new law [or its implementation] decided promptly." *Id.* at 1364; *see* 8 U.S.C. § 1252(e)(3)(D) (providing cases should be "expedite[d] to the greatest possible extent"). As the Supreme Court explained, a "major objective of [the law codifying § 1225(b)(1)] was to protect the Executive's discretion from undue interference by the courts; indeed, that can fairly be said to be the theme of the legislation." *Thuraissigiam*, 591 U.S. at 112 (internal quotation marks and formatting omitted).

22

Congress thus channeled all challenges to agency actions, rules, or policies implementing the provisions of § 1225(b)(1) to the District of Columbia, and that jurisdictional limitation applies regardless of whether a plaintiff challenges a discrete expedited removal action particular to her or broader rules or policies reflecting a systemwide implementation of the expedited removal statute. *See Make the Road New York v. Wolf*, 962 F.3d 612, 627 (D.C. Cir. 2020) (holding that review under § 1252(e)(3) is "not textually confined to claims arising from individual removal actions," but extends to challenges to procedures and policies adopted to implement the statute "divorced from any individual determination").

Plaintiffs' claims pose precisely such a challenge to a policy implementing § 1225(b)(1). *See* 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(3). In alleging that they are entitled to bond hearings—with a seven-day turnaround and featuring their preferred procedures—Plaintiffs ask the Court to construe § 1225(b)(1)(B)(ii), which provides that if a noncitizen in expedited removal proceedings is found to have a credible fear of persecution, she "shall be detained for further consideration of the application for asylum." *See Cancino Castellar v. Mayorkas*, No. 17-cv-00491-BAS-AHG, 2021 WL 4081559, at *6 (S.D. Cal. Sept. 8, 2021) (holding that challenge to whether § 1225(b)(1)(B)(ii) is constitutional or otherwise lawful "concerns a means by which to carry out, accomplish, or provide an instrument for a mandatory detention applicable to individuals subject to expedited removal proceedings and thus

23

concerns the implementation of Section 1225(b)(1)"). To be precise, Plaintiffs reference *Matter of M-S-* to challenge what they describe as an alleged "*policy* of not providing bond hearings to class members." 2-ER-49, ¶ 148 (emphasis added); *see* 2-ER-37, ¶ 61 ("Pursuant to *Matter of M-S-*, Defendants have a policy and practice of denying bond hearings to noncitizens seeking protection who are apprehended after entering without inspection."). *Matter of M-S-* is an interpretation of § 1225(b)(1)(B)(ii), with the Attorney General looking squarely at the "statutory text" to conclude that "all aliens transferred from expedited to full proceedings after establishing a credible fear are ineligible for bond." 27 I. & N. Dec. at 515, 518-19. In short, *Matter of M-S-* is a straightforward application of § 1225(b)(1)(B)(ii)—which is part of § 1225(b). *See id.* at 515 ("[t]he text of the [INA] mandates th[e] conclusion" reached by the Attorney General). And because § 1252(e)(3) directs all "determinations under section 1225(b) . . . and its implementation" to the District of Columbia, this Court lacks jurisdiction over all those claims asserting that Defendants' actions, including the policy spelled out in *Matter of M-S-*, deprives class members of the bond hearings they think they are due. *See* 2-ER-28, ¶ 7.

The district court rejected these limitations on its review and denied the government's motion to dismiss for lack of jurisdiction. The district court made two points in support of finding jurisdiction, both of which are erroneous. First, the district court invoked its former denials of Defendants' motions for dismissal and

reconsideration, particularly its prior conclusion that "'[t]he gravamen of Plaintiffs'
lawsuit is that Defendants have not adopted any formal procedure or policy
regarding when . . . the bond hearings of which they complain will be held.'" 1-ER-
9 (quoting 2-ER-109). But that is not an accurate characterization of the Fourth
Amended Complaint, which, again, is a direct challenge to § 1225(b)(1)(B)(ii) itself,
as interpreted by *Matter of M-S-*. Plaintiffs themselves describe *Matter of M-S-* as a
"*policy* of not providing bond hearings to class members." 2-ER-49, ¶ 148 (emphasis
added); 2-ER-37, ¶ 61 ("Pursuant to *Matter of M-S-*, Defendants have a policy and
practice of denying bond hearings to noncitizens seeking protection who are
apprehended after entering without inspection."). The district court's misreading of
Plaintiffs' claim may stem from the fact that, in rejecting the government's
jurisdictional argument, the district court relied on a prior order denying the
government's motion to reconsider the denial of an *earlier* (2018) motion to
dismiss—one that moved to dismiss on jurisdictional grounds *only* those claims
alleging a lack of policies regarding the scheduling of *credible fear interviews*. *See*
ECF 36 (Defs.' First Mot. to Dismiss). That motion to dismiss was filed prior to
*Matter of M-S-* being decided, and thus did not move to dismiss the bond hearing
claims under § 1252. That is because until *Matter of M-S-* was decided, Defendants
treated Plaintiffs as if they were detained under 8 U.S.C. § 1226(a) pursuant to
*Matter of X-K-*—not § 1225(b). Thus, by relying on a prior ruling on a different set

of claims, the district court simply did not grapple with the differences between the claims in Plaintiffs' Second Amended Complaint and their current Fourth Amended Complaint. It therefore missed the critical point that Plaintiffs now challenge *Matter of M-S-*, which is undoubtedly an interpretation of § 1225(b)(1)(B)(ii) and thus foreclosed from judicial review.

