No. 24-2801

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

YOLANY PADILLA, et al.,

*Plaintiffs-Appellees*,

v.

IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
No. 2:18-cv-00928
Honorable Marsha J. Pechman

---

PLAINTIFFS-APPELLEES' ANSWERING BRIEF

---

Matt Adams
Leila Kang
Aaron Korthuis
Glenda M. Aldana Madrid
NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org
leila@nwirp.org
aaron@nwirp.org
glenda@nwirp.org

Trina A. Realmuto
Kristin Macleod-Ball
NATIONAL IMMIGRATION
LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447
trina@immigrationlitigation.org
kristin@immigrationlitigation.org

Anand Balakrishnan
Judy Rabinovitz
ACLU FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2618
abalakrishnan@aclu.org
jrabinovitz@aclu.org

Emma Winger
AMERICAN IMMIGRATION
COUNCIL
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
(202) 507-7512
ewinger@immcouncil.org

Stephen B. Kang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
425 California Street, 7th Floor
San Francisco, CA  94104
(415) 343-0783
skang@aclu.org

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ......................................................................2

STATEMENT OF ISSUES ...................................................................................2

STATEMENT OF THE CASE ..............................................................................3

SUMMARY OF THE ARGUMENT ....................................................................8

STANDARD OF REVIEW .................................................................................12

ARGUMENT .......................................................................................................12

    I.    The District Court Has Jurisdiction Over Plaintiffs' Claims. ......................12

    II.   Plaintiffs Have a Due Process Right to Ensure that Civil Detention Remains Tethered to its Lawful Purpose. ....................................................................23

        A.   The Constitution places important safeguards on civil detention.............23

        B.   *Thuraissigiam* does not undermine such safeguards, as it addressed only a claim of admission, not release from detention. ........................................29

        C.   Defendants' reliance on *Demore* is misplaced. ........................................36

        D.   Neither parole nor habeas is a constitutional alternative to a bond hearing… ..................................................................................................43

CONCLUSION ....................................................................................................47

STATEMENT OF RELATED CASES ................................................................49

CERTIFICATE OF COMPLIANCE ...................................................................50

i

# TABLE OF AUTHORITIES

**Cases**

*Abdi v. Duke*,
280 F. Supp. 3d 373 (W.D.N.Y. 2017) .......................................43, 46

*Abdi v. Duke*,
405 F. Supp. 3d 467 (W.D.N.Y. 2019) ............................................43

*Addington v. Texas*,
441 U.S. 418 (1979) ................................................25, 26, 27

*Al Otro Lado, Inc. v. McAleenan*,
423 F. Supp. 3d 848 (S.D. Cal. 2019) ............................................19

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ............................................16, 17

*Aracely R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) ................................................46

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) ................................................21

*Biden v. Texas*,
597 U.S. 785 (2022) ..................................................6

*Boumediene v. Bush*,
553 U.S. 723 (2008) ................................................13

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................21

*Brown v. United States*,
602 U.S. 101 (2024) ................................................17

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................28

*Carlson v. Landon*,
342 U.S. 524 (1952) ................................................25

ii

*Castro v. DHS*,
    835 F.3d 422 (3d Cir. 2016) ..............................................................22

*Coolidge v. New Hampshire*,
    403 U.S. 443 (1971) ..........................................................................44

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ......................................43, 45, 46

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir. 2018) .............................................................12

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989) ..........................................................................14

*Demore v. Kim*,
    538 U.S. 510 (2003) ....................................................................passim

*Department of Homeland Security v. Thuraissigiam*,
    591 U.S. 103 (2020) ....................................................................passim

*Doe v. Gallinot*,
    657 F.2d 1017 (9th Cir. 1981) ...........................................................47

*Dubin v. United States*,
    599 U.S. 110 (2023) ..........................................................................14

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) .............................................................17

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ..........................................................................22

*Fong Yue Ting v. United States*,
    149 U.S. 698 (1893) ..........................................................................25

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ......................................................................25, 27

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ........................................................................6, 13, 14

*Gerstein v. Pugh*,
  420 U.S. 103 (1975) ................................................................................44

*Goldberg v. Kelly*,
  397 U.S. 254 (1970) ................................................................................27

*Guerrier v. Garland*,
  18 F.4th 304 (9th Cir. 2021) ..................................................................32

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
  896 F.2d 1542 (9th Cir. 1989) ...............................................................44

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ..........................................................................13, 47

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ............................................................26, 39

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ................................................................8, 13, 20, 21

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) ........................................................26, 27, 37, 44

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ................................................................................30

*Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ................................................................................33

*Kucana v. Holder*,
  558 U.S. 233 (2010) ................................................................................15

*Kwai Fun Wong v. United States*,
  373 F.3d 952 (9th Cir. 2004) ..................................................................31

iv

*Landon v. Plasencia*,
459 U.S. 21 (1982) ...................................................................................33

*Lora v. Shanahan*,
804 F.3d 601 (2d Cir. 2015)....................................................................47

*Mendoza-Linares v. Garland*,
51 F.4th 1146 (9th Cir. 2022)...................................................................32

*Merit Mgmt. Group, LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018) ...................................................................................16

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
59 U.S. 272 (1855) ...................................................................................23

*Nielsen v. Preap*,
586 U.S. 392 (2019) ...................................................................................13

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1982) .........................................................................30, 33

*Padilla v. Immigr. & Customs Enf't*,
141 S. Ct. 1041 (2021) ...............................................................................6

*Padilla v. Immigr. & Customs Enf't*,
41 F.4th 1194 (9th Cir. 2022)......................................................................6

*Padilla v. Immigr. & Customs Enf't*,
953 F.3d 1134 (9th Cir. 2020).....................................................................6

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
551 U.S. 224 (2007) ...................................................................................17

*Reid v. Donalan*,
819 F.3d 486 (1st Cir. 2016) ......................................................................46

*Reno v. Flores*,
507 U.S. 292 (1993) ...................................................................................25

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) ..........................................................................19

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) .........................................................13

*Rodriguez v. Marin*,
  909 F.3d 252 (9th Cir. 2018) ......................................................20, 29

*Rudisill v. McDonough*,
  601 U.S. 294 (2024) .....................................................................15, 17

*Santosky v. Kramer*,
  455 U.S. 745 (1982) ..........................................................................26

*Schall v. Martin*,
  467 U.S. 253 (1984) ....................................................................27, 44

*Sebelius v. Cloer*,
  569 U.S. 369 (2013) ..........................................................................18

*Shadwick v. City of Tampa*,
  407 U.S. 345 (1972) ..........................................................................44

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953) ....................................................................34, 35

*Shunaula v. Holder*,
  732 F.3d 143 (2d Cir. 2013) ............................................................22

*Sopo v. Att'y Gen.*,
  825 F.3d 1199 (11th Cir. 2016) .......................................................46

*St. John v. McElroy*,
  917 F. Supp. 243 (S.D.N.Y. 1996) ...................................................44

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264 (2023) ..........................................................................14

*United States v. Rivera-Constantino*,
  798 F.3d 900 (9th Cir. 2015) ...................................................................17

*United States v. Salerno*,
  481 U.S. 739 (1987) .........................................................................25, 26

*United States v. Stackhouse*,
  105 F.4th 1193 (9th Cir. 2024) ...........................................................16

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ...........................................................................24

*Wilkie v. Robbins*,
  551 U.S. 537 (2007) ...........................................................................31

*Wilkins v. United States*,
  598 U.S. 152 (2023) ...........................................................................22

*Wong Wing v. United States*,
  163 U.S. 228 (1896) ...........................................................................25

*Yamataya v. Fisher*,
  189 U.S. 86 (1903) .............................................................................25

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ......................................................................passim

## Statutes

28 U.S.C. § 1292(b) ....................................................................................2

28 U.S.C. § 1331 ........................................................................................2

8 U.S.C. § 1182(d)(5) ...............................................................................38

8 U.S.C. § 1225(b)(1) ............................................................................3, 21

8 U.S.C. § 1225(b)(1)(A) ...........................................................................3

8 U.S.C. § 1225(b)(1)(A)(i)................................................16

8 U.S.C. § 1225(b)(1)(A)(ii) ...........................................16

8 U.S.C. § 1225(b)(1)(B)..................................................3

8 U.S.C. § 1225(b)(1)(B)(ii) ...........................................16

8 U.S.C. § 1225(b)(1)(B)(iii)(I).......................................16

8 U.S.C. § 1225(b)(1)(B)(iii)(II) ....................................16

8 U.S.C. § 1225(b)(1)(B)(iii)(IV).....................................16

8 U.S.C. § 1226(c) ..........................................................37

8 U.S.C. § 1226(e) ..........................................................18

8 U.S.C. § 1231(a) ..........................................................42

8 U.S.C. § 1252(a)(1) ......................................................17

8 U.S.C. § 1252(a)(1) (1994) .............................................4

8 U.S.C. § 1252(a)(2)(A)...........................................passim

8 U.S.C. § 1252(a)(2)(A)(i)............................................15

8 U.S.C. § 1252(a)(2)(A)(iii)..........................................15

8 U.S.C. § 1252(a)(2)(A)(iv)......................................12, 13

8 U.S.C. § 1252(a)(2)(D)................................................18

8 U.S.C. § 1252(b) ..........................................................18

8 U.S.C. § 1252(b)(9)......................................................20

8 U.S.C. § 1252(c) ..........................................................18

8 U.S.C. § 1252(d)...................................................................................18

8 U.S.C. § 1252(e)...................................................................................15

8 U.S.C. § 1252(e)(2)..............................................................................16

8 U.S.C. § 1252(e)(3) .......................................................................passim

8 U.S.C. § 1252(e)(3)(A)...................................................................16, 19

8 U.S.C. § 1252(f)...................................................................................18

8 U.S.C. § 1252(f)(1)..............................................................................13

8 U.S.C. § 1252(g)...................................................................................18

**Agency Decisions**

*Matter of M-S-,*
    27 I. & N. Dec. 509 (A.G. 2019).....................................................1, 5