Even if the district court were correct that "Defendants have not adopted any formal procedure or policy regarding when . . . the bond hearings of which they complain will be held," 1-ER-9, Plaintiffs' claims would still fall squarely within the jurisdictional bar, where *Matter of M-S-* is a formal policy—an explicit finding, to be exact, that bond hearings are *not* authorized by the INA.

Furthermore, to the extent the district court found that the government's bond hearing policies fall outside the scope of § 1252(a)(2)(A)(iv) because they were not *lawfully* adopted, "§ 1252(a)(2)(A)(iv) requires only that the disputed policies be 'adopted'"—full stop. *See M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021) (stating that § 1252(a)(2)(A)(iv)'s "bar on judicial review of certain 'policies adopted' would be ineffective if 'adopted' were construed to mean 'lawfully adopted' as determined by a reviewing court."). In short, only one of two possibilities can be true: either the alleged policies do not implement § 1225(b)—a position repudiated by the Fourth Amended Complaint—or they do implement the

26

statute, thus rendering them subject to the jurisdictional limitations in § 1252(a)(2)(A).

The second point on which the district court relied to find jurisdiction is language in *Jennings* that § 1252(e)(3) bars "challenges to the removal process itself, not to detentions attendant upon that process." 1-ER-10 (quoting 2-ER-65). In *Jennings*, the Supreme Court analyzed § 1252(b)(9), a provision channeling "questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States" into judicial review of a final order of removal. The Supreme Court "assume[d] for the sake of argument" that the detentions in question were "action[s] taken" to remove the noncitizens from the United States. 538 U.S. at 292-93. The Supreme Court then turned to whether the detention challenge "ar[ose] from" the actions taken to remove members of the class. *Id.* at 293. Without fully defining "arises from," the Supreme Court determined that the claims were distinct from a challenge to a removal order because the class was "not challenging the decision to detain them in the first place or to seek removal," nor were they "challenging any part of the process by which their removability [would] be determined." *Id.* at 293-94.

The *Jennings* holding is not relevant here. Sections 1252(a)(2)(A) and 1252(e)(3) are distinct provisions covering a different category of claims from § 1252(b)(9). Section 1252(a)(2)(A)(iv) does not use the phrase "arising from" at

27

all, while § 1252(a)(2)(A)(iii) more expansively bars "claim[s] arising from *or relating to* the *implementation or operation of* an order of removal pursuant to section 1225(b)(1)" (emphasis added). *See Mendoza Linares v. Garland*, 51 F.4th 1146, 1155 (9th Cir. 2022) (Section "242(a)(2)(A)'s general prohibition on judicial review covers the 'procedures and policies' that have been adopted to 'implement' the expedited removal process; the decision to 'invoke' that process in a particular case; the 'application' of that process to a particular noncitizen; and the 'implementation' and 'operation' of any expedited removal order."). Finally, even if any of these provisions were limited to the same set of claims covered by § 1252(b)(9) and not given the broad reading suggested on their face, the claims here meaningfully differ from the claims in *Jennings,* which were triggered only after detention continued for a *prolonged* period such that detention and the decision to initiate removal proceedings were no longer linked, and it was questionable whether the detention continued to "serve its purported immigration purpose." *Demore*, 538 U.S. at 527. Here, class members' immigration processing and detention are provided for in the same statute—8 U.S.C. § 1225(b)(1)—and Plaintiffs themselves posit that class members become eligible for bond hearings as soon as their cases are transferred to § 1229a removal proceedings. Thus, the detention-related claims here are directly tied to the decision to initiate removal proceedings in a way that the claims in *Jennings* were not.

28

The district court's decision conflicts with the decisions of other courts, which have reached contrary conclusions when construing claims involving § 1225(b), and it undermines Congress's intent to have the validity of the expedited removal system evaluated by a single court. *See, e.g.*, *Castro v. DHS*, 835 F.3d 422, 427 (3d Cir. 2016) ("Section 1252(e) . . . provides jurisdiction to the district court for the District of Columbia to review . . . challenges to the constitutionality of any provision of the expedited removal statute."); *Shunaula v. Holder*, 732 F.3d 143, 146-47 (2d Cir. 2013) (Section "1252(e)(3) provides for review of constitutional challenges to the validity of the expedited removal system . . . only in the United States District Court for the District of Columbia."). The constitutionality of a critical provision of the expedited removal system—detention under § 1225(b)(1)(B)(ii)—is exactly what is at issue in this case, and the Court should reject any argument that would sever detention from the larger expedited removal process of which it is an integral part. *See AILA*, 199 F.3d at 1358 ("The statute permits judicial review of the 'implementation' of 8 U.S.C. § 1225(b)" "only in the United States District Court for the District of Columbia."). Congress channeled all challenges to agency actions, rules, or policies implementing § 1225(b)(1) to the District of Columbia, and that limitation applies regardless of whether a plaintiff challenges a discrete expedited removal action particular to her or a systemwide implementation of the expedited removal statute. *See Make the Road New York*, 962 F.3d at 627 (§ 1252(e)(3) applies

29

to challenges to procedures and policies adopted to implement the expedited removal statute). Not surprisingly, the United States District Court for the District of Columbia has invoked that channeling provision to review detention policies and procedures in other cases arising under § 1225(b)(1), and a decision finding that jurisdiction over the bond hearing claims here can lie anywhere else—including in the Western District of Washington—would contravene § 1252(e)(3) and the exclusive authority it allows the District of Columbia to review challenges to the expedited removal system. *See Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19-20, 34-35 (D.D.C. 2020) (recognizing that expedited removal policies specifically relating to "detention placement" gave rise to the court's subject matter jurisdiction under § 1252(e)(3)); *see generally Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of [the] deportation procedure.").