*Matter of X-K-,*
    23 I. & N. Dec. 731 (BIA 2005) ...................................................3, 38

**Regulations**

8 C.F.R. § 3.19 (1994)...............................................................................4

8 C.F.R. § 208.30(f) ...................................................................................3

8 C.F.R. § 212.5 .......................................................................................43

8 C.F.R. § 242.2(d) (1994) .........................................................................4

**Session Laws**

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546........................17, 18

**Constitutional Provisions**

U.S. Const. amend. V .................................................................... 24

**Other Authorities**

1 William Blackstone, Commentaries (1765) ....................................... 24

3 William Blackstone, Commentaries (1768) ....................................... 24

4 William Blackstone, Analysis of the Laws of England (6th ed. 1771) ............... 23

4 William Blackstone, Commentaries (1769) ....................................... 24

Admin. Off. of U.S. Courts, U.S. Court of Appeals - Judicial Caseload Profile
    (Dec. 31, 2023), https://www.uscourts.gov/sites/default/files/data_tables/
    fcms_na_appprofile1231.2023.pdf .................................................. 40

Caleb Foote, *The Coming Constitutional Crisis in Bail: I*,
    113 U. Pa. L. Rev. 959 (1965) ................................................... 23

H.R. Rep. No. 104-469 (1995) ...................................................... 39

Human Rights First, Judge and Jailer: Asylum Seekers Denied Parole in Wake of
    Trump Executive Order (Sept. 2017), https://humanrightsfirst.org/wp-
    content/uploads/2022/10/hrf-judge-and-jailer-final-report.pdf ......................... 46

ICE, Detention Statistics, https://www.ice.gov/detention-management (last visited
    Oct. 18, 2024) ................................................................. 39

The Federalist No. 84 (Alexander Hamilton) ........................................ 24

# INTRODUCTION

At issue in this appeal is whether a class of bona fide asylum seekers may pursue their claim that the Constitution entitles them to bond hearings to determine whether their continued detention is justified. When Plaintiffs first brought this case, the government had been providing class members with bond hearings for over a decade, and similarly situated people for many more decades. As a result, Plaintiffs' claims focused on whether those bond hearing procedures comported with due process. In 2019, the government eliminated bond hearings for class members in *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), and since then Plaintiffs' claims have evolved to meet the changing legal landscape. In its present form, Plaintiffs' case turns on whether people who are found to have a credible fear of persecution or torture and placed in lengthy removal proceedings can be detained for the duration of those proceedings without *any* custody determination by a neutral decisionmaker.

The district court correctly held that it both had jurisdiction over Plaintiffs' claims and that Plaintiffs stated a claim on which it could grant relief. Statutory text, context, and judicial precedent all support the conclusion that 8 U.S.C. § 1252(a)(2)(A) and (e)(3) do not strip the district court of jurisdiction. That is because those provisions address challenges to the removal process, not challenges —like Plaintiffs'—arising from detention. Without this jurisdictional hurdle,

1

Plaintiffs' claims survive because they go to the core of what the Due Process Clause is intended to protect against—prolonged confinement without a hearing before a neutral magistrate to assess whether detention remains tethered to its lawful purpose. The Supreme Court's decision in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), does not support a contrary result, because that case considered only the due process rights of a person "regarding admission," not liberty. Plaintiffs' challenge to civil immigration detention is well-grounded in Supreme Court and Ninth Circuit precedent. Accordingly, this Court should affirm the district court's decision denying Defendants' motion to dismiss.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. 2-ER-29 ¶ 12. The district court denied, in large part, Defendants' motion to dismiss for lack of jurisdiction and failure to state a claim. 1-ER-2–19. The district court subsequently certified its decision for interlocutory appeal under 28 U.S.C. § 1292(b), and this Court granted Defendants' petition for appeal. 2-ER-21–25. This Court has jurisdiction under that statute.

## STATEMENT OF ISSUES

1.     Whether the district court correctly concluded that 8 U.S.C. § 1252(a)(2)(A) and (e)(3) do not deprive it of jurisdiction over Plaintiffs' claims

challenging the denial of bond hearings for noncitizens with bona fide asylum claims who have been referred for full consideration of their application?

2.     Whether the district court correctly determined that Plaintiffs have stated a cognizable claim of entitlement to bond hearings to determine if their continued detention is justified?

## STATEMENT OF THE CASE

In June 2018, Plaintiffs filed this class action lawsuit to enforce, among other things, their right to a constitutionally adequate bond hearing. *See* 2-ER-113–15 ¶¶ 5, 7; 2-ER-165. At the time, Plaintiffs were placed in expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1), as they were apprehended shortly after entering the United States. However, because they claimed they would be persecuted or tortured if returned to their home country, they were given a credible fear interview (CFI) by asylum officers. *See* 8 U.S.C. § 1225(b)(1)(A), (B). Because they passed the CFI—that is, they were determined to have bona fide claims for asylum—Plaintiffs were subsequently referred for full removal proceedings in immigration court where they can apply for asylum and any other applicable forms of relief. 8 C.F.R. § 208.30(f). Under then-controlling regulations and agency decisions, after passing a CFI, Plaintiffs were entitled to bond hearings before an immigration judge (IJ). *See Matter of X-K-*, 23 I. & N. Dec. 731, 732, 734–35 (BIA 2005). This was in keeping with the longstanding practice of

providing bond hearings to individuals who enter the United States and then face deportation. *See* 8 U.S.C. § 1252(a)(1) (1994); 8 C.F.R. §§ 3.19, 242.2(d) (1994).

As there was no dispute at that time that Plaintiffs and putative class members were entitled to bond hearings, Plaintiffs initially sought relief regarding only the procedures for these bond hearings. They defined the class in part based on the length of their detention before receiving a bond hearing in light of the significant delays class members experienced in receiving such hearings. Thus, when granting Plaintiffs' motion for class certification on March 6, 2019, the district court certified a nationwide Bond Hearing Class of:

> All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing.

2-ER-96.[1] Soon after, the court granted Plaintiffs' motion for a preliminary injunction, recognizing their "constitutional right to press their due process claims, including their right to be free from indeterminate civil detention, and their right to have the bond hearing conducted in conformity with due process." 2-ER-82. The district court accordingly ordered that Plaintiffs' bond hearings should be

---

[1]     The court later amended this definition to include "individuals who otherwise satisfy the requirements for class membership but were determined to have a credible fear of torture, rather than only individuals determined to have a credible fear of persecution." SER-22.

4

conducted within seven days of a request, that the government should bear the burden of justifying continued detention in the bond hearing, and that the hearing should be recorded and should conclude in written decisions. 2-ER-94.

Eleven days after the court issued the preliminary injunction, the Attorney General issued *Matter of M-S-*, which radically changed the detention landscape for Plaintiffs. 27 I. & N. Dec. 509 (A.G. 2019). The decision eliminated bond hearings for all asylum seekers who enter without inspection and demonstrate a credible fear of persecution or torture, and thus have been referred for regular removal proceedings. Instead, the Attorney General held that such individuals could be released only under a discretionary grant of parole by the U.S. Department of Homeland Security (DHS). *Id.* at 515–17.

Plaintiffs subsequently moved to amend their complaint and modify the injunction. In that amended complaint, Plaintiffs asserted that *Matter of M-S-* violated the Due Process Clause by depriving Plaintiffs of *any* bond hearing. SER-69–71 ¶¶ 117–29; SER-73 ¶¶ 140–46; SER-31–39. The district court subsequently granted the motion to modify the preliminary injunction. In its decision, the Court both affirmed its prior decision providing for procedural protections *and* concluded that Plaintiffs are likely to succeed on their claim that they are constitutionally entitled to bond hearings. 2-ER-74–75.

5

Defendants appealed the modified preliminary injunction. This Court affirmed that Plaintiffs were likely to succeed on their claim that due process entitles them to custody hearings. *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1142–48 (9th Cir. 2020), *cert. granted*, *judgment vacated*, 141 S. Ct. 1041 (2021). However, the Court vacated and remanded the order with respect to the timing and procedural protections for bond hearings, holding that further factual development was required for those claims. *See id* at 1148–49.