## II. Plaintiffs lack a due process right to bond hearings after seven days of detention pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii).

Plaintiffs, as noncitizens apprehended at or near the border and processed for expedited removal, lack any procedural rights beyond what statute provides. This basic principle has been repeatedly—most recently in *Thuraissigiam*—reaffirmed by the Supreme Court and mandates the dismissal of this case. But even if some members of the class were somehow able to demonstrate an entitlement to bond hearings, no legal authority supports their request for a bond hearing after only seven days of detention—let alone with all of their preferred procedures—and so the

complaint would still have to be dismissed. The undisputed legality of § 1225(b)(1)(B)(ii) is underscored, moreover, by two safety valves: the availability of parole and individual habeas actions.

### a. *Thuraissigiam* reaffirms the principle that Plaintiffs are entitled to no more process than what statute provides.

Due process does not extend any right to a bond hearing in the expedited removal context, let alone a bond hearing within seven days of a request for one. As *Thuraissigiam* affirms, noncitizens "at the threshold of initial entry" have only those procedural rights specifically provided by statute. 591 U.S. at 107, 140. Here, members of the Bond Hearing Class—all of whom were subject to expedited removal pursuant to 8 U.S.C. § 1225(b)(1)—are noncitizens apprehended soon after entering illegally into the United States. *See* 8 C.F.R. § 235.3(b)(1). As such, they fall within the category of noncitizens contemplated in *Thuraissigiam*, who, being "at the threshold," lack the requisite ties to this country to claim any constitutional entitlements beyond what Congress has allowed. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.").

To prevail on their due process claim, Plaintiffs would have to locate a right to bond hearings in the expedited removal statute under which they were processed, 8 U.S.C. § 1225(b)(1). Section 1225(b)(1), however, does not recognize any right to bond hearings; it makes no mention of bond hearings at all, for that matter. Instead, § 1225(b)(1)(iii)(IV) specifically provides that a noncitizen under expedited removal is subject to "[m]andatory detention" and "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." As if to remove any lingering doubt about Congress's choice to subject such noncitizens to detention at DHS's discretion, the statute goes on to provide that any noncitizen who is found to have a credible fear "shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).

In enacting § 1225(b)(1), while Congress did not go as far as to construct "an expedited removal scheme based entirely on the Attorney General's discretion," it instituted "procedures for identifying and removing aliens expeditiously," "thereby laying the groundwork for *limited* procedural rights" in the expedited removal setting. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1085 (9th Cir. 2011) (emphasis added). As a result, pursuant to § 1225(b)(1), a noncitizen who indicates a fear of persecution or an intention to apply for asylum is provided certain protections: an interview with an asylum officer, who must make a reasoned

32

determination on the noncitizen's fear claim, and upon request, *de novo* review by an immigration judge in the case of a negative finding.[8] *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(i), (B)(iii)(II), (B)(iii)(III). Beyond those specified procedures and protections, however, the statute provides no right to a bond hearing. Thus, even if Plaintiffs were to try, they could not trace their claimed due process right to a discrete source of statutory law, given that § 1225(b)(1)—which governs the expedited removal process that class members would follow until the conclusion of their proceedings—excludes any mention of bond. And without any liberty interest derived from statute, Plaintiffs lack the grounds to insist that a court upend the government's orderly administration of § 1225(b)(1) by imposing a set of procedures more to their liking. *See Thuraissigiam*, 591 U.S. at 140; *Landon*, 459

---

[8] In the case of a positive credible fear determination, a noncitizen is entitled to even more process, as the agency may retain the noncitizen's application for asylum for consideration by an asylum officer, or the agency may issue a Notice to Appear and transfer the noncitizen for removal proceedings before an immigration judge under 8 U.S.C. § 1229a. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f). The noncitizen has the right to counsel throughout proceedings before an immigration judge, as well as the ability to examine, present, and even subpoena evidence. 8 U.S.C. § 1229a(b)(4); 8 U.S.C. § 1534. From there, the noncitizen may appeal an adverse order to the Board of Immigration Appeals and, if that appeal were to fail, generally seek review in a federal court of appeals. 8 U.S.C. § 1229a(c)(5); 8 U.S.C. § 1252(a). All to say, even outside of 8 U.S.C. § 1225(b)(1), noncitizens at the threshold of entry benefit from a number of procedural protections provided by Congress. At the same time, none of those provisions undermine the detention provision set out in 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

U.S. at 32 ("[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application.").