Defendants filed a petition for certiorari, which the Supreme Court subsequently granted, vacating this Court's prior decision and remanding for further consideration in light of *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). *See Immigr. & Customs Enf't v. Padilla*, 141 S. Ct. 1041 (2021). On remand, Plaintiffs acknowledged that further developments following the Supreme Court's decision warranted vacatur of the injunction. *See* Pls.' Supp. Br., *Padilla v. Immigr. & Customs Enf't*, No. 19-35565, ECF No. 112 (filed July 21, 2022) (acknowledging that *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), prohibited the lower court's injunction and that only declaratory relief was available on a class-wide basis). This Court then instructed the district court to vacate the preliminary injunction and remanded for further consideration in light of *Thuraissigiam*, *Aleman Gonzalez*, and *Biden v. Texas*, 597 U.S. 785 (2022). *Padilla v. Immigr. & Customs Enf't*, 41 F.4th 1194, 1195 (9th Cir. 2022).

6

On remand, the district court vacated the preliminary injunction pursuant to this Court's order. SER-17. Plaintiffs filed a Fourth Amended Complaint (FAC) to address the shifting legal landscape. The FAC included Plaintiffs' due process claim to bond hearings, as well as certain procedural claims under the Administrative Procedure Act. *See* 2-ER-47 ¶¶ 132–44; 2-ER-52 ¶¶ 166–71. Defendants moved to dismiss all claims on behalf of the Bond Hearing Class.[2]

The district court held that it had jurisdiction to review Plaintiffs' claims and that neither 8 U.S.C. § 1252(a)(2)(A) or (e)(3) precluded those claims, in keeping with its prior decisions in this case. 2-ER-9–10.[3] The court then granted the motion to dismiss with regard to two of Plaintiffs' claims under the APA, 1-ER-17–18, but found that Plaintiffs continued to state a valid due process claim, 1-ER-10–16. The court reasoned that *Thuraissigiam* addressed a distinct, narrow issue, and that Plaintiffs sufficiently alleged claims to bond hearings under both substantive and procedural due process. 1-ER-11–13. Notably, the court specifically declined to address "the specific time frame that applies" to Plaintiffs' bond hearings because

---

[2] The FAC also presented claims on behalf of a separate class known as the Credible Fear Class. Those claims related to delays in the CFI process, which the parties settled. The district court approved the settlement on behalf of that separate class. *See* SER-4–7.

[3] The district court previously rejected Defendants' jurisdictional arguments based on these provisions when addressing Defendants' first motion to dismiss and when modifying the preliminary injunction to address *Matter of M-S-*. *See* SER-84–86; 2-ER-109; 2-ER-65–66.

7

"[f]urther development of the factual record is necessary to make any affirmative determination as to the precise timeframe or other parameters." 1-ER-17. The district court's decision permitting Plaintiffs to move forward with discovery is now on hold pending this Court's resolution of Defendants' interlocutory appeal. *See* 2-ER-24.

## SUMMARY OF THE ARGUMENT

The district court correctly concluded both that it had jurisdiction over this case and that Plaintiffs have stated a claim under the Due Process Clause. First, 8 U.S.C. § 1252(a)(2)(A) and (e)(3) do not deprive this Court of jurisdiction. The text, structure, and caselaw all support this conclusion. With regard to text, the title and language of the relevant statutory sections focus on removal orders and credible fear determinations, not detention. More broadly, the structure of § 1252 reinforces this focus, as the entire section focuses on limiting, channeling, and specifying the circumstances under which a noncitizen's removal order may be challenged. Indeed, in the same legislation where Congress enacted § 1252 and § 1225, it specifically limited challenges to detention elsewhere in the legislation, indicating Congress knew how to do so when it wanted. Finally, in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), the Supreme Court previously addressed § 1225(b)(1) detention on the merits, reflecting that 8 U.S.C. § 1252(a)(2)(A) and (e)(3) do not bar this case.

8

On the merits, the district court correctly concluded that Plaintiffs stated a claim that the Due Process Clause entitles them to a custody hearing before a neutral decisionmaker. The Supreme Court and this Court's cases have long held that to subject a person to prolonged detention, the Due Process Clause requires the government to justify detention not before the arresting officer, but instead before a neutral and detached magistrate. This principle is embedded in this country's history, was widely accepted in the common law at the time of the founding, and is reflected in the Due Process Clause's protection against the loss of liberty without certain guaranteed procedures. The Supreme Court has repeatedly applied this principle across a wide variety of civil detention contexts, from pretrial detention to civil commitment. And notably, the Supreme Court has made clear this principle also applies in the context of immigration detention, which is simply another form of civil detention.

The Supreme Court's decision in *Department of Homeland v. Thuraissigiam*, 591 U.S. 103 (2020), does not alter this legal landscape. By its own terms, *Thuraissigiam* did not involve a "core" habeas challenge seeking release from Executive detention. Instead, the case held that neither habeas nor the Due Process Clause allowed a noncitizen to seek new procedures that would allow them to remain lawfully in the United States. To reach this conclusion, the Court repeatedly relied on long line of caselaw regarding the plenary power in the

9

context of entries and admissions, which states that noncitizens have only those rights *as to admission* that Congress provides. However, the Court has not applied this same plenary power doctrine to *detention* claims. To the contrary, it has explained that, in the detention context, the power is subject to important constitutional limitations under the Due Process Clause.

Similarly, the Supreme Court's decision in *Demore v. Kim*, 538 U.S. 510 (2003), does not bar Plaintiffs' claims. *Demore* rejected a facial challenge to the constitutionality of a mandatory detention statute. That case is readily distinguished. First, unlike this case, *Demore* only mandated detention for a small subset of noncitizens who had been convicted of certain enumerated crimes. Such a "narrow detention policy" was constitutional, the Court explained. Second, that "narrow" policy was premised on a voluminous congressional record, studies, and fact-findings providing a detailed factual basis that substantiated the need for such detention. Defendants cannot point to any comparable record here. Lastly, the Court issued the decision in *Demore* on the understanding that the detention at issue was "brief" in nature—mere weeks in most cases and around five months in cases of appeal. Plaintiffs here present a challenge regarding prolonged detention for those transferred to full immigration proceedings after having passed credible fear interviews. Indeed, as this Court's own docket indicates (since Bond Hearing Class members often file petitions for review), such cases often last years.

10

Finally, the availability of parole and individual habeas petitions does not rescue the mandatory detention statute at issue here from its constitutional infirmities when applied to Plaintiffs. Parole decisions are issued by low-level DHS officers without a hearing, offer no opportunity to present witnesses or review the government's evidence, and do not provide a formal appeal process. All these shortcomings are critical factors that the Supreme Court has considered crucial when evaluating the legality of a civil detention scheme. And while Defendants now point to data that suggests many noncitizens are released on parole, that argument is improper. This interlocutory appeal concerns a denial of a motion to dismiss; Defendants' fact-based argument requires factual development in discovery, as the district court recognized. In any event, several other district courts have found that Defendants' parole process is arbitrary and that at times DHS has declined to release *anyone*. Nor does the availability of individual habeas petitions help Defendants. The protections of the Due Process Clause exist apart from those guaranteed by the Suspension Clause and habeas corpus. Furthermore, as this Court and others have recognized, the availability of individual habeas petitions is of little value when so few noncitizens can meaningfully access that procedure.

11

## STANDARD OF REVIEW

The Court reviews the district court's legal conclusions regarding jurisdiction and whether plaintiffs have stated a claim de novo and factual findings relevant to those determinations for clear error. *Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014); *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018).

## ARGUMENT

## I.   The District Court Has Jurisdiction Over Plaintiffs' Claims.

Sections 1252(a)(2)(A) and (e)(3) do not deprive the district court of jurisdiction in this case. Defendants' primary argument is that paragraph (e)(3) limits challenges to any "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A)(iv); *see also* Brief for Appellants (Op. Br.) 21–24. But the district court correctly held that § 1252(e)(3) addresses only "challenges to the removal process itself, not to detentions attendant upon that process." 1-ER-10. The statute's text and context, as well as the nature of Plaintiffs' claims—which focus solely on detention— demonstrate that the district court was correct to reject Defendants' arguments to the contrary. Such a conclusion is also consistent with Supreme Court and Ninth Circuit precedent.

12

In their brief, Defendants concede that § 1252(a)(2)(A) and (e)(3) do not bar individual habeas actions, which remain are available to challenge the constitutionality of detention under § 1225(b)(1). Op. Br. 52. This is true because the Constitution, through the Suspension Clause, guarantees that the writ of habeas corpus will be available for core habeas challenges involving a person's liberty. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (explaining that the Suspension Clause guarantees writs of habeas corpus are available to challenge unlawful detention); *Thuraissigiam*, 591 U.S. at 119, 127 (noting challenges to Executive detention are at the "core" of Suspension Clause and the writ of habeas corpus); *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality) ("[The Suspension Clause] has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law.").

The government nonetheless argues that this non-habeas challenge is precluded.[4] But as set forth below, the government's interpretation of the INA's

---

[4]      While this case was initially filed as a habeas petition and complaint, *Aleman Gonzalez* made clear that injunctive relief is not available on a class-wide basis because of 8 U.S.C. § 1252(f)(1). 596 U.S. 543. Plaintiffs here seek declaratory relief, which remains available. *See, e.g.*, *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (opinion of Alito, J., in which Roberts, C.J. and Kavanaugh, J. joined) (explaining that § 1252(f)(1) did not eliminate "jurisdiction to entertain the plaintiffs' request for declaratory relief"); *Rodriguez*, 583 U.S. at 355  (Breyer, J., joined by Ginsburg, J., and Sotomayor, J., dissenting) (stating that a "court could order declaratory relief" regardless of Section 1252(f)(1)); *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010) ("Section 1252(f) was not meant to bar classwide

13

jurisdictional provisions is incorrect. The text and context make clear that detention challenges fall outside the INA's limitations on review of expedited removal orders.