In denying the government's motion to dismiss Plaintiffs' Fourth Amended Complaint, the district court took an unduly restricted view of *Thuraissigiam*. Specifically, it found that the discussion of due process in *Thuraissigiam* was "necessarily constrained to challenges to admissibility to the United States," given that the respondent's "sole claim" was "for a chance to reapply for asylum and admission." 1-ER-12. The district court relied on a number of references to "admission" or "rights regarding admission" that appear in the opinion. 1-ER-12–13 (highlighting such statements as that noncitizens at the threshold possess "'only those rights regarding admission that Congress has provided by statute,'" and that the "'power to admit or exclude aliens is a sovereign prerogative'" (quoting *Thuraissigiam*, 591 U.S. at 139, 140)). The district court, however, overlooked the fact that *Thuraissigiam*, at multiple points, also discusses the limited rights afforded to noncitizens at the threshold of entry, without qualifying those statements by any strict reference to admission. The Supreme Court, for instance, noted that the respondent had "no entitlement to *procedural rights* other than those afforded by statute." *Thuraissigiam*, 591 U.S. at 107 (emphasis added). The Court also recalled its precedent that, for noncitizens "who have never . . . been admitted into the country pursuant to law, the decisions of executive or administrative officers, acting

34

within powers expressly conferred by Congress, are *due process of law*."[9] *Id.* at 138 (emphasis added).

Ultimately, the Supreme Court did not balkanize § 1225(b)(1) so as to divide it into "rights regarding admission" and rights regarding detention or anything else. On the contrary, it addressed in general the procedural rights available to noncitizens at the threshold of entry—such as the Bond Hearing Class here—without splitting hairs so finely as to exempt detention from the fundamental principle that such noncitizens are not entitled to any more than what Congress allows. *See id.* at 139 (highlighting prior precedent that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border" (internal quotation marks omitted) (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953))). Thus, the opinion is replete with broad pronouncements about the limited "*due process rights* of an alien seeking initial entry"; at the same time, there are no disclaimers

---

[9] The district court itself did not limit its interpretation of *Thuraissigiam* to just those rights dealing purely with "admission." Instead, it found that the noncitizens' claim in *Thuraissigiam* encompassed both a request for admission and "a chance to reapply for asylum." ECF 217, at 11; *cf. Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021) (holding that "[l]awful status and admission are distinct concepts in immigration law," which "nowhere state[s] that admission is a prerequisite of nonimmigrant status"). In any case, regardless of what particular procedural right the district court thought to be animating the due process discussion in *Thuraissigiam*—e.g., whether a right relating to admission, asylum, detention, or some other facet of the immigration process—the fact remains that the Supreme Court's holding, by its owns terms, was not so constrained as the district court believed.

confining its scope to those provisions of § 1225(b)(1) that deal exclusively with "admission." *Thuraissigiam*, 591 U.S. at 139 (emphasis added); *see id.* at 107 (finding that the noncitizen had "no entitlement to *procedural rights* other than those afforded by statute" (emphasis added)). As the Supreme Court recognized, the limited process due to those "seeking initial entry" "rests on fundamental propositions," including the Executive's "plenary authority to decide which aliens to admit" and the "concomitant . . . power *to set the procedures* to be followed in determining whether an alien should be admitted." *Id.* at 139 (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892), and *Knauff*, 338 U.S. at 544) (emphasis added). And those foundational principles stretch back more than "a century," entrenching as precedent the notion that, for noncitizens "who have never . . . been admitted into the country pursuant to law, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are* due process of law." *Id.* at 138 (internal quotation marks omitted) (emphasis added).

Even apart from the interpretive gloss provided by this lengthy history, the text and structure of § 1225(b)(1) make it exceedingly doubtful that the expedited removal process can be broken down into the strict categories favored by Plaintiffs and the district court, given that all aspects of the expedited removal process are governed by the same statute. Rather tellingly, the term "admission" does not appear anywhere in § 1225(b)(1) other than in the caption ("Inspection of applicants for

36

admission"). Instead, the statute is organized in a way that reflects the specific procedures a noncitizen undergoes as she moves along the expedited removal process, including steps that allow the noncitizen to "establish eligibility for asylum" and secure her desired relief. 8 U.S.C. § 1225(b)(1)(B)(v). And within that statutory scheme, a prominent piece is the detention to which the noncitizen is subject pending a final determination of their credible fear claim or, in the case of a negative finding, removal. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV). It is no coincidence that a specific provision entitled "Mandatory detention" sits at the heart of the expedited removal statute. 8 U.S.C. § 1225(b)(iii)(IV). The expedited removal process was designed to utilize detention and Congress acted purposefully in providing for it. *See* H.R. Rep. No. 104-469, at 117-18 (1995) (discussing the detention requirement in § 1225(b)(1)(B)(ii) in light of findings that "thousands" of noncitizens arrive each year, seek "asylum immediately upon arrival," and "do not return for their hearings" once "released into the general population"). As the Supreme Court has recognized, detention serves as a "constitutionally valid" and necessary means of "expeditiously removing" noncitizens who make "patently meritless claims from the country." *Demore*, 538 U.S. at 523; *Thuraissigiam*, 591 U.S. at 106.