First, the statutory text and context limit § 1252(a)(2)(A) and (e)(3)'s scope to challenges that concern how the agency operates its system of issuing and effectuating expedited removal orders. By contrast, that same text and context reflect that these subparts do not encompass challenges to agency actions that prolong detention. "[A] fundamental canon of statutory construction" is "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). As a result, subparagraph (a)(2)(A) and paragraph (e)(3) cannot be read "in isolation," thereby "constru[ing the text] in a vacuum." *Id*. Instead, a view to the whole statute and its context demonstrates that the parts of § 1252 at issue are limited in scope. *See also, e.g.*, *Dubin v. United States*, 599 U.S. 110, 118 (2023) (adopting a "narrower reading" of "uses" and "in relation to" after analyzing these terms in "the statutory context, taken as a whole"); *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275–76 (2023) (concluding that the meaning of statutory text is "overwhelmingly evident" when read "alongside its neighboring

declaratory relief."), *abrogated in part on other grounds by Aleman Gonzalez*, 596 U.S. 543.

14

[statutory] provisions"). Indeed, the Supreme Court has previously looked to the "statutory context" of § 1252 as a primary reason to adopt a limiting construction when construing a subpart of that statute. *See Kucana v. Holder*, 558 U.S. 233, 245 (2010). The same is appropriate here.

To begin, subparagraph (a)(2)(A) is focused on eliminating review of expedited removal orders and the credible fear interviews that can accompany them. Clause (i) eliminates review of "any individual determination . . . arising from or relating to the implementation or operation of *an order of removal* pursuant to section 1225(b)(1) of this title." 8 U.S.C. § 1252(a)(2)(A)(i) (emphasis added). And clause (iii) strips courts of jurisdiction of "the determination made under section 1225(b)(1)(B) of this title." *Id.* § 1252(a)(2)(A)(iii). The "determination" referenced is "that [the noncitizen] lacks a credible fear of persecution." *Thuraissigiam*, 591 U.S. at 112 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)).

Subsection (e), which subparagraph (a)(2)(A) repeatedly cross-references, reinforces this focus and this interpretation of "determination." That subsection is entitled "Judicial review *of orders* under section 1225(b)(1)." 8 U.S.C. § 1252(e) (emphasis added). Such "[s]ection headings . . . 'supply cues' as to what Congress intended." *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (second alteration in the original) (quoting *Merit Mgmt. Group, LP v. FTI Consulting, Inc.*, 583 U.S.

15

366, 380 (2018)); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (similar). The statute then addresses when the "determinations" under § 1225(b)(1) are reviewable. *See* 8 U.S.C. § 1252(e)(2), (e)(3)(A). Critically, § 1225(b)(1) uses the same language of "determine" or "determination" *only* in reference to immigration officer decisions regarding admissibility, CFIs, and expedited removal orders. For example, § 1225(b)(1)(A)(i) addresses "immigration officer determin[ations]" regarding admissibility and removal orders, § 1225(b)(1)(A)(ii) addresses "immigration officer determin[ations]" to refer individuals for CFIs, and § 1225(b)(1)(B)(ii) and (B)(iii)(I) address "[asylum] officer determin[ations]" at those CFIs. *See also id.* § 1225(b)(1)(B)(iii)(II) ("The officer shall prepare a written record of a determination under subclause (I)."). At no point does the statute use the language of "determine" or "determination" in reference to decisions regarding detention. *See id.* § 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV).

The use of "determination" in the parts of § 1252 referencing § 1225(b)(1) is thus instructive in informing what Congress intended § 1252(a)(2)(A) and (e)(3) to cover. This "parallel language . . . compels parallel results" in meaning. *United States v. Stackhouse*, 105 F.4th 1193, 1201 (9th Cir. 2024). Indeed, "[a] standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning." *United States v.*

16

*Rivera-Constantino*, 798 F.3d 900, 905 (9th Cir. 2015) (quoting *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007)). Notably, the sections at issue here were enacted in the same legislation, *see* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, §§ 302, 306, 110 Stat. 3009-546, 3009-579–84, 3009-607–12.

Thus, Congress's explicit cross-references in § 1252 to the determinations in § 1225(b)(1) demonstrate that only decisions about admissibility, removal orders, and CFIs matter for purposes of § 1252(a)(2)(A) and (e). *Cf. Brown v. United States*, 602 U.S. 101, 115–19 (2024) (discussing effect of statutory cross-references). In previously addressing § 1252(e)(3), this Court has agreed, observing that "[s]ection 1252(e)(3), in short, limits jurisdiction over challenges to regulations *implementing expedited-removal orders*." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 666 (9th Cir. 2021) (emphasis added).

More broadly, § 1252 is entitled "Judicial review of orders of removal," underscoring this focus. *See Rudisill*, 601 U.S. at 309; *Almendarez-Torres*, 523 U.S. at 234. Paragraph (a)(1) then addresses "[g]eneral orders of removal" in proceedings before immigration judges (IJs), 8 U.S.C. § 1252(a)(1), while (a)(2)(A)—the provision at issue here—deals with expedited removal orders. Subparagraph (a)(2)(D) subsequently addresses what is judicially reviewable in a petition for review filed to challenge an order of removal identified in (a)(1). *Id.*

17

§ 1252(a)(2)(D). The remaining subsections similarly reflect the statute's focus on removal orders. *See id.* § 1252(b) (addressing the scope of review of removal orders in petitions for review); *id.* § 1252(c) (concerning "[a] petition for review or for habeas corpus of an order of removal,"); *id.* § 1252(d) (discussing "[r]eview of final orders [of removal].");  *id.* § 1252(f) (limiting injunctive relief and stays of removal for persons subject to detention and removal); *id.* § 1252(g) (limiting jurisdiction over challenges to "to commence [removal] proceedings, adjudicate [removal] cases, or execute removal orders").

When Congress has addressed judicial review over immigration detention decisions, it has done so in the sections creating the detention authority itself. *See id.* § 1226(e) (limiting federal court jurisdiction over certain detention decisions made under that section). Notably, § 1226 was enacted as part of the same legislation that created § 1225 and § 1252. *See* IIRIRA, Pub. L. No. 104-208, Div. C, §§ 302–03, 110 Stat. at 3009-579–87. Congress's decision to limit detention claims in one statute but not the other further informs § 1252's limited focus. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) (alteration and citation omitted).

18

Taken together, this text and context convey that subparagraph (a)(2)(A) and paragraph (e)(3) only limit jurisdiction to challenges that "target the process of removal directly," rather than those that "target other circumstances incidental to removal." *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 867 (S.D. Cal. 2019). While Defendants urge a broader interpretation, Op. Br. 21–24, the statute's "language itself, the specific context in which that language is used, and the broader context of the statute as a whole" all support a more limited reading. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Indeed, (e)(3) explicitly states that it is the "[j]udicial review of *determinations* under section 1225(b) of this title and its implementation" that are subject to its scope. 8 U.S.C. § 1252(e)(3)(A) (emphasis added). As noted above, the "determinations" referenced in § 1225 only involve admissibility, CFIs, and expedited removal orders.

Second, in addition to the statute's text and context, the Supreme Court's and this Court's past exercise of jurisdiction in cases involving § 1225(b) detention are instructive. In *Jennings v. Rodriguez*, the Supreme Court distinguished challenges to detention from challenges to removal orders and other determinations involved in the removal process. Specifically, the Court stated:

> [R]espondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar.

583 U.S. at 294–95. Similarly, this Court subsequently rejected a similar contention by the government that Section 1252(b)(9) deprived it of jurisdiction to review detention decisions, quoting the same language cited above from the Supreme Court's decision in *Rodriguez. See Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018). Thus, the Court held that the jurisdiction-stripping provision at § 1252(b)(9) did not apply because the petitioners challenged their detention and not the removal process or orders made in the removal proceedings.

Defendants assert that the Supreme Court's discussion of § 1252(b)(9) in *Rodriguez* is irrelevant here because the language of (a)(2)(A) and (e)(3) is different from that of (b)(9). Op. Br. 27–28. But as noted above, both provisions focus on the removal process and the actions and orders taken in issuing removal orders. The Supreme Court read § 1252(b)(9)'s otherwise broad language— precluding review of "all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien"—to *not* encompass detention claims, and instead emphasized that the section focuses on the "review of final removal orders" alone. 583 U.S. at 293. The same is true regarding (a)(2)(A) and (e)(3), which are similarly focused on actions and decisions directed at expedited removal orders (and the process leading to them). Thus, the district court was correct to observe that, as in *Rodriguez*, Plaintiffs "were 'not asking for review of an order of removal; . . . not challenging the decision to detain them in the first

20

place or to seek removal; and . . . not even challenging any part of the process by which their removability will be determined." 1-ER-10 (alterations in original) (quoting *Rodriguez*, 583 U.S. at 294).