Nor is it unusual that *Thuraissigiam* contains references to admission, given that the Supreme Court was concerned with the procedural rights available to noncitizens "on the threshold." *Id.* at 140. For such individuals, like Plaintiffs, the

37

most immediate objective is to obtain entry into the United States. The very first sentence in *Thuraissigiam* recognizes that link between expedited removal and the overarching goal of admission: Congress "provides for the expedited removal of certain 'applicants' seeking admission into the United States, whether at a designated port of entry or elsewhere." *Id.* at 103. That is not to say, however, that expedited removal does not implicate detention or any other "concomitant" to the Executive's prerogative to decide which noncitizens to admit. *Id.* at 139 (recognizing "the power to set the procedures to be followed in determining whether an alien should be admitted"). On the contrary, as discussed, § 1225(b)(1) specifically directs detention pending a final determination of any credible fear claim or, if that determination turns out to be negative, removal. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV); *see Jennings*, 583 U.S. at 301; *see also* 8 U.S.C. § 1182(d)(5)(A) (allowing for parole of applicants for admission on a case-by-case basis).

Thus, even if the noncitizen in *Thuraissigiam* did not seek "'simple release' but, ultimately, the opportunity to remain lawfully in the United States," it is inaccurate to suggest that the Supreme Court saw detention as a procedural matter falling outside the scope of its holding.[10] 591 U.S. at 119. If anything, *Thuraissigiam*

---

[10] Indeed, the Supreme Court's discussion on this point centers around the fact that the noncitizen filed a *habeas* petition—the traditional remedy to secure release from unlawful custody—and yet was not seeking release; nor did the Supreme Court give any indication that it meant to exclude detention-related procedural rights from its holding. *See*, *e.g.*, *Thuraissigiam*, 591 U.S. at 118.

illustrates just how inextricably intertwined detention is with the rest of the expedited removal statute. For instance, citing the mandatory detention provision in § 1225(b)(1), the Supreme Court held that the respondent could not even "*dispute* that [his] confinement during the pendency of expedited asylum review, and even during the additional proceedings he [sought], [was] lawful." *Id.* at 118 (emphasis added). In other words, the Supreme Court was not purporting to suspend the "century-old rule regarding the due process rights of an alien seeking initial entry" relative to any part of § 1225(b)(1) that implicates detention. *Id.* at 139. Rather, it was making the point that because the statute affords *no right* to release from detention, it was futile for the petitioner (or any other noncitizen processed under § 1225(b)(1)) to "claim an entitlement to release." *Id.* at 118-19, 139. That is precisely the position Defendants have advanced in this case, and one that is consistent with the general principle that "[a]n alien's freedom from detention is only a variation on the alien's claim of an interest in entering the country." *Clark v. Smith*, 967 F.2d 1329, 1332 (9th Cir. 1992).

Finally, it is worth noting that while the respondent in *Thuraissigiam* did not pointedly ask to be released from custody in his complaint, he did not specifically request to be admitted into the United States either. 591 U.S. at 115. Rather, the respondent sought "a new opportunity to apply for asylum and other applicable forms of relief," particularly through judicial review of the negative credible fear

determination. *Id.* It was against that backdrop that the Supreme Court, citing the specific rules at § 1225(b)(1)(B)(ii) and (v), concluded that "Congress provided the right to a determination whether [the respondent] had a significant possibility of establishing eligibility for asylum," and that "he was given that right." *Id.* at 140 (cleaned up). Had it been a different provision of § 1225(b)(1) at issue—such as the detention provision at § 1225(b)(1)(B)(ii)—it is only fair to expect that the Supreme Court would have referenced that particular rule, while still espousing the same underlying principle that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff*, 338 U.S. at 544. Throughout its opinion in *Thuraissigiam*, the Supreme Court consistently chose the most expansive terms to uphold an unbroken line of precedent affirming that a noncitizen "on the threshold of initial entry stands on a different footing" and cannot claim more than what statute expressly provides. *Mezei*, 345 U.S. at 212. This Court, no less, has relied on those same foundational principles after *Thuraissigiam* to hold that "in the expedited removal context, a petitioner's due process rights are coextensive with the statutory rights Congress provides." *Guerrier v. Garland*, 18 F.4th 304, 310 (9th Cir. 2021); *see Mendoza Linares*, 51 F.4th at 1148 (noncitizen who "jumped the border fence" had "no constitutional rights regarding his application" because of the "unique constitutional status of arriving aliens with no ties to the United States" (internal quotation marks omitted)).

To sum, *Thuraissigiam* can and should be read in light of the century-long precedent affirming Congress's authority to set the procedures to be followed by noncitizens who stand at the country's threshold. In the case of noncitizens processed for expedited removal, § 1225(b)(1) is the statute that must be followed, and none of its provisions contemplate or allow for the possibility of bond hearings. For those reasons, Plaintiffs' bond hearing claims are without any merit, and this Court should order that they be dismissed.

### b. Even if *Thuraissigiam* were not dispositive, Plaintiffs' claim of a constitutional entitlement to bond hearings within a strict seven-day time limit lacks any basis in law.

Even if Plaintiffs had some cognizable interest in a bond hearing (an interest expressly disclaimed by the statute), that interest would be insufficient to entitle them to a bond hearing after only seven days, and their complaint would still fail to state a claim. That is because there is no support for their claim of entitlement to a bond hearing after only seven days of detention—not to mention any of the enhanced procedures Plaintiffs would require—in *any* immigration detention context, let alone the expedited removal context where Plaintiffs have fewer rights than noncitizens who have established ties to the United States.