Just as important, however, is that the Supreme Court addressed § 1225(b)(1) detention in *Rodriguez*—a case involving a certified class— notwithstanding (a)(2)(A) and (e)(3). Specifically, the Court rejected the argument that "§ 1225(b)(1) contain[s] . . . an implicit 6–month limit on the length of detention." *Id.* at 297. But the Supreme Court would not have had jurisdiction to address this issue if, as Defendants claim, (a)(2)(A) and (e)(3) strip jurisdiction over claims regarding how Defendants implement the detention provisions of § 1225(b)(1). The Court's decision to address this issue provides critical guidance here. Accordingly, Defendants' claim that the "*Jennings* holding is not relevant here" is mistaken. Op. Br. 27.

The Supreme Court's exercise of jurisdiction in *Rodriguez* further demonstrates jurisdiction is proper here. "[C]ourts, including [the Supreme Court], have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Thus, prior cases where this Court and the Supreme Court have exercised jurisdiction are instructive in answering the question here. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 307 (1962) (courts should not

21

"disregard the implications of an exercise of judicial authority assumed to be proper" for many years); *see also Wilkins v. United States*, 598 U.S. 152, 161–65 (2023) (relying in part on the Court's past practice and decisions to conclude a statutory provision was not jurisdictional).

Finally, Defendants assert that the district court's decision conflicts with the case law of other circuits. Op. Br. 29. This is incorrect. The two cases Defendants cite in support of this alleged conflict do not involve "core" habeas claims challenging "unlawful executive detention." *Thuraissigiam*, 591 U.S. at 119 (citation omitted). Instead, these cases are challenges to expedited removal orders: precisely the type of claim that both parties agree is barred. *See Castro v. DHS*, 835 F.3d 422 (3d Cir. 2016) (finding no jurisdiction to challenge the outcome of CFIs); *Shunaula v. Holder*, 732 F.3d 143, 146 (2d Cir. 2013) ("Shunaula's challenge falls within [(a)(2)(A)'s] jurisdictional bar because he alleges illegality in the Attorney General's particular decision to remove him and in the specific way his removal was carried out.").

In sum, the statute's "text in light of context, structure, and related statutory provisions," all make plain that the district court had jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). As this Court's and the Supreme Court's precedent indicate, subparagraph (a)(2)(A) and paragraph (e)(3)

do not encompass claims to detention, and instead focus solely on expedited

removal orders and the CFI process related to them.

## II. Plaintiffs Have a Due Process Right to Ensure that Civil Detention Remains Tethered to its Lawful Purpose.

### A. The Constitution places important safeguards on civil detention.

The district court correctly found that Plaintiffs have adequately alleged a

due process claim. 1-ER-10–17. In arguing that members of the Bond Hearing

Class have no rights other than those provided by statute, Op. Br. 40, Defendants

fail to meaningfully address the well-established constitutional limits on civil

detention.

The Due Process Clause protects—at a minimum—"those settled usages and

modes of proceeding existing in the common and statute law of England."

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1855).

At the time of the founding, English common law did not permit prolonged

confinement without a hearing before a neutral decisionmaker to assess whether

detention was necessary. *See* Caleb Foote, *The Coming Constitutional Crisis in

Bail: I*, 113 U. Pa. L. Rev. 959, 966–68 (1965) (detailing pre-founding English

history and practices regarding bail and pretrial detention). Indeed, Blackstone

recognized the right to bail "in any Case whatsoever." 4 William Blackstone,

Analysis of the Laws of England 148 (6th ed. 1771). This right to a bail hearing

before a magistrate historically served as a fundamental check against arbitrary

detention. *See* 4 William Blackstone, Commentaries 296–97 (1769); 3 William Blackstone, Commentaries 291 (1768). English common law tradition also afforded such core protections to noncitizens and citizens alike. *See United States v. Wong Kim Ark*, 169 U.S. 649, 655 (1898) ("Such allegiance and protection . . . were not restricted to natural-born subjects and naturalized subjects, . . . but were predicable of aliens in amity, so long as they were within the kingdom."); 1 William Blackstone, Commentaries 366 (1765) (defining "the people" of England to include "aliens"); *id.* at 370 ("[F]or so long time as he continues within the king's dominion," the king "affords his protection to an alien . . . during his residence in this realm."). The Framers incorporated these principles into the Fifth Amendment guarantee that all "person[s]" may not be deprived of "liberty" without "due process of law," U.S. Const. amend. V, recognizing that "the practice of arbitrary imprisonments, [has] been, in all ages," among "the favorite and most formidable instruments of tyranny." The Federalist No. 84 (Alexander Hamilton).

Consistent with this legal tradition, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Because "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," *Foucha v. Louisiana*, 504 U.S. 71,

24

83 (1992) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)), due process requires that civil detention be closely tethered to its preventive purpose.

Immigration detention, like other forms of civil detention, is subject to these constitutional constraints. The plenary "power of Congress to exclude or expel" noncitizens is not a license to "disregard the fundamental principles that inhere in 'due process of law'" when "executing the provisions of a statute involving the liberty of persons." *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903). Executive officers may not "arbitrarily . . . cause [a noncitizen] who has entered the country . . . to be taken into custody" without "giving him all opportunity to be heard." *Id.* at 101. That power remains "subject to . . . the 'paramount law of the constitution.'" *Carlson v. Landon*, 342 U.S. 524, 537 (1952) (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893)). Notably, the Supreme Court has repeatedly applied its precedent concerning other forms of civil detention or imprisonment to cases involving immigration custody. *See, e.g.*, *Zadvyda*s, 533 U.S. at 690–92; *Reno v. Flores*, 507 U.S. 292, 314 (1993); *Wong Wing v. United States*, 163 U.S. 228, 237–38 (1896). This is not a surprise, as "civil commitment for *any* purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added). Similarly, the Court has also relied on precedent concerning the due process rights of noncitizens when addressing other forms of civil commitment.

25

*See, e.g.*, *id.* at 432 (drawing from cases on deportation and denaturalization); *Santosky v. Kramer*, 455 U.S. 745, 756–57 (1982) (same).

Like other forms of civil detention, immigration detention violates due process unless "a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)); *see also Salerno*, 481 U.S. at 747 (holding that substantive due process prohibits detention that is "excessive in relation to [the government's] regulatory goal"); *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (similar). The only legitimate justifications for immigration detention are to effectuate removal and to protect against danger and flight risk during that process. *Zadvydas*, 533 U.S. at 690–91. Immigration detention violates due process unless it is reasonably related to these legitimate purposes. Thus, detention must be accompanied by adequate procedural safeguards to ensure that these purposes are served. *See id.* at 690–92; *Hernandez*, 872 F.3d at 990.

The Supreme Court's modern jurisprudence demonstrates the minimum requirements of due process in the civil detention context: a fair hearing before an impartial decisionmaker in which the government bears the burden of proof. *See, e.g.*, *Salerno*, 481 U.S. at 750 (upholding pretrial detention where Congress provided "a full-blown adversary hearing" on dangerousness and where the

government bears the burden of proof by clear and convincing evidence);

*Hendricks*, 521 U.S. at 357–58 (upholding civil commitment when there are

"proper procedures and evidentiary standards," including an individualized hearing

on dangerousness); *Schall v. Martin*, 467 U.S. 253, 277, 279–81 (1984) (upholding

pretrial detention pending juvenile delinquency hearing where government proves

dangerousness in a fair adversarial bond hearing with notice and counsel). Indeed,

the Supreme Court has consistently rejected forms of civil detention that place the

burden of proof on the individual whose liberty is at stake or apply a lesser burden

of proof on the government. *See Foucha*, 504 U.S. at 83 (finding unconstitutional a

statute requiring civilly committed individuals to bear the burden of proving that

they are not a danger to the community and entitled to release); *Addington*, 441

U.S. at 431 (concluding that "the preponderance standard [in civil commitment of

proceedings] falls short of meeting the demands of due process").

The principle that due process requires a hearing before an impartial

adjudicator is not provocative. The Supreme Court has required individualized

hearings by independent adjudicators even for far lesser interests than physical

liberty, including for property deprivations. For example, in *Goldberg v. Kelly*, the

Court held that the failure to provide an in-person hearing prior to termination of

welfare benefits was "fatal to the constitutional adequacy of the procedures." 397

U.S. 254, 268 (1970). Similarly, in *Califano v. Yamasaki*, the Court held that an in-

person hearing was required before the government could recover of excess Social Security payments. 442 U.S. 682, 696–97 (1979). These cases did not involve "[f]reedom . . . from government custody [or] detention, . . . [which] lie[] at the heart of the liberty" the Due Process Clause protects, and yet the rights and benefits at issue still required protection similar to those facing the loss of personal liberty. *Zadvydas*, 533 U.S. at 690; *see also id.* at 692 (noting that "[t]he Constitution demands greater procedural protection even for property" than the government provided in *Zadvydas*).

In sum, the Due Process Clause protects Plaintiffs against unlawful physical confinement. By definition, Plaintiffs have been found to have a substantive claim for protection, and thus have been transferred out of the expedited removal process and into full removal proceedings before the immigration court. In those proceedings, Plaintiffs have the right to seek administrative and judicial review of any decision denying an application for protection, a process that generally takes at least a year, and often much longer. Defendants do not have a valid interest in detaining noncitizens who do not present a danger to the community or risk of flight—the only two legitimate purposes of immigration detention—during this lengthy process. As this Court has explained,

> We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the

government's arbitrary deprivation of liberty would have thought so. Arbitrary civil detention is not a feature of our American government.