In ruling on the motion to dismiss, the district court noted that it was not resolving "whether Plaintiffs are entitled to a bond hearing within the seven-day time frame they have requested in their complaint," but simply finding that Plaintiffs had

41

"sufficiently alleged that they are entitled to a bond hearing in an expedited fashion." 1-ER-17. This, however, amounts to the district court denying the government's motion by rewriting Plaintiffs' complaint—a complaint that has been amended multiple times already. Plaintiffs have not alleged a claim to a bond hearing in an "expedited fashion." Plaintiffs have pleaded their complaint—and requested and received class certification—on a claim of entitlement to bond hearings after only seven days of detention and with enhanced procedural protections. *See, e.g.*, 2-ER-46, ¶ 127 (characterizing the "questions of law common to members of the [Bond Hearing] class" as, *inter alia*, "whether due process requires Defendants to provide bond hearings to putative class members within *seven days* of a request, and whether due process and the APA requires Defendants to place the burden of proof on the government to justify continue detention, and to provide adequate procedural safeguards to putative class members" (emphasis added)); 2-ER-46, ¶ 129 ("The representative Plaintiffs seek the same relief as the other members of the class: an order declaring unlawful Defendants' failure to provide bond hearings within seven days of request."); 2-ER-53, Prayer for Relief ¶ C ("Declare that Defendants have an obligation to provide Bond Hearing Class members an individualized custody hearing within 7 days of their requesting a hearing to set reasonable conditions for their release pending adjudication of their claims for protection.").

42

Regardless, Plaintiffs' claims for an "expedited" or seven-day timeline have no support in precedent. It is well established that detention is a constitutionally valid part of the removal process. *See, e.g.*, *Demore*, 538 U.S. at 523. The Supreme Court and this Court have repeatedly upheld the government's authority to detain noncitizens with far more substantial ties to the United States without bond hearings for significantly longer periods than seven days. *See Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1449-50 (9th Cir. 1995); *Zadvydas*, 533 U.S. at 701; *Demore*, 538 U.S. at 531; *Rodriguez v. Robbins* (*Rodriguez II*), 804 F.3d 1060, 1069-70 (9th Cir. 2015). Indeed, the Supreme Court has never gone further than to hold that constitutional concerns are implicated only after six months of detention, even in contexts where the prospect of indefinite detention loomed much larger than it does for noncitizens in removal proceedings, such as the class members here, for whom there is a definite termination point—that is, when their removal orders became final. In *Zadvydas*, the Supreme Court set out a six-month period of presumptively reasonable detention for former lawful permanent resident noncitizens detained pursuant to 8 U.S.C. § 1231 who had developed extensive ties to the United States, and who were detained during efforts to execute their removal orders, with no clear end in sight. 533 U.S. at 701. At the same time, the Supreme Court noted that the presumption did "not mean that every alien not removed must be released after six months." *Id.* Rather, the noncitizen had to "provide[] good reason to believe that

43

there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* Under that standard, even prolonged detention could still be constitutional if there remained a "significant likelihood" that the noncitizen would be removed. *Id.* And in *Demore*, the Supreme Court found no due process violation for a "brief" six-month detention without an initial bond hearing pursuant to 8 U.S.C. § 1226(c) of a lawful permanent resident noncitizen with extensive ties to the United States, while removal proceedings were pending. 538 U.S. at 513. The district court's efforts to distinguish these cases fall flat.

The district court relied on *Zadvydas* for the proposition that "'the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent,'" and that "'[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects.'" 1-ER-14 (quoting *Zadvydas*, 533 U.S. at 693); 1-ER-15–16 (quoting *Zadvydas*, 533 U.S. at 690). But the district court skipped over a crucial step in *Zadvydas*—as that case explains, in ascertaining what due process rights a noncitizen has, a court must determine whether or not the noncitizen has *entered* under the law, even if she is physically *present* in the United States. Thus, "despite nine years' presence in the United States, an 'excluded' alien 'was still in theory of law at the boundary line and had gained no foothold in the United States,'" and similarly, an "alien 'paroled into

44

the United States pending admissibility had not effected an 'entry.'" *Zadvydas*, 533 U.S. at 693 (quoting *Kaplan v. Tod*, 267 U.S. 228, 230 (1925)); *id.* (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958)). Moreover, *Zadvydas* confirms that even where an alien has "entered," she may be detained without bond for an extended period—presumptively six months—consistent with a valid government interest. *Id.* at 701. Here, Plaintiffs cannot be said to have made an entry, and the district court's ruling simply passed over this critical inquiry to find that they had stated a claim.

In addition to *Zadvydas*, the district court failed to meaningfully grapple with *Demore*, which it painted as an "exception" to a "line of Supreme Court cases" in non-immigration contexts holding that "non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals." 1-ER-14. But *Demore* is not an exception because those non-immigration cases have no bearing on the constitutionality of the civil immigration detention of noncitizens like Plaintiffs, who are apprehended shortly after entry and have no ties to this country. Instead, *Demore* reiterates the principle that immigration detention must continue to "serve its purported immigration purpose." *Demore*, 538 U.S. at 527 (citing *Zadvydas*, 533 U.S. at 690); *see Reno v. Flores*, 507 U.S. 292, 306 (1993); *Carlson*, 342 U.S. at

45

540; *Wong Wing v. United States*, 163 U.S. 228, 235-36 (1896); *see also Demore*, 538 U.S. at 531 (Kennedy, J., concurring).