*Marin*, 909 F.3d at 256. Requiring a fair hearing and an impartial decisionmaker ensures that the government has the requisite interest in continuing the Class members' detention.

### B. *Thuraissigiam* does not undermine such safeguards, as it addressed only a claim of admission, not release from detention.

The district court correctly concluded that *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), did not "foreclose Plaintiffs' due process claims . . . seek[ing] to vindicate a right to a bond hearing with certain procedural protections" because its "discussion of due process is necessarily constrained to challenges to admissibility to the United States." 1-ER-12–13. Defendants' argument to the contrary stretches *Thuraissigiam* beyond its context and rests on speculation as to what "[would] only [be] fair to expect" the Supreme Court to have said in the context at issue here: civil immigration detention. Op. Br. 40.

In *Thuraissigiam*, the petitioner—who was apprehended immediately after physically entering the United States—filed a habeas petition to challenge alleged flaws in his credible fear proceeding, seeking as a remedy a "new opportunity to apply for asylum." 591 U.S. at 115. Unlike this case, the habeas petitioner in *Thuraissigiam* did not challenge "unlawful executive detention," *id.* at 127 (citation omitted), but rather sought "the opportunity to remain lawfully in the

29

United States," *id.* at 119; *see also id.* at 107 (describing Mr. Thuraissigiam's goal as being "to obtain additional administrative review of his asylum claim and ultimately to obtain authorization to stay in this country"). For that reason, the Court held that neither the Suspension Clause nor the Due Process Clause afforded the petitioner a right to judicial review. In reaching its conclusion as to due process, the Court held that a noncitizen "in respondent's position"—in other words, a noncitizen who is apprehended shortly after having entered unlawfully— "has only those rights *regarding admission* that Congress has provided by statute." *Id.* at 140 (emphasis added).

The Court's focus on due process rights "regarding admission" or application to reside in the United States is critical here. *Thuraissigiam* relied heavily on the government's "plenary authority to decide which [noncitizens] to *admit*." 591 U.S. at 139 (emphasis added). This "plenary" power addresses Congress's authority to determine who may be permitted to lawfully enter the United States. *See, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1982) (addressing Congress's power "to forbid the entrance of foreigners" or regulate their admission); *Kleindienst v. Mandel*, 408 U.S. 753, 765–66 (1972) (similar).

But whatever the extent of Congress's power to admit or exclude, it does not follow that Congress may detain noncitizens free of the Due Process Clause's constraints. Notably, in *Zadvydas*, the Supreme Court rejected the same argument

30

the government raises here. There, the government asserted that Congress's "plenary power" required "the Judicial Branch [to] defer to Executive and Legislative Branch decisionmaking in [immigration law]," including as to the detention at issue in that case. 533 U.S. at 695. The Court disagreed, stating that the plenary power "is subject to important constitutional limitations." *Id.*[5] The Court then explained that Congress's plenary power does not apply where a noncitizen challenges "an indefinite term of imprisonment within the United States." *Id.* It further emphasized that the relief it was ordering—release from detention under conditions of supervision—did not confer any right to remain in the United States, but merely the right to be free of unlawful imprisonment. *Id.* So too here, as Plaintiffs similarly allege that Defendants have unlawfully detained them during the prolonged proceedings, not that they have been wrongfully denied admission or have a right to reside in the United States.

Recognizing that *Thuraissigiam* concerned the petitioner's request for entry into the country and rested on the political branches' authority over the admission of noncitizens, the district court rightly held that the opinion is limited "to

---

[5]     This Court has similarly explained that "the entry fiction is best seen . . . as a fairly narrow doctrine that primarily determines the procedures that the executive branch must follow before turning an immigrant away" because "[o]therwise, the doctrine would allow any number of abuses to be deemed constitutionally permissible merely by labelling certain 'persons' as non-persons." *Kwai Fun Wong v. United States*, 373 F.3d 952, 973 (9th Cir. 2004) (emphasis omitted), *abrogated on other grounds by Wilkie v. Robbins*, 551 U.S. 537 (2007).

determining only whether those *challenging the admission process* have due process rights." 1-ER-13 (emphasis added).[6] But, as noted, Plaintiffs do not seek admission or any other remedy that that would provide them "the opportunity to remain lawfully in the United States." 591 U.S. at 119. Instead, they seek only to challenge arbitrary detention while they undergo the admission process. Thus, they request a hearing to determine whether their detention remains justified pending lengthy removal proceedings. Accordingly, the district court rightly found *Thuraissigiam* inapposite.

Defendants assert that the district court "took an unduly restrictive view of *Thuraissigiam*" because at times *Thuraissigiam* speaks more broadly about the "limited rights afforded to noncitizens at the threshold of entry, without qualifying those statements by any strict reference to admission." Op. Br. 34. But as explained above, the claims at issue in that case addressed Mr. Thuraissigiam's rights with respect to admission. *See supra* pp. 29–32.

---

[6]     Nor do the post-*Thuraissigiam* Ninth Circuit cases Defendants rely on widen that scope, *see* Op. Br. 40, as they both concerned the manner in which credible fear proceedings were conducted. *See Guerrier v. Garland*, 18 F.4th 304, 310–11 (9th Cir. 2021) (alleging a deprivation of his right to counsel); *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1155 (9th Cir. 2022) (involving a challenge to "the credible fear determination made in Mendoza-Linares's case, and the standards that were employed by the asylum officer and the IJ in applying section 235(b)(1) to him"). Neither case dealt with a challenge to detention during those proceedings.

Consistent with that reading, the constitutional precedents the Supreme Court analyzed concerned the rights of noncitizens challenging the government's admission decisions or the procedures governing their admission. *See* 591 U.S. at 138–39. For example, the Court quoted *Nishimura Ekiu* for the proposition that for those who have not "even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law," 591 U.S. at 138 (quoting 142 U.S. at 660). *Nishimura Ekiu* so held in the context of addressing whether such noncitizens "shall be permitted to enter" the country. 142 U.S. at 660. *Knauff v. Shaughnessy*, which announced that Congress's "procedure" was "due process as far as a[] [noncitizen] denied entry is concerned," so declared when addressing the Attorney General's decision regarding whether the noncitizen should "be denied the privilege of entry into the United States." 338 U.S. 537, 544 (1950); *id.* at 539–40 (challenging whether the Attorney General could "exclude her without a hearing for security reasons"). Finally, *Landon v. Plasencia*, which stated "that a[] [noncitizen] seeking initial admission to the United States . . . has no constitutional rights regarding his application," made that statement in analyzing the claims of a noncitizen challenging the manner in which the government determined whether to admit her back into the country. 459 U.S. 21, 28, 32 (1982).

33

The only constitutional case *Thuraissigiam* relied on that was *not* purely focused on admission is *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953). There, the Court upheld the summary exclusion and detention of a noncitizen denied entry. But *Mezei* must be read in light of its peculiar circumstances: an exclusion resting on national security "during periods of international tension and strife." 345 U.S. at 207, 210. Mr. Mezei had a final order of exclusion as a threat to national security, and remained detained only because no country would accept him. *Id.* at 209. As the Court explained, "to admit a[] [noncitizen] barred from entry on security grounds nullifies the very purpose" of the exclusion order because it could unleash the very threat that the order sought to avoid. *Id.* at 216. That rationale does not apply here. Moreover, Plaintiffs have all been screened and found to have bona fide claims for protection, and thus transferred to full removal proceedings. They stand in a fundamentally different position from Mr. Mezei, who had lost any basis for seeking admission and been conclusively "denied entry." *Id.* at 212 (citation omitted).[7] Notably, the *Mezei* court explained that even as to the admission process, noncitizens "who have once passed through our gates, even illegally," are entitled to "proceedings conforming

---

[7]     *Thuraissigiam*'s due process analysis also cited *Zadvydas*, but only to contrast Mr. Thuraissigiam from noncitizens who are deemed to "have 'effected an entry.'" 591 U.S. at 140 ("[A] [noncitizen] who is detained shortly after unlawful entry cannot be said to have 'effected an entry.'" (quoting *Zadvydas*, 533 U.S. at 693)).

34

to traditional standards of fairness encompassed in due process of law." *Id.* As explained above, *Zadvydas* and other cases require much more where detention, not admission, is involved.