The district court determined that *Demore* was "distinguishable" because "it considered a narrow category of noncitizens who had committed certain enumerated crimes and found that the voluminous [c]ongressional record before it justified denying bail given the substantial rate at which such individuals either reoffended or absconded." 1-ER-14–15. But those circumstances fail to distinguish this case from *Demore*. Plaintiffs are a distinct group of noncitizens, narrowly defined in statute and certified to include only those who entered unlawfully, were processed for expedited removal, and expressed a fear that was found to be credible. The class does not include anyone apprehended in the interior, or those who have been admitted to the country, or those who have been present for longer than the preceding two weeks. And as discussed above, there is similarly a congressional record here demonstrating that § 1225(b)(1)(B)(ii) was passed in part because of the "thousands" of noncitizens that arrive each year, seek "asylum immediately upon arrival," and "do not return for their hearings" once "released into the general population." H.R. Rep. No. 104-469, at 117-18 (1995). Thus, it was wrong for the district court to say that "Defendants can point to no similar public safety concerns or flight risk that might apply to those, like Plaintiffs, with bona fide asylum claims and who desire to remain in the United States." 1-ER-15.

46

The district court also erred in finding that the length of detention in *Demore*, approximately 47 days, "was far briefer than the length of detention at issue here," without comparing those 47 days to what Plaintiffs actually ask for—seven days. *Id.* at 14. If mandatory detention under 8 U.S.C. § 1226(c)—with much more limited possibility for parole—of lawful permanent residents with certain criminal violations who have been placed in removal proceedings is proper for *at least* 47 days, it follows that Plaintiffs, who Congress similarly determined should be detained, cannot state a claim that they are entitled to bond hearings, without exception, after only seven days have passed. In any case, the key to the analysis in *Demore* was not the exact length of detention, but that detention had a definite end point—the conclusion of proceedings—just as it does here. *See Jennings*, 583 U.S. at 304 ("In *Demore v. Kim,* we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has 'a definite termination point': the conclusion of removal proceedings." (citing *Demore*, 538 U.S. at 529)).

Thus, in keeping with the broad principles articulated in *Thuraissigiam*, the Court should dismiss Plaintiffs' due process claims, where the statute under which they were processed provides no right to a bond hearing. But even if the Court were inclined to identify an extra-statutory procedural right for inadmissible noncitizens at the mere threshold of entry, there are no grounds to justify the strict seven-day

47

timeline Plaintiffs demand of the government along with their requested procedures. That claim is overly stringent and untethered to the practical constraints facing our immigration officers, who must process tens of thousands of expedited removal cases each year. Crucially, it is contrary to binding precedent that has repeatedly held that constitutional interests are not even implicated until the six-month mark, even in contexts with a higher risk of prolonged detention than expedited removal.

### c. The availability of parole and individual habeas petitions reinforces the constitutionality of 8 U.S.C. § 1225(b)(1)(B)(ii).

Congress has provided for the detention of noncitizens pending a determination of any entitlement they might have to admission, and the process it has provided for release—parole—is lawful, since any process that statute provides is the only process due in those circumstances. And Congress was deliberate in devising that process, spelling out "a specific provision authorizing release from § 1225(b) detention": "With a few exceptions not relevant here, the [Secretary] may 'for urgent humanitarian reasons or significant public benefit' temporarily parole aliens detained under §[] 1225(b)(1)." *Jennings*, 583 U.S. at 300 (quoting 8 U.S.C. § 1182(d)(5)(A)); *see also Matter of M-S-*, 27 I. & N. Dec. at 516-17 ("The conclusion that [8 U.S.C. § 1225] requires detention does not mean that every transferred alien must be detained from the moment of apprehension until the completion of removal proceedings . . . . [Section 1182(d)(5)(A)] grants the Secretary the discretion to parole aliens under its terms."); *Rodriguez v. Marin*, 909

48

F.3d 252, 255 (9th Cir. 2018) (describing "humanitarian parole" under section 1182(d)(5) as an "exception[] to indefinite detention"). The district court's order includes only passing reference to parole, noting that Plaintiffs alleged that parole "is not a constitutionally adequate substitute for a bond hearing." 1-ER-16 (identifying what it saw as potential shortcomings of parole as a substitute for bond hearings, including that parole "does not test the necessity of detention" or "afford the noncitizen an in-person adversarial hearing before a neutral decisionmaker where he or she may present witness testimony or evidence").

But the availability of parole is an essential component of the constitutional inquiry. Parole is not a theoretical possibility; the Secretary has routinely exercised discretion to parole noncitizens on a case-by-case basis out of necessity, since "[w]ithout question, ICE [U.S. Immigration and Customs Enforcement] has insufficient detention resources to detain throughout removal proceedings all aliens amenable to detention under the immigration laws." *Padilla*, No. 19-35565 (9th Cir.), Dkt. 16-2 at 5. For example, ICE paroles aliens "whose continued detention is not in the public interest," a broad category that encompasses a number of "non-exhaustive . . . circumstances," one of which has historically been consideration for parole "in light of available detention resources." *Id.*; *see* 8 U.S.C. § 1182(d)(5)(A) (elucidating authority to parole noncitizens if parole serves a "significant public benefit"). In conjunction with the four other categories of noncitizens eligible for