Thus, as the district court recognized, *Thuraissigiam* grounded its analysis on Congress's power concerning admission and entry into the United States. Its "broad pronouncements," Op. Br. 35, came from that context. *See, e.g.*, 591 U.S. at 107 ("[T]he Court long ago held that Congress is entitled to set the conditions for a[] [noncitizen's] *lawful entry* into this country and that, as a result, a[] [noncitizen] at the threshold of initial entry cannot claim any greater rights under the Due Process Clause." (emphasis added)). There was therefore no need for "disclaimers" as to its scope, Op. Br. 35–36, as the opinion focused on the fact that the petitioner's claim challenged the procedures he was afforded to seek lawful status. *See, e.g.*, 591 U.S. at 119 ("[R]espondent does not want 'simple release' but, ultimately, the opportunity to remain lawfully in the United States."); *id.* at 117 (rejecting notion that "the writ of habeas corpus was understood at the time of the adoption of the Constitution to permit a petitioner to claim the right to enter or remain in a country or to obtain administrative review potentially leading to that result"); *id.* at 135 & n.26 (explaining that the fact of "Congress['s] plenary power to set requirements for admission" was "unhelpful" to Mr. Thuraissigiam's claims); *id.* at 137 (noting caselaw did not support Mr. Thuraissigiam's efforts to

"us[e] habeas as a means of gaining entry" into the country).[8] Defendants'

assertion that *Thuraissigiam* makes clear that Plaintiffs "are entitled to no more

process than what statute provides," Op. Br. 31, is thus "untethered to the claim in

*Thuraissigiam* and the Court's reasoning," 1-ER-12.

Finally, Defendants make much of the Supreme Court's note that the

petitioner in *Thuraissigiam* did not "dispute" his detention during the pendency of

his expedited removal proceedings. Op. Br. 39 (quoting 591 U.S. at 118). But that

brief reference only reinforces that the legality of Mr. Thuraissigiam's detention

was *not* at issue in that case. 591 U.S. at 118–19. Moreover, Plaintiffs are not

similarly situated to Mr. Thuraissigiam since they, unlike him, have all passed a

credible fear interview and been transferred out of the expedited removal process.

## C. Defendants' reliance on *Demore* is misplaced.

Defendants rely on the Supreme Court's decision in *Demore v. Kim*, 538

U.S. 510 (2003), for the broad statement that "executive immigration detention

authority is limited to a deferential review of whether the statute continues to

---

[8] For that reason, Defendants' attempts to broaden *Thuraissigiam's* scope beyond admission by distinguishing asylum from admission, Dkt. Op. Br. 35 n.9, are unavailing. Throughout its decision, the Supreme Court reiterated the link between applying for asylum and entering the United States lawfully, relying on the plenary power doctrine to do so. *See* 591 U.S. at 163–64 (Sotomayor, J., dissenting) ("[T]he Court seems to argue that respondent seeks only a peculiar form of release: admission into the United States or additional asylum procedures that would allow for admission into the United States.").

'serve its purported immigration purpose,'" Op. Br. 31 (quoting *Demore*, 538 U.S. at 527). However, Defendants overstate the scope of its holding.

First, *Demore* upheld a facial challenge to a statute that mandated the detention of certain noncitizens who were deportable for having committed an enumerated list of crimes, based on Congress's determination that they posed a categorical bail risk. *See* 8 U.S.C. § 1226(c). The Court emphasized that this "narrow detention policy" was reasonably related to the government's purpose of effectuating removal and protecting public safety. 538 U.S. at 526–28. As Defendants acknowledge, Op. Br. 32, the governmental interests at issue in *Demore* do not apply to this case, which concerns a challenge on behalf of a distinct class of noncitizens who have *not* been detained based on their criminal history. Indeed, Plaintiffs must first establish to an immigration officer that they have a bona fide claim to protection in the United States, at which point they are transferred to face lengthy proceedings in immigration court. *Cf. Zadvydas*, 533 U.S. at 691 (concluding indefinite detention raised due process concerns because the detention statute did "not apply narrowly to 'a small segment of particularly dangerous individuals,' . . . but broadly to [noncitizens] ordered removed for many and various reasons, including tourist visa violations" (quoting *Hendricks*, 521 U.S. at 368)).

37

Second, *Demore* relied heavily on the voluminous record before Congress, which showed that the population of "criminal aliens" targeted by the mandatory detention statute posed a heightened categorical risk of flight and danger to the community. *See* 538 U.S. at 518–21 (citing studies and congressional findings regarding the "wholesale failure by the INS to deal with increasing rates of criminal activity by [noncitizens]"). In contrast, Congress made no comparable findings regarding the population at issue here—that is, individuals who have all been screened by DHS and found to have a credible fear of persecution or torture. Indeed, for the first fifteen years, Defendants read the statute as authorizing bond hearings for asylum seekers who were apprehended after entering the country without inspection. *See Matter of X-K-*, 23 I. & N. Dec. 731 (affirming IJ jurisdiction to provide bond hearings). And even though Defendants now interpret the statute to bar bond hearings for Plaintiffs, they continue to recognize that Congress permits their release from custody via parole. *See* 8 U.S.C. § 1182(d)(5); Op. Br. 48–50.

Defendants claim the legislative record accompanying § 1225(b) establishes Congress was concerned with the flight risk of recent entrants. They then reason that this case is similar to the record justifying the elimination of bond hearings in *Demore*. But Defendants cite only a *single* statement in the legislative record. Op. Br. 46. And that lone reference concerning § 1225(b) does not even pertain to the

Bond Hearing Class—it refers only to arriving asylum seekers who have declared an intent to seek asylum, without more. *See* H.R. Rep. No. 104-469, pt. 1, at 117 (1995) (referring to concerns with detention bed space for "[t]housands of smuggled [noncitizens who] arrive in the United States each year with no valid entry documents and declare asylum immediately upon arrival"). It does not address the limited class of noncitizens at issue here, all of whom have been screened by DHS officials and found to have bona fide claims for protection and are thus transferred *out* of the expedited removal process. This single, inapposite reference to noncitizens who "declare asylum" does not in any way compare to the voluminous record in *Demore*, which relied on multiple studies and congressional findings addressing the targeted group—those with specified criminal records. *See* 538 U.S. at 518-21.[9]

---

[9]    Moreover, Defendants ignore sweeping systemic changes that render Congress's identified concerns obsolete. Prior to 1996, DHS routinely released individuals to clear bed space, raising concerns that individuals were released irrespective of danger or flight risk. *See id.* (noting "lack of detention space"). However, DHS since has expanded its detention capacity, enabling the agency to hold anyone who presents a genuine risk of danger or flight. *See* ICE, Detention Statistics, https://www.ice.gov/detention-management (last visited Oct. 18, 2024) (reporting an average of 37,697 adults in ICE custody on any given night) (data accessed in Excel file on ICE's website under the file's Detention FY24 tab). In addition, DHS has developed effective alternatives to detention. *Hernandez*, 872 F.3d at 991 (discussing supervision program that "resulted in a 99% attendance rate at all EOIR hearings and a 95% attendance rate at final hearings").

Third, *Demore* emphasized what the Court understood to be the brief period of time that mandatory detention typically lasts. *See* 538 U.S. at 529–30 (noting mandatory detention lasts about 45 days in 85% of cases and about 5 months for those 15% of cases where individuals seek appeal to BIA). In contrast, Plaintiffs face far longer periods of detention. They have already been subjected to a period of detention while waiting to be screened through the CFI process.[10] Now, after having been found to present bona fide claims for protection, Plaintiffs face an additional—and much lengthier—period of detention, as their protection claims must be heard in full removal proceedings, which may include administrative and judicial appeals. They can therefore expect to additionally spend a median time of nearly six months for their protection claims to be adjudicated before the IJ, nearly a year in cases involving an appeal to the BIA, and a year or more for judicial review. *See* Op. Br. 17; 1-ER-15; 2-ER-36 ¶ 59; *see also, e.g.*, Admin. Off. of U.S. Courts, U.S. Court of Appeals - Judicial Caseload Profile (Dec. 31, 2023), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_appprofile1231.2 023.pdf (reflecting that the Ninth Circuit averaged over 13.5 months to resolve appeals during 2023).

---

[10]     The Credible Fear Class challenged the delays in the initial CFI process precisely because those delays result in additional periods of prolonged detention. 2-ER-50–51 ¶¶ 155–65. The district court approved a settlement on behalf of the Credible Fear Class limiting that process to approximately two months. *See* SER-11–12; SER-4–7.

Defendants fault the district court for comparing the length of detention at issue in *Demore*—which was approximately 47 days—to the far longer duration of detention that Bond Hearing Class members experience. 1-ER-15. Defendants maintain that the proper comparison is between 47 days and 7 days, because Plaintiffs' complaint alleged that due process requires bond hearings be held within seven days of a request. *See* Op. Br. 47.

But Defendants are challenging a decision the district court never made. In denying Defendants' motion to dismiss, the district court did not decide *when* a bond hearing should occur—only that Plaintiffs "have sufficiently alleged that they are entitled to a bond hearing in an expedited fashion." Op. Br. 16. The district court was explicit: "it is not required to determine at this stage the specific time frame that applies or is required." 1-ER-17.

In any event, this argument is misleading. Defendants' primary argument is that Plaintiffs are *never* entitled to a bond hearing, no matter the length of detention. And significantly, Defendants do not now contest, nor have they ever contested Plaintiffs' allegations that detention under § 1225(b) lasts far longer than the period under consideration in *Demore*. As the district court explained, "[f]urther development of the factual record is necessary to make any affirmative determination as to the precise timeframe or other parameters [for bond hearings]. At this point, the Court merely finds the claims sufficiently alleged." *Id.* This Court

41

should similarly allow the district court to decide the form and timing of bond hearings after factual development below.