49

parole, *see* 8 C.F.R. § 212.5(b)(1)-(4), the number of noncitizens released from detention via DHS's discretionary authority has been considerable, given the government's "finite detention resources and the need to parole "a significant number of" unadmitted aliens from custody." *Padilla v. Immigration and Customs Enforcement*, No. 19-35565 (9th Cir.), Dkt. 16-2 at 5. For example, in "Fiscal Year 2019" alone, ICE's Enforcement and Removal Operations "released more than 233,000 aliens pursuant to its discretionary authority." *Id.*

There is accordingly no basis to conclude, as the district court did, that parole "is not an adequate substitute for a bail hearing to test the legitimate need for continued detention." 1-ER-17. As early as 1996, when Congress amended the parole statute, it took the deliberate step of removing language from the original bill that would have limited "urgent humanitarian reasons" and "significant public benefit" to a defined set of rare situations. *See* H.R. 2202, "Immigration in the National Interest Act of 1995," Aug. 4, 1995, https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih (allowing parole "only" in certain specified instances, such as if "the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member," or if "the alien has assisted the United States Government in a matter, such as a law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to

come to the United States"). And over the years, immigration authorities have concluded that parole, "with all available safeguards, may also be warranted where detention capacity limits the agency's ability to detain the [noncitizen] consistent with legal requirements." Mem. from Matthew T. Albence, Exec. Assoc. Dir., ICE, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017), at 3, https://www.ice.gov/doclib/foia/ eoRecords/eoRecordsEnforcement_01-20-2017_03-14-2017.pdf.

Against this background, a court-imposed requirement to conduct bond hearings within a seven-day timeframe would only undercut the Executive's parole authority, stripping the congressionally mandated procedure of its intended purpose and effect. It would potentially incentivize noncitizens to enter the United States unlawfully without documentation and to refrain from engaging with the parole process—encouraging them instead to take advantage of the information asymmetry to obtain release through court-ordered bond hearings in which the government would bear the burden of proof. Plaintiffs' requested procedures would essentially allow an inadmissible noncitizen to enter the United States because of the government's lack of information on the individual, who, evading government authorities, could exploit an inadvertent loophole left open by a court ruling. *Cf. Rossi v. United States*, 289 U.S. 89, 91-92 (1933) (allocating burden partly on account of information asymmetry). Parole has proven to be a practical statutory

51

recourse for noncitizens—including those processed under § 1225(b)(1)—to secure release from detention on a case-by-case basis, and agency personnel should be allowed to complete any parole investigations or determinations they commence, without that deliberate process being compromised by court-ordered bond hearings hastily arranged under an arbitrary seven-day timeline. As explained above, hundreds of thousands of noncitizens have successfully availed themselves of parole over the course of many years.[11] And it would be a severe blow to the immigration system to lose the flexibility offered by parole in favor of an unyielding rule that not only lacks a legal foundation, but would give far greater process to noncitizens at the threshold of entry than to those who may have established ties to this country.

Finally, in addition to parole, individual habeas petitions remain available for noncitizens who believe their detention has become "arbitrary" and "prolonged" such that it no longer serves its immigration purpose, and wish to challenge its legality in court. *Marin*, 909 F.3d at 256; *see, e.g.*, *Banda v. McAleenan*, No. 18-cv-1841-JLR, 2019 WL 2473815, at *1-*3 (W.D. Wash. June 12, 2019). Such claims brought by "individual alien[s]" are excepted from the bar on injunctive relief articulated in section 1252(f)(1). *See Marin*, 909 F.3d at 256. Individual habeas

---

[11] Some of these paroles were issued under a parole policy that was set aside in *Florida v. Mayorkas*, No. 23-cv-09962-TKW-ZCB, 2023 WL 3567851 (N.D. Fla. May 16, 2023). The Secretary, however, retains discretion to grant paroles on a case-by-case basis consistent with § 1182(d)(5)(A), even where there is no applicable parole policy in place.

52

petitions also allow a district court to undertake the "flexible" approach that the Supreme Court has "stressed repeatedly" due process requires, ordering "'such procedural protections as the particular situation demands.'" *Jennings*, 583 U.S. at 314 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

In sum, the presence of multiple safety valves bolsters the conclusion that § 1225(b)(1)(B)(ii) is constitutional, and should alleviate any concerns about the practical ramifications of affirming the broad principle elucidated in *Thuraissigiam* that noncitizens at the threshold of entry have only those procedural rights that statute affords.

## CONCLUSION

The Court should remand this case with instructions to dismiss.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*

EREZ R. REUVENI
SARAH S. WILSON
*Assistant Directors*

By: */s/ Lauren C. Bingham*
       LAUREN C. BINGHAM
       *Senior Litigation Counsel*
       Office of Immigration Litigation
       U.S. Department of Justice, Civil Division
       P.O. Box 878, Ben Franklin Station

Washington, DC 20044
Tel.: 202-616-4458
Email: lauren.c.bingham@usdoj.gov

By: */s/ David Kim*
    DAVID KIM
    *Senior Litigation Counsel*

    BICHNGOC T. DO
    *Trial Attorney*

Dated: August 19, 2024          *Attorneys for Defendants-Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellants state that they know of no related case pending in this Court.

*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel
United States Department of Justice
Civil Division

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel
United States Department of Justice
Civil Division

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitation of Ninth Circuit Rule 28.1-1 because it contains 12,979 words. This brief complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 32 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel
United States Department of Justice
Civil Division