Defendants similarly suggest that *Zadvydas* "upheld [a] detention scheme[] where detention . . . was expected to last far longer than the seven days at issue in this case." Op. Br. 20. But Defendants disregard that *Zadvydas* addressed a much stronger remedy than the bond hearings Plaintiffs seek here: the outright release of individuals whose removal is not reasonably foreseeable. *See* 533 U.S. at 699–701.[11]

Moreover, in *Zadvydas*, the interests of the noncitizens and the government were entirely different than here. *Zadvydas* addressed the detention of an individual who was already ordered removed and simply awaiting the execution of that order of removal. Here, every member of the Bond Hearing Class has been screened and found to present a bona fide claim for protection and all are currently in full removal proceedings to determine whether they can remain in the United States. In addition, in *Zadvydas,* the government's interest was in ensuring the removal of those with no claim to remain in the United States; here, the

---

[11]    The relevant detention authority was also different. The post-order detention statute in *Zadvydas*, 8 U.S.C. § 1231(a), required detention for three months for noncitizens and provides for discretionary detention thereafter while DHS attempts to execute the removal order. *See* 533 U.S. at 722.

government's interest is in ensuring those who are litigating their claims to remain are present for those proceedings.

**D.    Neither parole nor habeas is a constitutional alternative to a bond hearing.**

Defendants assert that the parole process is sufficient to safeguard Plaintiffs' liberty interests, *see* Op. Br. 48–52, but that process is inadequate on its face. The parole process consists merely of a limited determination by low-level DHS officers. *See* 8 C.F.R. § 212.5. The process includes no adversarial hearing conducted in-person, no neutral decisionmaker, no opportunity to call witnesses, no right to review the government's evidence, and no administrative appeal. *See id.* Instead, DHS officers make parole decisions—that can result in months or years of incarceration—by checking a box on a form that contains no factual findings, no specific explanation, and no evidence of deliberation. *See, e.g.*, *Abdi v. Duke*, 280 F. Supp. 3d 373, 404–05 (W.D.N.Y. 2017), *vacated in part on other grounds*, 405 F. Supp. 3d 467 (W.D.N.Y. 2019); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 341 (D.D.C. 2018).

As *Zadvydas* recognized, "the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." 533 U.S. at 692 (internal quotation marks omitted). Indeed, the Supreme Court has repeatedly held that the "government enforcement agent"— here, the jailer—cannot itself be responsible for custody reviews. *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 450 (1971); *see also, e.g.*, *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972) ("Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement."). In fact, in all the civil detention schemes the Court has upheld, the individual adjudicating the validity of confinement was a judge or a person with comparable structural independence vis-à-vis the jailing authority. *See, e.g.*, *Hendricks*, 521 U.S. at 352–53; *Schall*, 467 U.S. at 264, 270. Law enforcement officers cannot serve as "neutral and detached" arbiters in such custody reviews because they are "engaged in the often competitive enterprise of ferreting out crime." *Gerstein v. Pugh*, 420 U.S. 103, 112–13 (1975) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)); *see also St. John v. McElroy*, 917 F. Supp. 243, 251 (S.D.N.Y. 1996) (due process is not satisfied by parole reviews, but requires an "impartial adjudicator" to review detention since, "[d]ue to political and community pressure, the INS . . . has every incentive to continue to detain").

Defendants now point to information that they have, in fact, released many people pursuant to the parole process. Op. Br. 50. However, Defendants produced none of this data to the district court. Nor could they have, as "[g]enerally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). Defendants' attempt to rely on that data now is

even less appropriate at this stage, since they chose to seek interlocutory appeal on their motion to dismiss, rather than proceeding to discovery and developing the record with respect to the parole system. If Defendants believe the current functioning of the parole system cures the facial problems Plaintiffs and the district court identified, the proper course is to address this issue in discovery and allow the district court to weigh this evidence. What is *not* proper is to raise such factual matters for the first time on an interlocutory appeal of a motion to dismiss.

Moreover, if Plaintiffs were given the opportunity, they would present contrary evidence showing that the parole system leads to inconsistent, unreasoned, and arbitrary results. For example, in *Damus v. Nielsen*, government statistics showed that from February to September 2017, three of the defendant ICE Field Offices denied 100% of parole applications, and the two other defendant Field Offices denied 92% and 98% of applications. 313 F. Supp. 3d at 339. Those high denial rate occurred despite the fact that (1) only a few years before, those same Field Offices granted more than 90% of parole applications, and (2) there was no change in the types of individuals seeking asylum in the United States. *Id.* at 339–40. *Damus* also cited evidence of ICE officers informing attorneys that "there is no more parole" and that the agency is "not granting parole." *Id.* at 340 (internal quotation marks and citations omitted). Indeed, the government's own submissions revealed that ICE was providing sham parole reviews. *See, e.g.*, *id.* at

45

341 (citing examples of (1) an asylum seeker denied parole due solely to her status as a "recent entrant," even though all asylum seekers who pass a credible fear screening are recent entrants; (2) asylum seekers denied parole interviews; and (3) asylum seekers who received "boilerplate" parole denials only one day after receiving notice of the right to apply); *see also Abdi*, 280 F. Supp. 3d at 404–05 (asylum seekers were "never provided with any paperwork explaining how to seek parole" and were "denied multiple requests for parole via perfunctory form denials"); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 145–49 (D.D.C. 2018) (citing arbitrary parole denials); Human Rights First, Judge and Jailer: Asylum Seekers Denied Parole in Wake of Trump Executive Order 1–2, 6–15 (Sept. 2017), https://humanrightsfirst.org/wp-content/uploads/2022/10/hrf-judge-and-jailer-final-report.pdf (same).

Finally, the mere availability of habeas review does not satisfy the Due Process Clause, as Defendants suggest. Op. Br. 52. The Supreme Court has never excused the government from complying with the Due Process Clause on the basis that detainees can file habeas petitions. To the contrary, numerous cases recognize that the government has an obligation to provide due process regardless of whether a detainee files a habeas petition. *See, e.g.*, *Sopo v. Att'y Gen.*, 825 F.3d 1199, 1217 n.8 (11th Cir. 2016); *see also Reid v. Donalan*, 819 F.3d 486, 498 (1st Cir. 2016) ("[F]ederal habeas litigation itself is both complicated and time-consuming,

46

especially for [noncitizens] who may not be represented by counsel."); *Lora v. Shanahan*, 804 F.3d 601, 615 (2d Cir. 2015) (explaining why reliance on individual habeas petitions does not adequately protect detained noncitizens).[12]

Further, in other civil detention contexts, the Supreme Court has made clear that the government is constrained by the Due Process Clause separate and apart from habeas corpus. *See, e.g.*, *Hamdi*, 542 U.S. at 525 (setting forth distinct due process hearing requirements even though "[a]ll agree suspension of the writ has not occurred here"). Defendants' duty to provide due process is particularly critical here, because as a practical matter individual habeas petitions do not provide meaningful relief for Plaintiffs. The overwhelmingly majority of detained asylum seekers are pro se, do not speak English, and are unfamiliar with the legal system. In such a system, "th[e] protection [of habeas corpus] is illusory[, as] . . . a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place." *Doe v. Gallinot*, 657 F.2d 1017, 1023 (9th Cir. 1981).

## CONCLUSION

For all the foregoing reasons, the Court should affirm the district court's denial of Defendants' motion to dismiss.

---

[12]   *Sopo*, *Reid*, and *Lora* were all overruled on other grounds by the Supreme Court's decision in *Rodriguez*.

Respectfully submitted this 18th day of October, 2024.

s/ Matt Adams
Matt Adams, WSBA No. 28287

s/ Leila Kang
Leila Kang, WSBA No. 48048

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No.
46987

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org
leila@nwirp.org
aaron@nwirp.org
glenda@nwirp.org

s/ Emma Winger
Emma Winger

AMERICAN IMMIGRATION
COUNCIL
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
(202) 507-7512
ewinger@immcouncil.org

s/ Trina Realmuto
Trina Realmuto

s/ Kristin Macleod-Ball
Kristin Macleod-Ball

NATIONAL IMMIGRATION
LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447
trina@immigrationlitigation.org
kristin@immigrationlitigation.org

s/ Anand Balakrishnan
Anand Balakrishnan

s/ Judy Rabinovitz
Judy Rabinovitz

ACLU IMMIGRANTS'
RIGHTS PROJECT
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2618
abalakrishnan@aclu.org
jrabinovitz@aclu.org

s/ Stephen B. Kang
Stephen B. Kang

ACLU IMMIGRANTS'
RIGHTS PROJECT
425 California Street, 7th floor
San Francisco, NY 94104
(415) 343-0783
skang@aclu.org

*Attorneys for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiffs-Appellees state that they know of no related cases pending in this Court.

Dated:     October 18, 2024

*s/ Aaron Korthuis*
Aaron Korthuis
Northwest Immigrant Rights Project
615 Second Ave Ste 400
Seattle, WA 98104
206-816-3872
aaron@nwirp.org

*Attorney for Plaintiffs-Appellees*

49

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that:

This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because this brief contains 11,257 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word's Times New Roman 14-point font.

Dated:          October 18, 2024

*s/ Aaron Korthuis*
Aaron Korthuis
Northwest Immigrant Rights Project
615 Second Ave Ste 400
Seattle, WA 98104
206-816-3872
aaron@nwirp.org

*Attorney for Plaintiffs-Appellees*