No. 24-2801

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

YOLANY PADILLA, et al.,
*Plaintiffs-Appellees*,

v.

IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of Washington
No. 2:18-cv-00928
Honorable Marsha J. Pechman

---

**PLAINTIFFS-APPELLEES' SUPPLEMENTAL  EXCERPTS
OF RECORD
VOLUME 1 OF 1**

---

Matt Adams
Leila Kang
Glenda M. Aldana Madrid
Aaron Korthuis
NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org
leila@nwirp.org
glenda@nwirp.org
aaron@nwirp.org

Trina A. Realmuto
Kristin Macleod-Ball
NATIONAL IMMIGRATION
LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447
trina@immigrationlitigation.org
kristin@immigrationlitigation.org

Anand Balakrishnan
ACLU FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2618
abalakrishnan@aclu.org

Stephen B. Kang
ACLU FOUNDATION
IMMIGRANTS' RIGHTS
PROJECT
425 California Street, 7th Floor
San Francisco, CA 04104
(415) 343-0783
skang@aclu.org

Emma Winger
AMERICAN IMMIGRATION
COUNCIL
1331 G Street NW, Suite 200
Washington, DC 20005
(202) 507-7512
ewinger@immcouncil.org

*Attorneys for Plaintiffs-Appellees*

# INDEX

**VOLUME 1 of 1** ............................................................................**S.E.R. 4**

01/05/2024  Order Granting Final Approval of Proposed Class Settlement
Docket No. 225 ............................................................ S.E.R. 4

10/18/2023  Settlement Agreement
Docket No. 215-2 ........................................................ S.E.R. 8

07/29/2022  Order Vacating Preliminary Injunction
Docket No. 183 .......................................................... S.E.R. 17

08/29/2019  Joint Stipulation and Order Clarifying Scope of Class
Docket No. 158 .......................................................... S.E.R. 19

05/28/2019  Plaintiffs' Motion for Modification of the Existing Preliminary
Injunction
Docket No. 131 .......................................................... S.E.R. 24

05/20/2019  Third Amended Complaint: Class Action for Injunctive and
Declaratory Relief
Docket No. 130 .......................................................... S.E.R. 50

12/11/2018  Order on Motion to Dismiss
Docket No. 91 ............................................................ S.E.R. 79

Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| YOLANY PADILLA, *et al.*,<br><br>               Plaintiffs-Petitioners,<br><br>     v.<br><br>U.S. IMMIGRATION AND CUSTOMS<br>ENFORCEMENT, *et al.*,<br><br>               Defendants-Respondents. | Case No. 2:18-cv-00928-MJP<br><br>[PROPOSED] ORDER GRANTING<br>STIPULATED MOTION TO DISMISS<br>COUNT IV AND GRANTING FINAL<br>APPROVAL OF PROPOSED CLASS<br>SETTLEMENT |

The Parties have filed a Stipulated Motion to Dismiss Count IV of the Complaint and Grant Final Approval of the class action settlement with respect to the Credible Fear Class. The Court has carefully considered the Class Settlement Agreement together with all exhibits thereto, all the filings related to the settlement, the arguments of counsel, and the record in this case. The Court also held a fairness hearing on January 5, 2024, following notice to the class as approved by the Court's previous order granting preliminary approval of the Agreement. The Court finds that the Agreement is sufficiently fair, reasonable, and adequate.

**IT IS HEREBY ORDERED THAT**:

    1. Count IV is dismissed with prejudice. The Parties shall bear their own attorney's fees and costs, except as provided by the Agreement.

2. The Court grants final approval of the Agreement, finding that the terms of the Agreement are fair, reasonable, and adequate as required by Fed. Rule Civ. Proc. 23(e)(2).

3. The Court previously certified the class as "All detained asylum seekers in the United States subject to expedited removal proceedings under 8 U.S.C. § 1225(b) who are not provided a credible fear determination within ten days of the later of (1) requesting asylum or expressing a fear of persecution to a DHS official or (2) the conclusion of any criminal proceeding related to the circumstances of their entry, absent a request by the asylum seeker for a delayed credible fear interview." This is also the class for purposes of settling the claims with respect to the Credible Fear Class.

4. As specified in the Agreement, and notwithstanding the dismissal of Count IV, the Court shall retain jurisdiction over all disputes between and among the Parties arising out of the Agreement, including but not limited to interpretation and enforcement of the terms of the Agreement, except as otherwise provided in the Agreement.

5. Neither the settlement, nor any exhibit, document, or instrument delivered thereunder shall be construed as or deemed to be evidence of an admission or concession by Defendants or an interpretation of any liability or wrongdoing by Defendants, or of the truth of any allegations asserted by Plaintiffs, Class Members, or any other person.

6. The Court orders Defendants to pay attorney's fees and costs in the amount of $100,000. The Court finds that this amount is reasonable.

7. The Parties' Stipulated Motion to Dismiss Count IV and for Final Approval of

Proposed Class Settlement is hereby GRANTED. The Court hereby approves the

proposed class-wide relief set forth in the Agreement.

**IT IS SO ORDERED.**

Dated this 5th day of January, 2024.

Honorable Marsha J. Pechman
United States Senior District Judge

Presented this 22nd day December, 2023.

s/ Matt Adams
Matt Adams, WSBA No. 28287

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA No. 46987

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611
matt@nwirp.org
aaron@nwirp.org
glenda@nwirp.org

s/ Trina Realmuto
Trina Realmuto*

s/ Kristin Macleod-Ball
Kristin Macleod-Ball*

NATIONAL IMMIGRATION LITIGATION
ALLIANCE
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447
trina@immigrationlitigation.org
kristin@immigrationlitigation.org

s/ Emma Winger
Emma Winger*

AMERICAN IMMIGRATION COUNCIL
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005
(202) 507-7512
ewinger@immcouncil.org

Attorneys for Plaintiffs and Class Members
*Admitted pro hac vice

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

EREZ REUVENI
Assistant Director, District Court Section

SARAH S. WILSON
Assistant Director, Appellate Section

/s/ Lauren C. Bingham
LAUREN C. BINGHAM, Fl. Bar #105745
Senior Litigation Counsel,
District Court Section
Office of Immigration Litigation
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 616-4458; (202) 305-7000 (fax)
lauren.c.bingham@usdoj.gov

JESI J. CARLSON
Senior Litigation Counsel, Appellate Section

DAVID KIM
Trial Attorney, Appellate Section

*Attorneys for Defendants-Respondents*

# Exhibit 1

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is by and between Named Plaintiffs Yolany Padilla, Ibis Guzman, Blanca Orantes, and Baltazar Vazquez ("Named Plaintiffs") and the Credible Fear Class (as defined below) (collectively, "Plaintiffs"), and Defendants (as defined below), with reference to the facts recited herein.

## I. Recitals

WHEREAS:

**A.** On August 22, 2018, Named Plaintiffs filed an amended class action complaint alleging, inter alia, that Defendants (1) unlawfully delayed the credible fear interviews of noncitizens subject to expedited removal proceedings under 8 U.S.C. § 1225(b)(1) and (2) failed to provide those noncitizens who enter the United States and who are determined to have a credible fear with timely bond hearings with protections the Due Process Clause requires;

**B.** On December 11, 2018, this Court granted in part and dismissed in part Defendants' motion to dismiss Plaintiffs' claims regarding delayed credible fear interviews;

**C.** On March 6, 2019, this Court granted Plaintiffs' motion for class certification, certifying the following classes:

1. **Credible Fear Class**

   All detained asylum seekers in the United States subject to expedited removal proceedings under 8 U.S.C. § 1225(b) who are not provided a credible fear determination within ten days of *the later of* (1) requesting asylum or expressing a fear of persecution to a DHS official *or* (2) the conclusion of any criminal proceeding related to the circumstances of their entry, absent a request by the asylum seeker for a delayed credible fear interview.

2. **Bond Hearing Class**

   All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing

**D.** This Court granted Plaintiffs' motions on behalf of the Bond Hearing Class for a preliminary injunction and motion to modify the preliminary injunction, and Defendants filed an appeal of both orders;

1

**E.** The Ninth Circuit initially affirmed in part and vacated in part the preliminary injunction; the Supreme Court granted Defendants' petition for certiorari, vacated the Ninth Circuit decision, and remanded in light of *Department of Homeland Security v. Thuraissigiam,* 140 S. Ct. 1959 (2020); and the Ninth Circuit subsequently ordered vacatur of the preliminary injunction and further consideration of this case in light of the Supreme Court's decisions in *Biden v. Texas*, 142 S. Ct. 2528 (2022), *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022), and *Thuraissigiam*;

**F.** On March 22, 2023, Plaintiffs filed a fourth amended complaint;

**G.** On March 6, 2023, Defendants filed a renewed motion to dismiss Plaintiffs' claims, including the claims as to delayed credible fear interviews;

**H.** Defendants' renewed motion to dismiss remains pending;

**I.** The Parties, having engaged in settlement discussion, recognize the need to conclude this litigation, which has been pending for more than five years, and desire to resolve portions of this matter by entering into this Agreement, thereby avoiding the uncertainty, time and expense of further litigation as to the settled claims;

**NOW THEREFORE**, in recognition that the Parties and the interests of justice are best served by concluding aspects of this litigation through settlement, subject to the Court's approval and entry of an order consistent with this Agreement, the undersigned Parties, through Class Counsel, hereby **STIPULATE** and **AGREE** as follows:

## II.  Purpose and Scope of the Settlement Agreement

The Parties acknowledge and agree that, if approved by this Court, this Agreement shall constitute a full, fair, and complete settlement of the Credible Fear Class's claims, and specifically, Count IV and the portions of Count V of the Fourth Amended Complaint that relate to CFI delays. Nothing in this agreement shall be construed as an agreement, resolution, waiver, or release of the Bond Hearing Class's claims.

## III. Definitions

**A.** The "Action" shall refer to the lawsuit *Padilla et. al. v. Immigration & Customs Enforcement et al.*, No. 2:18-cv-928 (W.D. Wash.).

**B.** "CFI" shall mean a credible fear interview administered under 8 U.S.C. § 1225(b)(1).

**C.** "Court" means the U.S. District Court for the Western District of Washington.

**D.** "Class Counsel" shall mean:

Matt Adams

2

Aaron Korthuis
Glenda Aldana Madrid
Leila Kang
Northwest Immigrant Rights Project
615 2nd Ave Ste 400
Seattle, WA 98104

Trina Realmuto
Kristin Macleod-Ball
National Immigration Litigation Alliance
10 Griggs Terrace
Brookline, MA 02446

Emma Winger
American Immigration Council
1331 G Street NW, Suite 200
Washington, DC 20005

**E.** "Defendants" shall mean Named Defendants in the Fourth Amended Complaint, who are charged with administering 8 U.S.C. § 1225(b)(1)'s expedited removal scheme and implementing its credible fear interview provisions.

**F.** "ICE book-in" shall mean when a noncitizen is admitted into a detention facility and documents the appropriate information for tracking the noncitizen through the detention cycle.

**G.** "Plaintiffs" shall mean only Named Plaintiffs on behalf of Credible Fear Class members for the purposes of this Agreement and shall not include Bond Hearing Class members.

**H.** "Processing complete" shall mean when the A-file or other processing paperwork has been completed and signed by the approving CBP supervisor with signing authority.

## IV. Terms of the Agreement

**A.** Timeline for Administering CFIs to Credible Fear Class Members

1. With limited exceptions, no individual detained credible fear case will take more than 60 days to complete from date of referral to U.S. Citizenship and Immigration Services (USCIS) for the CFI to date of credible fear decision service. If more than 60 days elapse, the individual will be issued a Notice to Appear (NTA) and placed into removal proceedings under 8 U.S.C. § 1229a.

2. "Limited exceptions" shall be defined as: (1) Any delay caused by the noncitizen or the noncitizen's attorney/accredited representative (e.g.,

3

request to reschedule, request for time to obtain documents, etc.); and
(2) Medical Quarantine.

3.  Defendants shall refer a Credible Fear Class Member for a CFI within 7
    business days – in the case of U.S. Customs and Border Protection
    (CBP), within 7 business days of "processing complete" for a Class
    Member whose credible fear interview, as well as any immigration
    judge review of a negative determination, will take place while the
    noncitizen is in CBP holding facilities; and in the case of U.S.
    Immigration and Customs Enforcement (ICE), within 7 business days of
    "book-in" of a Class Member, absent exigent circumstances – so long
    as: (1) a Class Member has asserted a fear of return to his or her country
    of origin, either orally or in writing, and (2) if applicable, upon the
    conclusion of any criminal proceeding related to the circumstances of a
    Class Member's entry.

4.  Nothing in this Agreement shall prevent Defendants from exercising
    their discretion to release a Credible Fear Class Member, issue an NTA
    to a Credible Fear Class Member, or administratively close the Credible
    Fear Class Member's case (e.g., where the Credible Fear Class Member
    seeks to dissolve their credible fear claim or withdraw their application
    for admission, taking them out of expedited removal proceedings and
    the credible fear process) prior to 60 days from the date of referral or
    prior to any referral for a CFI.

**B.** Duration of the Agreement: This agreement shall last for 4 years from the
Agreement's Effective Date.

## V.  Reporting Requirement

**A.** Every 90 days, Defendants shall report to Class Counsel: The number of
individual detained credible fear cases pending more than 60 days from date of
referral to USCIS.

**B.** The number of individual detained credible fear cases pending more than 60 days
from date of referral to USCIS that are not subject to the limited exceptions
defined in Section IV.A.2.

**C.** The number of individual detained credible fear cases pending more than 60 days
from date of referral to USCIS that are subject to the limited exceptions defined in
Section IV.A.2.

**D.** The total number of individual detained credible fear determinations made within
the 60-day period.

4

## VI. Dispute Resolution Mechanism

**A.** Should Plaintiffs believe in good faith that a pattern and practice of noncompliance with the Agreement has emerged with regard to the timeline set out above (Section IV.A.) for individual detained credible fear cases, Plaintiffs shall notify Defendants in writing. The Parties agree to meet and confer within 21 calendar days and engage in good faith efforts to resolve any compliance dispute without further intervention from the Court.

**B.** As an alternative to a meet and confer, or following an unsuccessful meet and confer as described in this Agreement, the parties may attempt to mediate the dispute before a mutually agreeable mediator, magistrate, or judge. Such mediation is not a condition precedent to enforce this Agreement or terminate the Agreement through a motion to the Court. If the Parties elect to pursue mediation and the dispute has not been resolved through mediation within forty-five (45) days, counsel may seek to enforce the Agreement or terminate the Agreement through a motion to the Court. The Parties agree that the mediation process shall be conducted confidentially and that no public disclosure shall be made relating to the dispute before or during the mediation process. All documents and information disclosed by either Party during the mediation process shall not be admissible in any judicial proceeding. All statements or conclusions of the mediator shall not be admissible in any subsequent judicial proceeding.

**C.** Should the parties fail to resolve the dispute, Plaintiffs may then apply to the Court for enforcement of the Agreement—which, as it relates to Section IV.A., may entail an order from the Court directing Defendants, in individual cases where the 60-day deadline for service of the credible fear decision has been exceeded, to comply with the relevant terms of the Agreement for those individuals. Resolution of any such dispute shall be governed by the standard principles of contract interpretation. The Parties agree to abide by any ruling on the meaning of this contract as determined by the Court, subject to appeal.

## VII. Modification of this Agreement

The Parties may mutually agree to modifications of this Agreement in writing. Such modification shall be subject to this Court's approval as required by Federal Rule of Civil Procedure 23.

## VIII. Effective Date

This Settlement Agreement will be effective on the date the Settlement Agreement receives final approval by the Court.

### A. Court Approval and Retention of Jurisdiction

The Parties stipulate that, as a condition of this Agreement, the United States District Court for the Western District of Washington shall retain jurisdiction over all disputes arising out of this

5

Agreement, notably with respect to Section IV.A. and the deadlines it sets out for individual detained credible fear cases.

Subject to the terms of this Agreement, and upon the Court's approval of this Agreement pursuant to the requirements of Rule 23(e) of the Federal Rules of Civil Procedure (including, inter alia, notice to the Credible Fear Class and an opportunity for Credible Fear Class Members to submit objections), the Parties stipulate that the Court may enter an order dismissing Count IV and the portions of Count V of the Fourth Amended Complaint that relate to CFI delays with prejudice, provided that the Court expressly include in its dismissal order that it retains jurisdiction to resolve disputes brought by Plaintiffs on behalf of individual Class Members regarding this Agreement. If the Court does not approve this Agreement or the Court does not agree to retain jurisdiction, this Agreement shall be null and void, and nothing herein will be construed as an admission of liability or held against either party.

## IX. Attorneys' Fees

As set forth below, Defendants shall pay to Class counsel the sum of $100,000 to settle and resolve Plaintiffs' claims to all attorneys' fees and costs associated with the activities detailed in the attached time sheets (Ex. A), if such award is approved by the Court. Plaintiffs agree to waive any future claim to fees and costs on the time records that they have submitted related to this claim (Ex. A). Accordingly, even if Plaintiffs were to prevail or reach a settlement with respect to the Bond Hearing Class, they agree not to seek fees or costs for any time set out in the attached records (Ex. B) that may have overlapped with activities relating to any Bond Hearing Class claims.

    **A.** The parties agree to the "Attorneys' Fee Settlement Amount" of $100,000 to avoid further litigation on the Credible Fear Class claims and costs associated with litigating a fee-and-cost request on those claims, as well as to avoid the risks attendant on such proceedings. Plaintiffs shall file a motion for fees under Fed. R. Civ. P. 23(h).

    **B.** Defendants agree not to oppose a motion seeking a fee award of $100,000 or less.

    **C.** If for any reason the Court awards an amount in excess of $100,000, Plaintiffs and Class Counsel expressly disclaim any and all right to collect the amount that exceeds $100,000 from any person or entity, and agree, upon demand, to execute a release of any person's or entity's obligations to pay such sums. In the event the Court awards Class Counsel less than $100,000, this Settlement Agreement shall remain in full force and effect. Nothing in this Agreement waives or prevents Plaintiffs and Class Counsel from appealing an award of less than $100,000.

    **D.** Subject to the foregoing provisions, Defendants shall deliver the Attorneys' Fee Settlement Amount to Class Counsel by direct wire transfer into Class Counsel's designated account. Class Counsel shall within five days of the Effective Date provide to Defendants all information necessary to accomplish the direct wire transfer into that account, and then Defendants shall transfer the funds within 65 days of the Effective Date. Plaintiffs and Class Counsel acknowledge that

6

payment of the Attorneys' Fee Settlement Amount by Defendants, or any of Defendants, in accordance with the wire instructions shall resolve all of Defendants' liability for such amount.

**E.** Class Counsel shall be fully responsible for the allocation and payment of the Attorneys' Fee Settlement Amount among themselves.

**F.** Defendants' payment of the Attorneys' Fee Settlement Amount shall satisfy any claims by Plaintiffs' Counsel and/or Class Counsel for attorney fees and costs related to the activities detailed in the attached time sheets (Ex. B), including any fees and costs that may be incurred by Plaintiffs' Counsel and/or Class Counsel in the course of monitoring the implementation of this Agreement (except as set forth in Paragraph G). Plaintiffs, Plaintiffs' Counsel, and Class Counsel, and their heirs, executors, administrators, representatives, attorneys, predecessors, successors, assigns, agents, affiliates, and partners, and any persons they represent, by operation of any final judgment entered by the Court, fully, finally, and forever release, relinquish, and discharge the Defendants of and from any and all claims for attorney fees and costs related the activities detailed in the attached records (Ex. B), including any fees and costs that may be incurred in the course of monitoring the implementation of this Agreement (except as set forth in Paragraph G).

**G.** Plaintiffs represent that they have no existing debts to the United States and that they are not subject to an offset under Astrue v. Ratliff, 560 U.S. 586 (2010).

**H.** Plaintiffs represent that their claims for attorney's fees, litigation costs, and other expenses have been assigned to their counsel, and DHS accepts the assignment and waives any applicable provisions of the Anti-Assignment Act, 31 U.S.C. § 3727.

**I.** This Settlement Agreement does not waive Plaintiffs' or their attorneys' tax liability or any other liability owed to the United States government.

**J.** In the event that Class Counsel seek to enforce the terms of the Agreement pursuant to Section VI.C., nothing in this Agreement shall be interpreted as precluding Plaintiffs from seeking attorneys' fees and costs solely for such enforcement action.

## X.  Release of Claims

**A.** Upon final approval of this Agreement by the Court, Plaintiff Class Members on behalf of themselves, their heirs, executors, representatives, attorneys, successors, assigns, agents, affiliates, and partners, and any person they represent, waive and fully, finally, forever release Defendants from liability for all claims, demands, rights, liabilities and causes of action for declaratory or equitable relief, including injunctive relief, known or unknown, that relate to CFI delays.

7

**B.** Nothing in this section shall preclude Class Members from bringing a subsequent lawsuit to challenge Defendants' actions regarding the timing of CFIs following the expiration of this Agreement or in the event of a change in law or other legal development that alters the timeframes set forth in this Agreement.

**C.** By entering this Agreement, Plaintiffs do not waive or release any claims with respect to the Bond Hearing Class, and Defendants admit nothing with respect to the bond hearing claims.

**XI. Approval of Class Settlement**

**A.** Following the Parties' execution of this Agreement, the Parties shall file forthwith a joint motion seeking preliminary approval of the Settlement Agreement. The motion must request the court to:

1. Preliminarily approve the Settlement Agreement as being a fair, reasonable, and adequate settlement within the meaning of Federal Rule of Civil Procedure 23 and applicable law, and consistent with due process;

2. Approve the Notice Plan set forth in section XI.B. below; and

3. Set the date and time of the Fairness Hearing.

**B.** Notice: Notice to Class Members, attached hereto as Exhibit B shall be translated into Spanish. The Parties will propose to the Court that the notice shall be:

> Posting in all ICE Detention Facilities.
> Posting in main processing area of all CBP Holding Facilities.

Class Counsel will post the Notice on their organizational websites and will share the notice with national immigration listservs on which they participate.

**C.** Prior to the Fairness Hearing, the Parties will file a stipulated motion for final approval of the Agreement, requesting that the Court approve this Agreement and dismiss the CFI claims with prejudice and that notwithstanding such dismissal, the Court shall retain jurisdiction to resolve disputes regarding this Agreement for its duration as defined in Section IV.B. of this Agreement.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YOLANY PADILLA, IBIS GUZMAN, BLANCA  ORANTES, BALTAZAR VASQUEZ, | CASE NO. C18-928 MJP |
| Plaintiffs-Petitioners, | ORDER VACATING PRELIMINARY INJUNCTION AND DIRECTING FILING OF JOINT STATUS REPORT |
| v. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Defendants-Respondents. | |

The Court issues this Order in light of the Ninth Circuit's Order and Mandate. (Dkt. No. 182.) The Ninth Circuit's Order directs the Court "to vacate the preliminary injunction and for further consideration in light of the Supreme Court's decisions in <u>Biden v. Texas</u>, 142 S. Ct. 2528 (2022), <u>Garland v. Aleman Gonzalez</u>, 142 S. Ct. 2057 (2022), and <u>Department of Homeland Security v. Thuraissigiam</u>, 140 S. Ct. 1959 (2020)." The Court therefore VACATES the preliminary injunction. (Dkt. No. 110.)

The Court further ORDERS the Parties to meet and confer and file a Joint Status Report setting forth the Parties' respective positions as to what briefing they would like to file to address the authority cited by the Ninth Circuit's Order and the Parties' proposed trial date and case deadlines that the Court should set. The Court urges the Parties to reach agreement on any proposed briefing and case deadlines, as well as a trial date. The Joint Status Report must be filed by no later than August 19, 2022.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 29, 2022.

Marsha J. Pechman
United States Senior District Judge

*The Honorable Marsha J. Pechman*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| YOLANY PADILLA, IBIS GUZMAN, BLANCA ORANTES, BALTAZAR VASQUEZ,<br><br>　　　　　　　　　　　　Plaintiffs-Petitioners,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"); U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); U.S. CITIZENSHIP AND IMMIGRATION SERVICES ("USCIS"); EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ("EOIR"); MATTHEW ALBENCE, Acting Director of ICE; KEVIN MCALEENAN, Acting Secretary of DHS; MARK MORGAN, Acting Commissioner of CBP; KEN CUCCINELLI, Acting Director of USCIS; MARC J. MOORE, Seattle Field Office Director, ICE, WILLAIM BARR, United States Attorney General; LOWELL CLARK, warden of the Northwest Detention Center in Tacoma, Washington; CHARLES INGRAM, warden of the Federal Detention Center in SeaTac, Washington; DAVID SHINN, warden of the Federal Correctional Institute in Victorville, California; JAMES JANECKA, warden of the Adelanto Detention Facility;<br><br>　　　　　　　　　　　Defendants-Respondents. | No. 2:18-cv-928 MJP<br><br>**JOINT STIPULATION AND ORDER CLARIFYING SCOPE OF CLASS**<br><br>NOTE ON MOTION CALENDAR: AUGUST 28, 2019. |

Pursuant to Local Civil Rules 7(d)(1) and 10(g), Plaintiffs and Defendants hereby stipulate and jointly move the Court for an Order clarifying the scope of the class that is certified in this case. The Bond Hearing class is presently defined as:

> **Bond Hearing Class**: All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. § 1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within seven days of requesting a bond hearing.

The parties request that the Court clarify that the Bond Hearing Class includes individuals who were determined to have a credible fear of torture, not just individuals who were determined to have a credible fear of persecution and who otherwise meet the criteria for class membership. *See* ECF 102.

     The parties request this Order to clarify Defendants obligations pursuant to the preliminary injunction entered by this Court (as partially stayed by the Ninth Circuit).

RESPECTFULLY SUBMITTED this 28th day of August, 2019.

*s/ Matt Adams*
Matt Adams, WSBA No. 28287
Email:  matt@nwirp.org

Leila Kang, WSBA No. 48048
Email:  leila@nwirp.org

Aaron Korthuis, WSBA No. 53974
Email: aaron@nwirp.org

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025
*Attorneys for Plaintiffs-Petitioners*

Trina Realmuto*
Kristin Macleod-Ball*

AMERICAN IMMIGRATION COUNCIL
1318 Street, Suite 18
Brookline, MA 02446
(857) 305-3600
trealmuto@immcouncil.org
kmacleod-ball@immcouncil.org

Judy Rabinovitz*
Michael Tan*
Anand Balakrishnan*

ACLU IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2618

*Admitted *pro hac vice*

*Attorneys for Plaintiffs-Petitioners*

JOSEPH. H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

EREZ REUVENI
Assistant Director, District Court Section
Office of Immigration Litigation

SARAH S. WILSON
Assistant United States Attorney

*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM, Fl. Bar #105745
Senior Litigation Counsel,
District Court Section
Office of Immigration Litigation
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 616-4458; (202) 305-7000 (fax)
lauren.c.bingham@usdoj.gov

ARCHITH RAMKUMAR
Trial Attorney

*Attorneys for Defendants-Respondents*

**ORDER**

Based on the foregoing stipulation of the parties, IT IS SO ORDERED. The Court hereby CLARIFIES that the Bond Hearing Class includes individuals who otherwise satisfy the requirements for class membership but were determined to have a credible fear of torture, rather than only individuals determined to have a credible fear of persecution. Accordingly, the preliminary injunction in this case (as partially stayed by the Ninth Circuit), applies to these individuals.

DATED this _29th_ day of ___August___, 2019.

_Marsha J. Pechman_
Marsha J. Pechman
United States Senior District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2019, I had the foregoing electronically filed with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to those

attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served in

accordance with the Federal Rules of Civil Procedure.


*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel


Attorney for Defendants-Respondents

Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| YOLANY PADILLA, *et al.*, | Case No. 2:18-cv-00928-MJP |
| Plaintiffs-Petitioners, | |
| v. | **PLAINTIFFS' MOTION FOR MODIFICATION OF THE EXISTING PRELIMINARY INJUNCTION** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | Noted on Motion Calendar: June 14, 2019 |
| Defendants-Respondents. | ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

   I.   Legal Framework Governing the Detention of Individuals Who Have Entered
       the United States and Are Placed in Removal Proceedings ................................ 2

  II.  *Matter of M-S-* ............................................................................................... 4

ARGUMENT ......................................................................................................... 6

   I.   Plaintiffs Likely Will Succeed on the Merits .................................................... 6

      A.  *Matter of M-S-* Violates Plaintiffs' Rights to Due Process ........................ 6

          1.  Substantive Due Process Requires an Individualized Hearing Before
              a Neutral Decision-maker on Flight Risk and Danger to the Community ............. 8

          2.  Procedural Due Process Requires an Individualized Bond Hearing ................... 13

      B.  *Matter of M-S-* Violates the APA ......................................................... 15

  II.  Plaintiffs and Members of the Bond Hearing Class Will Suffer Irreparable
       Harm Absent a Preliminary Injunction ......................................................... 18

 III.  The Balance of Hardships Tip Sharply in Plaintiffs' Favor, and a Preliminary
       Injunction is in the Public Interest ............................................................... 21

CONCLUSION ..................................................................................................... 22

**INTRODUCTION**

Plaintiffs Blanca Orantes and Baltazar Vasquez, on behalf of themselves and the certified Bond Hearing Class (together, "Plaintiffs"), move for modification of this Court's preliminary injunction order, Dkt. 110, to enjoin the Attorney General's recent decision in *Matter of M-S-,* 27 I. & N. Dec. 509 (A.G. 2019). Plaintiffs ask this Court to preserve the most basic requirement of due process: a bond hearing before an impartial adjudicator to determine if their detention is justified. No other modification of the existing order is sought.

On April 16, 2019—approximately two weeks after the Court issued the preliminary injunction—the Attorney General issued *Matter of M-S-,* eliminating bond hearings for asylum seekers who, like Plaintiffs, entered the United States without inspection to seek protection and were initially placed in expedited removal proceedings but were referred for regular removal proceedings after being found by an immigration officer to have a credible fear of persecution or torture. If *Matter of M-S-* is permitted to go into effect, for the first time in nearly half a century asylum seekers who are present in the United States after having effected an entry will be locked up pending their removal proceedings—potentially for months or years—without ever receiving a bond hearing on whether their detention is justified.

The elimination of custody hearings for individuals who are present in the United States after having effected an entry violates the Due Process Clause of the U.S. Constitution. For more than a century, the Supreme Court has recognized that noncitizens who enter the United States—even unlawfully—are protected by due process. And for fifty years, the immigration courts have provided bond hearings to these individuals. The Attorney General's decision in *Matter of M-S-* also violates the Administrative Procedure Act (APA) by invalidating the agency's own bond hearing regulations without complying with the notice and comment requirement.

Modification of the preliminary injunction to enjoin *Matter of M-S-* is warranted to maintain the availability of bond hearings and protect the status quo. In the absence of immediate judicial intervention, Plaintiffs and members of the Bond Hearing Class will no longer be

entitled to bond hearings before a neutral adjudicator to determine if they pose a flight risk or danger to the community that justifies their continued civil detention. As a result, thousands of individuals with *bona fide* claims to asylum or other forms of protection face the prospect of months or years of imprisonment while their claims are adjudicated, even if they pose no flight risk or danger.

For Plaintiffs and members of the Bond Hearing Class, the stakes are enormous. As this Court has found, arbitrary imprisonment is an irreparable harm in itself, and one that takes a significant toll on detainees' medical and mental health. *See* Dkt. 110 at 15-16. This is particularly true for individuals like the Plaintiffs who have already experienced trauma. In addition, detention significantly impedes Plaintiffs' ability to successfully litigate their claims to protection, since most detainees are unable to obtain the assistance of counsel and therefore are forced to proceed *pro se*. *See id*. at 16.

Because Plaintiffs are likely to succeed on the merits of their due process and APA claims, will suffer irreparable injury from the discontinuation of bond hearings, and satisfy all other requirements for injunctive relief, this Court should maintain its preliminary injunction but modify it to enjoin *Matter of M-S-* to expressly safeguard Plaintiffs' right to individualized bond hearings.

## BACKGROUND

### I.    Legal Framework Governing the Detention of Individuals Who Have Entered the United States and Are Placed in Removal Proceedings

For nearly half a century, consistent with Supreme Court precedent, the law has afforded bond hearings to individuals placed in deportation proceedings after having entered the United States—including those who entered without inspection (also referred to as "EWIs"). *See Yamataya v. Fisher*, 189 U.S. 86, 100-01 (1903) (establishing that noncitizens who enter the United States, even unlawfully, are protected by due process).

Until 1996, the Immigration and Nationality Act (INA) provided for two types of removal proceedings: "deportation" proceedings for those individuals who had entered the

United States (including EWIs), and "exclusion" proceedings for those individuals who were apprehended at the border before effectuating an entry. *See Judulang v. Holder*, 565 U.S. 42, 45-46 (2011); 5 Charles Gordon, et al., *Immigration Law and Procedur*e § 63.01 (2019). The statute governing deportation proceedings provided for discretionary release on bond, and the implementing regulations provided for review of the agency's decision to detain at a hearing before an immigration judge (IJ). *See* 8 U.S.C. § 1252(a)(1) (1994); 8 C.F.R. §§ 242.2(d), 3.19 (1994).[1] In contrast, individuals placed in exclusion proceedings were not entitled to an IJ bond hearing; their only option for release was a "parole" review by the Attorney General. *See* 8 U.S.C. §§ 1182(d)(5), 1225(b) (1994); 8 C.F.R. §§ 212.5(a), 235.3(b) (1994).

Congress enacted major changes to the immigration statute in 1996, replacing "exclusion" and "deportation" proceedings with a single "removal" proceeding. *See* 8 U.S.C. § 1229. However, the detention scheme remained essentially the same. As before, noncitizens who had entered the United States, including EWIs, were generally entitled to bond hearings, while noncitizens apprehended at the border before effectuating an entry were limited to seeking release on parole. *See* 8 C.F.R. §§ 1003.19(a), 1236.1(d)(1) (providing in general for IJ review of custody determinations pending removal proceedings); *id*. §§ 1003.19(h)(2)(i)(B), 1236.1(c)(11) (barring IJs from reviewing custody of "arriving" noncitizens stopped at border and certain others suspected of terrorism or charged with removability on criminal grounds, but not EWIs). Formerly classified as "excludable," individuals stopped at the border are now classified as "arriving." 8 C.F.R. § 1.2 (defining "arriving [noncitizen]" *inter alia*, as "an applicant for admission coming or attempting to come into the United States at a port-of-entry"); *see also* 8 C.F.R. § 1235.3(c) (limiting noncitizens stopped at border to seeking release on parole).

---

[1] The government first provided bond hearings before special inquiry officers in 1969. *See* 34 Fed. Reg. 8037 (May 22, 1969). It later replaced special inquiry officers with immigration judges in 1973. *See* 38 Fed. Reg. 8590 (Apr. 4, 1973) (amending 8 C.F.R. § 1.1 to define "immigration judge" as interchangeable with "special inquiry officer"); *see also* 48 Fed. Reg. 8038 (Feb. 25, 1983) (establishing the Executive Office for Immigration Review).

The creation of expedited removal in the 1996 amendments did not disrupt the well-settled entitlement of those who had already entered to bond hearings. *See* 8 U.S.C. § 1225(b)(1). Congress applied the expedited removal process to certain noncitizens apprehended at the border without proper documents, 8 U.S.C. § 1225(b)(1)(A)(i), but authorized the Attorney General to expand the expedited removal provisions to certain persons who are apprehended inside the country and cannot demonstrate that they have been present for a continuous two-year period. 8 U.S.C. § 1225(b)(1)(A)(iii). In all cases, Congress protected the right to a fair adjudication of *bona fide* asylum claims: individuals in expedited removal who express a fear of persecution and pass a credible fear interview are referred for regular removal proceedings before an IJ to consider their asylum claim. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B)(ii); 8 C.F.R. §§ 208.30(f), 1235.6(a)(ii), (iii).

Even when the government began applying these new "expedited removal" proceedings to EWIs in 2004, 69 Fed. Reg. 48,877-01 (Aug. 11, 2004), regulations provided that those persons referred for regular removal proceedings after entering the United States without inspection and then passing a credible fear screening were entitled to IJ bond hearings. *See Matter of X-K-*, 23 I. & N. Dec. 731, 732, 734-35 (BIA 2005) (reading 8 C.F.R. §§ 1003.19(h)(2), 1236.1(c)(11), (d), as clearly authorizing bond hearings for such individuals).

## II.    *Matter of M-S-*

The Attorney General's decision in *Matter of M-S-* purports to eliminate the right to a bond hearing for all asylum seekers who entered without inspection and subsequently demonstrated a credible fear of persecution or torture. If permitted to take effect, these individuals will be denied the basic due process of a bond hearing for the first time since bond hearings were implemented fifty years ago.

In *Matter of M-S-*, the Attorney General reversed *Matter of X-K*, in which the Board of Immigration Appeals (BIA) held that EWIs who are referred to regular removal proceedings after having initially been placed in expedited removal are entitled to bond hearings under the

regulations. 27 I. & N. Dec. at 509-10. Citing the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Attorney General held that when individuals who are initially placed in expedited removal are referred for full removal proceedings before an IJ, their detention continues to be governed by the expedited removal detention provision, 8 U.S.C. § 1225(b)(1)(B)(ii), and not 8 U.S.C. § 1226, the statute that generally governs detention pending regular removal proceedings. *Matter of M-S-*, 27 I. & N. Dec. at 515-17 (citing *Jennings*, 138 S. Ct. at 839, 844-45). Moreover, the Attorney General held that the expedited removal detention provision, 8 U.S.C. § 1225(b)(1)(B)(ii), permits release in only one circumstance: under a discretionary grant of parole by the Secretary of Homeland Security. *Matter of M-S-*, 27 I. & N. Dec. at 516-17 (citing *Jennings,* 138 S. Ct. at 844, and 8 U.S.C. § 1182(d)(5)). Thus, the Attorney General concluded that the bond hearing regulations that the Board relied upon in *Matter of X-K* cannot authorize bond hearings for individuals initially placed in expedited removal without violating the detention statute. *Id*. at 518.

The result of *Matter of M-S-* is that thousands of individuals who are pursuing *bona fide* claims for protection in regular removal proceedings will be detained for months and sometimes years without ever receiving a bond hearing simply because they were initially placed into expedited removal proceedings. In Fiscal Year 2017 alone, more than 42,000 such individuals were entitled to bond hearings. *See* U.S. Citizenship and Immigration Services, Credible Fear Workload Report Summary, FY2017 Inland Caseload (Apr. 24, 2018), https://www.uscis.gov/ sites/default/files/USCIS/Outreach/Upcoming%20National%20Engagements/PED_FY17_CFand RFstatsThru09302017.pdf. By Plaintiffs' estimate, half of such individuals who are detained are found by an IJ to pose no flight risk or danger to the community and granted release on bond. Declaration of David Hausman (Hausman Decl.) ¶ 9; *see also* Transactional Records Access Clearinghouse (TRAC) Immigration, *Three-fold Difference in Immigration Bond Amounts by Court Location*, Tbl. 2 (Jul. 2, 2018), http://trac.syr.edu/immigration/reports/519/ (showing that 47.1% of IJ bond decisions in the first 8 months of FY2018 granted release on bond).

## ARGUMENT

Plaintiffs ask this Court to modify the existing preliminary injunction to expressly enjoin *Matter of M-S-* and specifically require that Defendants continue to provide bond hearings. The party moving for a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm absent injunctive relief, (3) that the balance of equities favors injunctive relief, and (4) that an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit uses a "sliding scale," approach, such that where the balance of hardships tips strongly in the movant's favor, she need only show that her claims raise "serious questions going to the merits" and that the other two elements are met. *See, e.g.*, *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).

Because Defendants must follow the Constitution and maintain the status quo—that is, continue to provide individualized bond hearings—Plaintiffs merit a prohibitory injunction. *See Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (noting that an injunction that "prevents future constitutional violations" is "a classic form of prohibitory injunction"). Plaintiffs can demonstrate not only serious questions going to the merits, but a likelihood of success on those merits, satisfying both the "sliding scale" and traditional inquiries.

This Court retains inherent authority to modify a preliminary injunction order based on changed circumstances, including a change in law. *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647 (1961). "A party seeking modification . . . of an injunction bears the burden of establishing that a significant change in facts or law warrants revision . . . of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

## I. Plaintiffs Likely Will Succeed on the Merits.

### A. *Matter of M-S-* Violates Plaintiffs' Rights to Due Process.

*Matter of M-S-*'s elimination of bond hearings violates Plaintiffs' substantive and procedural due process rights. As this Court has recognized, because Plaintiffs all have entered the country, they are entitled to due process protections under longstanding Supreme Court and

Ninth Circuit precedent. *See* Dkt. 91 at 9-10; Dkt. 110 at 6-7 (citing *United States v. Raya-Vaca*, 771 F.3d 1995, 1202 (9th Cir. 2014)); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce [a noncitizen] enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (due process protects every person within the United States, "[e]ven one whose presence in this country is unlawful, involuntary, or transitory"); *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1112 n.15 (9th Cir. 2018) ("[P]resence matters to due process."); *Bayo v. Napolitano*, 593 F.3d 495, 502 (7th Cir. 2010) (en banc) (explaining that, once the noncitizen "crossed the border," he "became entitled to certain constitutional rights, including the right to due process"); *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (similar); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1108 (9th Cir. 2001) ("[O]nce [a noncitizen] has 'entered' U.S. territory, legally or illegally, he or she has constitutional rights, including Fifth Amendment rights.").

This principle applies regardless of how long individuals have been present or the nature of their entry to the United States. Indeed, the Ninth Circuit has routinely applied this rule to noncitizens who only recently entered the country. *See, e.g.*, *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1153, 1160-62 (9th Cir. 2004) (due process for noncitizen apprehended same day as unlawful entry); *Jie Lin v. Ashcroft*, 377 F.3d 1014 (9th Cir. 2004) (requiring due process for child found alone in international airport); *Padilla-Agustin v. INS*, 21 F.3d 970, 972, 974-77 (9th Cir. 1994) (requiring due process for noncitizen apprehended shortly after crossing border), *abrogated on other grounds by Stone v. INS*, 514 U.S. 386 (1995) (same); *Reyes-Palacios v. INS*, 836 F.2d 1154, 1155-56 (9th Cir. 1988) (same); *Rios-Berrios v. INS*, 776 F.2d 859, 860, 863 (9th Cir. 1985) (same).

Significantly, the government has repeatedly acknowledged in prior cases that noncitizens who have entered the country unlawfully, even for very brief periods of time, have

due process rights. For example, at oral argument before the Supreme Court in *Clark v. Martinez*, the Court specifically asked the Deputy Solicitor General for the position of the United States on the procedural due process rights of unlawful entrants apprehended after crossing the border:

> JUSTICE BREYER: A person who runs in illegally, a person who crosses the border illegally, say, from Mexico is entitled to these rights when you catch him.
>
> [Government Counsel]: He's entitled to procedural due process rights.

Transcript of Oral Argument at 25, *Clark v. Martinez*, 543 U.S. 371 (2005) (Nos. 03-878, 03-7434).

Moreover, as a practical matter, expedited removal does not apply only to individuals who recently entered the country. As the BIA has recognized, some individuals "may have been living, working, and raising a family in the United States for many years, but were either absent for some part of the 14 days preceding their apprehension by the [Department of Homeland Security ("DHS")] or were unable to provide adequate evidence to prove their continuous physical presence for that period." *Matter of X-K-*, 23 I. & N. Dec. at 736. And indeed, although it would raise serious due process concerns to do so, the statute purports to allow the agency to expand expedited removal to individuals who have been living in the United States for up to two years. 8 U.S.C. § 1225(b)(1)(A)(iii)(II).

### 1. Substantive Due Process Requires an Individualized Hearing Before a Neutral Decision-maker on Flight Risk and Danger to the Community.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause. *Zadvydas*, 533 U.S. at 690. The Supreme Court in *Zadvydas* affirmed the due process requirement that immigration detention, like all civil detention, is justified only where "a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)); *see also United States v. Salerno*, 481 U.S. 739, 747 (1987) (substantive due process prohibits detention

that is "excessive in relation to [the government's] regulatory goal"). The purpose of
immigration detention is to effectuate removal, and to protect against danger and flight risk
during that process. *Zadvydas*, 533 U.S. at 690-91. Immigration detention violates due process
unless it is reasonably related to these legitimate purposes. *Id*. at 690; *see also Hernandez*, 872
F.3d at 990. Moreover, detention must be accompanied by adequate procedural safeguards to
ensure that those purposes are served. *Zadvydas*, 533 U.S. at 690-91; *see also Hernandez*, 872
F.3d at 990.

Defendants' elimination of bond hearings means that the only procedure available to
Plaintiffs to challenge their detention is a discretionary parole determination made by a DHS
officer. However, with only one exception—*Demore v. Kim*, 538 U.S. 510 (2003), a case which
is clearly distinguishable, *see infra* pp. 10-11—the Supreme Court has never upheld civil
detention as constitutional without an individualized hearing before a neutral decision-maker, to
ensure that the person's imprisonment is actually serving the government's goals. *See, e.g.*,
*Salerno*, 481 U.S. at 750 (upholding pretrial detention where Congress provided "a full-blown
adversary hearing" on dangerousness, where the government bears the burden of proof by clear
and convincing evidence); *Hendricks*, 521 U.S. at 357-58 (upholding civil commitment when
there are "proper procedures and evidentiary standards," including an individualized hearing on
dangerousness); *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992) (noting individual's entitlement to
"constitutionally adequate procedures to establish the grounds for his confinement"); *Schall v.
Martin*, 467 U.S. 253, 277, 279-81 (1984) (upholding detention pending a juvenile delinquency
determination where the government proves dangerousness in a fair adversarial hearing with
notice and counsel).

Indeed, the Supreme Court has required individualized hearings for far lesser interests,
including for criminals facing revocation of parole (despite their having already been sentenced
to the full term of their confinement), *see Morrissey* v. *Brewer*, 408 U.S. 471, 485-86 (1972), and
even for property deprivations, *see, e.g.*, *Goldberg* v. *Kelly*, 397 U.S. 254, 268 (1970) (failure to

provide in-person hearing prior to termination of welfare benefits was "fatal to the constitutional adequacy of the procedures"); *Califano* v. *Yamasaki*, 442 U.S. 682, 696-97 (1979) (in-person hearing required for recovery of excess Social Security payments); *see also Zadvydas*, 533 U.S. at 692 (criticizing the administrative custody reviews in that case and noting that "[t]he Constitution demands greater procedural protection even for property").

Although the Supreme Court upheld immigration detention without a hearing in *Demore v. Kim*, that case is clearly distinguishable. First, the statute in *Demore* imposed mandatory detention on a subset of noncitizens who had committed an enumerated list of crimes, based on Congress's determination that they posed a categorical bail risk. *See* 8 U.S.C. § 1226(c). The Court emphasized that this "narrow detention policy" was reasonably related to the government's purpose of effectuating removal and protecting public safety. 538 U.S. at 526-28. By contrast, the detention statute here applies broadly to individuals with no criminal records and who all have been found to have *bona fide* claims to protection in the United States. *Cf. Zadvydas*, 533 U.S. at 691 (stating that the government's indefinite detention policy raised due process concerns because the detention statute did "not apply narrowly to 'a small segment of particularly dangerous individuals,' . . . but broadly to [noncitizens] ordered removed for many and various reasons, including tourist visa violations" (quoting *Hendricks*, 521 U.S. at 368)).

Second, in reaching its conclusion, the Court in *Demore* placed great reliance on the voluminous record before Congress, which showed that the population of "criminal aliens" targeted by the mandatory detention statute posed a heightened categorical risk of flight and danger to the community. *See* 538 U.S. at 518-21 (citing studies and congressional findings regarding the "wholesale failure by the INS to deal with increasing rates of criminal activity by [noncitizens]"). In contrast, Congress made no such findings regarding the population at issue here—that is, individuals who have all been screened by DHS and found to have a credible fear of persecution or torture. Indeed, Congress instead permitted their release from custody. *See* 8 U.S.C. § 1182(d)(5).

Third, the Supreme Court placed great emphasis on what it understood to be the brief period of time that mandatory detention typically lasts. *See id.* at 529 (noting that mandatory detention lasts about 45 days in 85% of cases and about 5 months for those 15% of cases where individuals seeks appeal to BIA). In contrast, asylum seekers can expect to spend a median time of nearly six months for their protection claims to be adjudicated before the IJ and nearly a year in cases involving an appeal to the BIA, *see* Hausman Decl. ¶ 8, along with any additional needed time for judicial review.

Under *Matter of M-S-*, Plaintiffs would only qualify for release on parole. *See* 27 I. & N. Dec. at 516-18. However, parole reviews are not an adequate substitute for an individualized hearing. In contrast to a bond hearing before an IJ, the parole process consists merely of a custody review conducted by low-level Immigration and Customs Enforcement (ICE) detention officers. *See* 8 C.F.R. § 212.5. It includes no hearing before a neutral decision maker, no record of any kind, and no possibility for appeal. *See id*. Instead, ICE officers make parole decisions—that can result in months or years of additional incarceration—by merely checking a box on a form that contains no factual findings, no specific explanation, and no evidence of deliberation. *See, e.g.*, *Abdi v. Duke*, 280 F. Supp. 3d 373, 404 (W.D.N.Y. 2017); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 324-25, 341 (D.D.C. 2018). As the Supreme Court recognized in *Zadvydas*, "the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights." 533 U.S. at 692 (internal quotation marks omitted); *see also Morrissey*, 408 U.S. at 486-87 (requiring a neutral decision-maker for parole revocation hearings); *St. John v. McElroy*, 917 F. Supp. 243, 251 (S.D.N.Y. 1996) (due process is not satisfied by parole reviews, but requires an "impartial adjudicator" to review detention since, "[d]ue to political and community pressure, the INS, an executive agency, has every incentive to continue to detain [certain noncitizens]"); *accord Cruz-Taveras v. McElroy*, No. 96 CIV 5068, 1996 WL 455012, at *6-7 (S.D.N.Y. Aug. 13, 1996); *Thomas v. McElroy*, No. 96 Civ 5065, 1996 WL 487953, at *3 (S.D.N.Y. Aug. 27, 1996).

In addition, parole reviews fail to provide due process in practice. Government data and reports from service providers confirm that, under the Trump administration, the parole process has been largely eviscerated, and ICE uses the parole process to rubberstamp asylum seekers' arbitrary detention. For example, in *Damus v. Nielsen*, government statistics showed that from February to September 2017, three of the defendant ICE Field Offices *denied 100% of parole applications*, and the two other defendant Field Offices *denied 92% and 98% of applications*— despite the fact that (1) only a few years ago, those same Field Offices *granted* more than 90% of parole applications, and (2) there has been no change in the types of individuals seeking asylum in the United States. *Damus*, 313 F. Supp. 3d at 339-40. These blanket parole denials contrast starkly with bond hearings, where IJs routinely release asylum seekers from detention upon finding that they pose no flight risk or danger to the community. *See* Hausman Decl. ¶ 9.

This data has been confirmed by the courts. For example, the court in *Damus* cited evidence of ICE officers informing immigration attorneys that "there is no more parole" and that the agency is "not granting parole." *Damus*, 313 F. Supp. 3d at 340 (internal quotation marks and citations omitted). Indeed, the government's own submissions revealed that ICE was providing sham parole reviews. *See, e.g.*, *id*. at 341 (citing example of plaintiff denied parole due solely to her status as a "recent entrant" to the U.S., despite the fact this characteristic applies categorically to asylum seekers who pass a credible fear screening); *id*. (citing plaintiffs who "received letters advising them of the right to apply for parole only one day prior to receiving nearly identical boilerplate letters informing them of parole denial"); *id*. (citing asylum seekers who were never provided a parole interview by ICE, as required by ICE's own parole directive); *id*. (finding that ICE's "summary and often boilerplate" parole denials failed to show individualized parole determinations). *See also Abdi*, 280 F. Supp. 3d at 404-05 (citing evidence that asylum seekers were "*never* provided with any paperwork explaining how to seek parole" and were "denied multiple requests for parole via perfunctory form denials"); Human Rights First, *Judge and Jailer: Asylum Seekers Denied Parole in Wake of Trump Executive Order* 1, 11-

15 (Sept. 2017), https://www.humanrightsfirst.org/sites/default/files/hrf-judge-and-jailer-final-report.pdf (citing arbitrary parole denials).

In sum, parole reviews do not provide the process that Plaintiffs and class members are due. Instead, substantive due process requires that Plaintiffs receive an individualized bond hearing, before a neutral decision-maker, to determine if their detention is justified.

### 2.  Procedural Due Process Requires an Individualized Bond Hearing.

For many of the same reasons, procedural due process likewise requires individualized bond hearings before an IJ. In assessing the sufficiency of the government's custody review procedures, this Court must consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Parole reviews do not provide due process under a *Mathews* analysis. First, Plaintiffs have a profound interest in preventing their arbitrary detention. *See Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment . . . lies at the heart of the liberty" protected by the Due Process Clause); *see also Hernandez*, 872 F.3d at 993; Dkt. 110 at 6; *supra* Section I.A.

Second, the parole process creates an unacceptable risk of the erroneous deprivation of Plaintiffs' liberty. As set forth above, the parole process permits low-level ICE officers to authorize months or even years of incarceration by checking a box on a form that contains no factual findings, no specific explanation, and no evidence of deliberation. *See supra* Section I.A.1. Indeed, as several courts have found, ICE is no longer providing individualized reviews of flight risk and danger, but instead using the parole process to rubberstamp arbitrary detention. *See Damus*, 313 F. Supp. 3d at 339-43; *Abdi*, 280 F. Supp. 3d at 403-10; *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 145-57 (D.D.C. 2018). In contrast, bond hearings provide a critical check

on arbitrary detention. For example, nearly half of the individuals who entered without inspection, applied for asylum or other protection, and sought a bond hearing were found by an IJ to pose no flight risk or danger to the community and granted release on bond. Hausman Decl. ¶ 9; *see also* TRAC Immigration, *Three-fold Difference in Immigration Bond Amounts by Court Location*, Tbl. 2 (July 2, 2018), http://trac.syr.edu/immigration/reports/519/ (47.1% of immigration court bond decisions in the first 8 months of FY2018 granted release on bond).

Finally, the government lacks any countervailing interest in denying Plaintiffs' bond hearings. The government has no legitimate interest in detaining individuals who pose no flight risk or danger to the community. *See* Dkt. 110 at 15; *Hernandez*, 872 F.3d at 994. Thus, administrative cost is the only possible factor that could weigh against providing bond hearings. *See id*. Yet the government has provided bond hearings to asylum seekers initially placed in expedited removal proceedings pursuant to *Matter of X-K-* for more than a decade, and more generally to noncitizens who have entered the U.S. for nearly the past 50 years. The government cannot seriously argue that providing bond hearings it has provided for years imposes excessive burdens on the agency. Indeed, the government itself has an interest in maintaining bond hearings and ensuring accurate custody determinations. *See Matter of X-K-*, 23 I. & N. Dec. at 736 (explaining that "some [noncitizens] may demonstrate to the Immigration Judge a strong likelihood that they will be granted relief from removal and thus have great incentive to appear for further hearings"). This is particularly true given that the government already has determined that Plaintiffs and class members have *bona fide* protection claims, which gives them the right to remain in the United States while their applications for protection are considered in immigration proceedings. *See* H.R. Rep. No. 104-469, pt.1, at 158 (1996) ("If the [noncitizen] meets [the credible fear] threshold, the [noncitizen] is permitted to remain in the United States to receive a full adjudication of the asylum claim . . . .").

### B. *Matter of M-S-* Violates the APA.

Finally, the Attorney General's invalidation, without notice and comment, of the regulations governing bond hearings violates the rulemaking requirements of the APA. The APA expressly requires notice and an opportunity to comment prior to agency decisions to amend or repeal a rule. Section 551(5) defines "rule making" to mean "agency process for formulating, *amending, or repealing* a rule." 5 U.S.C. § 551(5) (emphasis added). The APA requires that notice of proposed rulemaking shall be published in the Federal Register; that there be at least a 30-day period between notice and effective date; and that interested persons be given an opportunity to participate. 5 U.S.C. § 553(b)-(d).

As the BIA explained in *Matter of X-K-*, the existing regulations entitle Plaintiffs to bond hearings. *See* 23 I. & N. Dec. at 731-32, 734-35. Specifically, the regulations give IJs general authority to hold bond hearings for individuals in removal proceedings, at any time prior to the entry of a final order of removal, except for specifically excluded classes of noncitizens.

8 C.F.R. § 1236.1(d) provides that:

> Prior to such final order, and except as otherwise provided in this chapter, the immigration judge is authorized to exercise the authority in section 236 of the Act . . . to detain the alien in custody, release the alien, and determine the amount of bond, if any, under which the respondent may be released, as provided in § 1003.19 of this chapter.

*Id*.

8 C.F.R. § 1003.19(h)(2)(i), in turn, excludes specific classes of individuals from the immigration judge's general custody jurisdiction. The regulation provides that:

> an immigration judge may not redetermine conditions of custody imposed by the Service with respect to the following classes of aliens:
>
> (A)   Aliens in exclusion proceedings;
>
> (B)   Arriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act;
>
> (C)   Aliens described in section 237(a)(4) of the Act;
>
> (D)   Aliens in removal proceedings subject to section 236(c)(1) of the Act . . . and

> (E)   Aliens in deportation proceedings subject to section 242(a)(2) of the
>         Act (as in effect prior to April 1, 1997 . . . .).

*Id*. Critically, this list of exclusions does *not* include Plaintiffs—namely, persons who entered

without inspection and who were initially subject to expedited removal but passed a credible or

reasonable fear screening and were placed in removal proceedings.

The regulatory history reinforces the plain meaning of § 1003.19(h)(2)(i). The regulation

the agency initially proposed in 1997 *eliminated* IJ jurisdiction over bond hearings for EWIs. *See*

62 Fed. Reg. 444, 483 (Jan. 3, 1997) (providing that that "an immigration judge may not exercise

authority" over bond for "inadmissible aliens in removal proceedings," including EWIs).

However, the agency *deleted* that language from the final rule, thereby maintaining IJ bond

jurisdiction over EWIs. *See* 8 C.F.R. § 1003.19(h)(2)(i).[2]

The Attorney General's contrary reading of the regulations in *Matter of M-S-* lacks merit.

The Attorney General cites 8 C.F.R. § 208.30(f)'s statement that "parole" of an individual who

establishes a credible fear of persecution "may be considered only in accordance with section

212(d)(5) of the Act and [8 C.F.R.] § 212.5." 8 C.F.R. § 208.30(f). But as the Attorney General

himself acknowledges, that regulation is *silent* on whether such an individual is eligible for a

bond hearing. *See Matter of M-S-*, 27 I. & N. Dec. at 518. Moreover, the agency had previously

recognized that, as "applicants for admission," EWIs were eligible to seek release on either

parole *or bond*. *See* Paul W. Virtue, Memorandum on Authority to Parole Applicants For

Admission Who Are Not Also Arriving Aliens, Legal Op. No. 98-10 (INS), 1998 WL 1806685,

at *2 (Aug. 21, 1998).

The Attorney General also cites a 2004 Federal Register notice that purports to deem

EWIs who establish a credible fear ineligible for bond hearings. *Matter of M-S-*, 27 I. & N. Dec.

at 518 (citing 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004)). But the notice fails to acknowledge

the regulation rendering EWIs eligible for bond hearings, 8 C.F.R. § 1003.19(h)(2)(i), which the

BIA subsequently applied in *Matter of X-K-*.

---

[2] *See also* Margaret H. Taylor, *The 1996 Immigration Act: Detention and Related Issued*, 74 No. 5 Interpreter
Releases 209, 215 (Feb. 3, 1997) (discussing regulatory history).

Furthermore, even assuming that the regulations are not compatible with the statute, that does not entitle the agency to effectively rewrite the regulations without complying with the required rulemaking procedures. *Matter of M-S-* effectively modifies the regulations to exclude an additional class of individuals from the IJ's custody jurisdiction—EWIs who are in regular removal proceedings after having been initially placed in expedited removal. But the only legal process to substantively amend a rule is through notice and comment rulemaking. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) (explaining that the APA "mandates that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance").

Nor can the government somehow waive its rulemaking obligations by claiming that the regulations were void *ab initio*. As the D.C. Circuit has explained:

> The . . . argument that notice and comment requirements do not apply to "defectively promulgated regulations" is untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation.

*Consumer Energy Council v. Federal Energy Regulatory Comm'n*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982). *See also Nat'l Treasury Employees Union v. Cornelius*, 617 F. Supp. 365, 371-72 (D.D.C. 1985) ("It would significantly erode the usefulness of the APA if agencies were permitted unilaterally to repeal regulations dealing with the substantive rights of individuals under federal statutes, by declaring that the earlier regulations were just a mistake.").

Moreover, rulemaking here would serve a useful purpose. In deciding *Jennings*, the Supreme Court expressly declined to consider the due process implications of its ruling. *See* 138 S. Ct. at 851 (limiting its holding to statutory questions and remanding to court of appeals to address the constitutional issues). Although the Court held that the detention statute, 8 U.S.C. § 1225(b)(1), permits only release on parole under § 1182(d)(5), *Jennings*, 138 S. Ct. at 844, it did not consider what kind of parole process was required under those statutes, especially in light of

the serious constitutional problems that are raised by detaining Plaintiffs and class members without bond hearings. *See supra*, Section I.A. A rulemaking process would give the public the opportunity to propose, and the agency the opportunity to consider, alternative ways of implementing the parole authority to potentially ameliorate these constitutional problems. *Cf.* 66 Fed. Reg. 56,967, 56,968 (Nov. 14, 2001) (amending the custody review process for individuals detained after receiving a final order of removal in light of constitutional concerns addressed in *Zadvydas v. Davis*, 533 U.S. 678 (2001)).

For these reasons, *Matter of M-S-* violates the APA.

## II.    Plaintiffs and Members of the Bond Hearing Class Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Detention without a bond hearing will cause Plaintiffs and members of the Bond Hearing class irreparable harm for multiple reasons. *See* Dkt. 45 at 20-23; Dkt. 110 at 15-17. First, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Hernandez*, 872 F.3d at 994 (internal quotation marks and citation omitted); *see also* Dkt. 110 at 15.

Second, the "unnecessary deprivation of [Plaintiffs'] liberty clearly constitutes irreparable harm." *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1998). As the Supreme Court has explained, "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness . . . . The time spent in jail is simply dead time . . . ." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972). *See also Hernandez*, 872 F.3d at 995 (noting the "the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained").

Third, Plaintiffs suffer irreparable harm from the circumstances of detention. "[I]mmigration detainees are treated much like criminals serving time: They are typically housed in shared jail cells with no privacy and limited access to larger spaces or the outdoors." *Rodriguez v. Robbins* (*"Rodriguez III"*), 804 F.3d 1060, 1073 (9th Cir. 2015), *rev'd on other*

grounds by *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). *See also Hernandez*, 872 F.3d at 995 (noting the "subpar medical and psychiatric care in ICE detention facilities"); Dkt. 110 at 15 (noting irreparable harms of "physical and psychological trauma (e.g., malnutrition, poor medical care, depression[)]"); Dkt. 49 ¶ 3 (documenting "systemic, sub-human conditions in immigration custody"); Dkt. 55 ¶ 5 (client faced irreversible physical harm while detained); Dkt. 51 ¶ 6 (clients denied access to sanitary products and blankets and were detained in locations that used tear gas against noncompliant detainees); Dkt. 54 ¶ 6 (clients vulnerable to "medical crisis" and "horrible food and living conditions").

Fourth, these harms are even more severe for individuals seeking protection from persecution. Detention often re-traumatizes vulnerable individuals who have only recently escaped persecution and may cause mental disorders such as post-traumatic stress disorder ("PTSD"). *See* Dkt. 110 at 16 (citing "panic attacks, depression, and exacerbation of pre-existing trauma" caused by prolonged detention); *see also* Declaration of Allen Keller ¶¶ 11-12. Moreover, detention often causes related physical symptoms, including pain, headaches, and gastrointestinal issues, for which detention centers are poorly equipped to offer medical care. *Id.* ¶¶ 13-14. *See also* Dkt 50 ¶ 13 (client suffered "panic attacks, loss of consciousness, loss of appetite, and severe nightmares"); Dkt. 52 ¶ 18 (detainees experience anxiety and psychological and emotional harm); Dkt. 53 ¶ 7 (clients suffer depression and hopelessness); Dkt. 60 ¶ 7 (detainees who previously were tortured, wrongfully imprisoned, or sexually assaulted experience exacerbation of prior trauma); Dkt. 58 ¶ 6 (detention exacerbates PTSD for many individuals). Indeed, in some cases, detention may coerce Plaintiffs into abandoning meritorious claims to protection. *See* Dkt. 110 at 16-17; *see also* Dkt. 46 ¶¶ 4, 6 (noting large number of detainees who abandon their claims after passing credible fear interview due to detention); Dkt. 58 ¶ 6 (many "give up hope and abandon their asylum cases" due to "hardship of prolonged detention"); *accord* Dkt. 59 ¶ 5.

Fifth, Plaintiffs and class members indisputably suffer irreparable harm by being unable to adequately prepare their immigration cases. *See* Dkt. 46 ¶ 4 (detention prevents individuals from contacting witnesses and obtaining support documents); ¶ 6 (detainees have no access to "phone numbers, names and other vital information required for the proper identification and preparation of witnesses and of persons who could help obtain evidence from the home country"); Dkt. 49 ¶¶ 14, 17-19 (individuals face challenge in meeting burden of proof for asylum applications because law libraries in detention center rarely contain relevant and updated materials).

In particular, detention severely limits an individual's ability to litigate his removal case by making it "more difficult to retain or meet with legal counsel." *Rodriguez III*, 804 F.3d at 1073. The overwhelming majority of immigration detainees—nearly 80 percent—are unrepresented. 79 Fed. Reg. 55,659, 55,660 (Sept. 17, 2014). Yet having a lawyer in removal proceedings is critical to defending one's right to remain in the United States. A nationwide study of government data found that, between 2007 and 2012, *39 percent* of immigrants who were released from detention and were represented by attorneys won their removal cases, compared to *two percent* of detained immigrants who were pro se. Ingrid V. Eagly and Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 50 (2015).

Not surprisingly, then, release from detention had a decisive impact on individuals' immigration cases. Between January 1, 2010 and February 1, 2019, the grant rate for such individuals who were released from detention and who applied for asylum, withholding, or CAT was 30% as compared to a less than 6% grant rate for those who were detained throughout their proceedings. That is, individuals released from detention were *five times more likely* to prevail on their claims. *See* Hausman Decl. ¶¶ 7, 10.

The challenges experienced by the named Plaintiffs bring these irreparable harms into sharp focus. Detained for over two months, Plaintiff Orantes suffered significant emotional

distress and considered giving up her case due to prolonged confinement and separation from her son. Dkt. 57 ¶¶ 13, 17. She also faced unsanitary detention conditions and dehumanizing treatment from detention officers. *Id.* ¶¶ 4, 10. Similarly, Plaintiff Vasquez endured unsanitary conditions in detention and had to be hospitalized for four days due to illness from the food served in detention. Dkt. 61 ¶ 3. He suffered from feelings of depression and isolation, particularly from being unable to maintain contact with his wife. *Id.* ¶¶ 5, 12. After passing his credible fear interview and waiting to receive a bond hearing, Plaintiff Vasquez faced difficulty in communicating with those outside of detention to gather evidence in support of his case. *Id.* ¶ 9. These experiences underscore the irreparable harms that Plaintiffs will face if they are re-detained without a bond hearing pending their removal proceedings.

## III.    The Balance of Hardships Tip Sharply in Plaintiffs' Favor, and a Preliminary Injunction is in the Public Interest.

The balance of equities and the public interest weigh heavily in favor of a preliminary injunction halting the implementation of *Matter of M-S-*. A preliminary injunction would "serve[] the interests of the general public by ensuring that the government's initial bond determination procedures comply with the Constitution." *Hernandez*, 872 F.3d at 996. Moreover, "any additional administrative costs to the government are far outweighed by the considerable harm to Plaintiffs' constitutional rights in the absence of the injunction." *Id.* at 995-96. When "[f]aced with . . . a conflict between financial concerns and preventable human suffering, [courts] have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). *Accord* Dkt. 110 at 17-18. The Court should also "consider . . . the indirect hardship" that detention causes "friends and family members." *Hernandez*, 872 F.3d at 996 (internal quotation marks and citation omitted); *see also id.* (noting the "financial and psychological strain" that unnecessary detention imposes on the families of detainees); Dkt. 110 at 18. Any additional administrative burden from a preliminary injunction are limited here: the government has provided bond hearings to Plaintiffs for a half-century, continued to do so for more than a year after the Supreme Court's decision in *Jennings*,

and the Attorney General ordered that they continue to do so for at least 90 days after he issued his decision in *Matter of M-S-*. 27 I. &. N. Dec. at 519 n.8.

Moreover, the government has ample tools at its disposal to ensure that individuals appear for removal proceedings. *See Hernandez*, 872 F.3d at 991 (noting that "demonstrated effectiveness of [conditions of supervision] at meeting the government's interest in ensuring future appearances"). Indeed, as the Ninth Circuit has found, ICE's "Intensive Supervision Appearance Program—which relies on various alternative release conditions—resulted in a 99% attendance rate at all [immigration court] hearings and a 95% attendance rate at final hearings." *Id*.[3] *See also* Declaration of Michelle Brane ¶¶ 6-27. The social science literature confirms that individuals seeking protection from persecution are highly motivated to appear for court proceedings and generally can be supervised safely in the community. *Id*.

Finally, "the general public's interest in the efficient allocation of the government's fiscal resources favors granting the injunction." *Hernandez*, 872 F.3d at 996. As the Ninth Circuit has explained:

> The costs to the public of immigration detention are "staggering": $158 each day per detainee, amounting to a total daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17 cents and 17 dollars each day per person . . . [R]educed detention costs can free up resources to more effectively process claims in Immigration Court.

*Id*. *Accord* Dkt. 110 at 18. In sum, the balance of hardships and public interest strongly favor a modification of the preliminary injunction order.

## CONCLUSION

The Court should grant Plaintiffs' motion to modify the preliminary injunction order to enjoin *Matter of M-S-* and preserve individualized bond hearings for the Bond Hearing Class.

RESPECTFULLY SUBMITTED this 28th day of May 2019.

---

[3] *Accord* U.S. Gov't Accountability Off., GAO-15-26, Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness 30 (2014), https://www.gao.gov/assets/670/666911.pdf.

s/ Matt Adams
Matt Adams, WSBA No. 28287
Email: matt@nwirp.org

s/ Leila Kang
Leila Kang, WSBA No. 48048
Email: leila@nwirp.org

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974
Email: aaron@nwirp.org

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025

s/ Trina Realmuto
Trina Realmuto*
Email: trealmuto@immcouncil.org

s/ Kristin Macleod-Ball
Kristin Macleod-Ball*
Email: kmacleod-ball@immcouncil.org

AMERICAN IMMIGRATION COUNCIL
1318 Beacon Street, Suite 18
Brookline, MA 02446
Telephone: (857) 305-3600

s/ Judy Rabinovitz
Judy Rabinovitz*
Email: jrabinovitz@aclu.org

s/ Michael Tan
Michael Tan*
Email: mtan@aclu.org

s/ Anand Balakrishnan
Anand Balakrishnan*
Email: abalakrishnan@aclu.org

ACLU IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th floor
New York, NY 10004
Telephone: (212) 549-2618

s/ Emily Chiang
Emily Chiang, WSBA No. 50517
Email: echiang@aclu-wa.org

ACLU OF WASHINGTON FOUNDATION
901 5th Ave, Suite 630
Seattle, WA 98164
Telephone: 206-624-2184

*Admitted pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Lauren C. Bingham | lauren.c.bingham@usdoj.gov |
| | ecf.oil-dcs@usdoj.gov |
| | crystal.greene@usdoj.gov |
| | |
| Joseph A. Darrow | joseph.a.darrow@usdoj.gov |
| | |
| Archith Ramkumar | archith.ramkumar@usdoj.gov |
| | ar4kc@virginia.edu |
| | |
| Sarah S. Wilson | Sarah.Wilson2@usdoj.gov |
| | Daniel.C.Meyer@usdoj.gov |

And I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: None.

Dated: May 28, 2019.            *s/ Leila Kang*_____
                               Leila Kang
                               Northwest Immigrant Rights Project
                               615 Second Avenue, Suite 400
                               Seattle, WA 98104
                               (206) 957-8608
                               leila@nwirp.org

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YOLANY PADILLA;  IBIS GUZMAN; BLANCA
ORANTES; BALTAZAR VASQUEZ;

                             Plaintiffs-Petitioners,

      v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
("ICE"); U.S. DEPARTMENT OF HOMELAND
SECURITY ("DHS"); U.S. CUSTOMS AND BORDER
PROTECTION ("CBP"); U.S. CITIZENSHIP AND
IMMIGRATION SERVICES ("USCIS"); EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW ("EOIR");
MATTHEW ALBENCE, Acting Deputy Director of ICE;
KEVIN K. McALEENAN, Acting Secretary of DHS;
JOHN P. SANDERS, Acting Commissioner of CBP; L.
FRANCIS CISSNA, Director of USCIS; ELIZABETH
GODFREY, Acting Director of Seattle Field Office, ICE;
WILLIAM BARR, United States Attorney General;
LOWELL CLARK, warden of the Northwest Detention
Center in Tacoma, Washington;  CHARLES INGRAM,
warden of the Federal Detention Center in SeaTac,
Washington;  DAVID SHINN, warden of the Federal
Correctional Institute in Victorville, California; JAMES
JANECKA, warden of the Adelanto Detention Facility;

                         Defendants-Respondents.

No. 2:18-cv-928 MJP

**THIRD AMENDED
COMPLAINT:
CLASS ACTION FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

## I.       **INTRODUCTION**

1.       Plaintiffs filed this lawsuit on behalf of themselves and other detained individuals seeking protection from persecution and torture, challenging the United States' government's punitive policies and practices seeking to unlawfully deter and obstruct them from applying for protection.

2.       This lawsuit initially included challenges to the legality of the government's zero-tolerance practice of forcibly ripping children away from parents seeking asylum, withholding and protection under the Convention Against Torture ("CAT"). Plaintiffs did not pursue those claims after a federal court in the Southern District of California issued a nationwide preliminary injunction Order against forcibly separating families. *Ms. L v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018); *see also* Dkt. 26.

3.       In their Second Amended Complaint, Plaintiffs reaffirmed that they sought relief on behalf of themselves and members of two proposed classes: (1) the Credible Fear Interview Class, challenging delayed credible fear determinations, and (2) the Bond Hearing Class, challenging delayed bond hearings that do not comport with constitutional requirements. *Id.*

4.       On March 6, 2019, this Court granted Plaintiffs' Motion for Class Certification and certified both the Credible Fear Interview Class and Bond Hearing Class. Dkt. 102 at 2. On April 5, 2019, this Court granted Plaintiffs' Motion for Preliminary Injunction, ordering that Defendant Executive Office for Immigration Review conduct bond hearings within seven days of request by a Bond Hearing Class members, place the burden of proof at those hearings on Defendant Department of Homeland Security, record the hearings, produce a recording or verbatim transcript upon appeal, and produce a written decision with particularized determinations of individualized findings at the conclusion of each bond hearing. Dkt. 110 at 19.

5.       Thereafter, on April 16, 2019, Defendant Attorney General Barr issued *Matter of M-S-*, 27 I&N Dec. 509 (A.G. 2018). In this decision, Defendant Barr reversed and vacated *Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005), holding that the Immigration and Nationality Act

(INA) does not permit bond hearings for individuals who enter the United States without inspection, establish a credible fear for persecution or torture, and are then referred for removal proceedings before an immigration judge.

6.      Defendants have therefore now adopted a policy that not only denies Plaintiffs and class members the procedural protections they seek, but prevents them from obtaining bond hearings *at all*. Plaintiffs file this Third Amended Complaint to more squarely address this new and even more extreme policy.

7.      Defendants exacerbate the harm those fleeing persecution have already suffered by needlessly depriving them of their liberty without adequate review. Plaintiffs seek this Court's intervention to ensure both that Defendants do not interfere with their right to apply for protection by delaying Plaintiffs' credible fear interviews and by subjecting them to lengthy detention without prompt bond hearings that comport with the Due Process Clause.

## II.      **JURISDICTION**

8.      This case arises under the Fifth Amendment of the United States Constitution and the Administrative Procedure Act ("APA"). This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 2241 (habeas jurisdiction); and Article I, § 9, clause 2 of the United States Constitution ("Suspension Clause"). Defendants have waived sovereign immunity pursuant to 5 U.S.C. § 702.

9.      Plaintiffs Yolany Padilla, Ibis Guzman, and Blanca Orantes  were in custody for purposes of habeas jurisdiction when this action was filed on June 25, 2018. Moreover, Plaintiffs remain in custody as they are in ongoing removal proceedings and subject to re-detention.

10.      Plaintiffs Guzman, Orantes, and Vasquez were in custody for purposes of habeas jurisdiction when the First Amended Complaint was electronically submitted on July 15, 2018.

## III.      **VENUE**

11.      Venue lies in this District under 28 U.S.C. § 1391 because a substantial portion of the relevant facts occurred within this District. Those facts include Defendants' detention of

Plaintiffs Padilla, Guzman, and Orantes in this District; Defendants' failure in this District to promptly conduct credible fear interviews and determinations for Plaintiffs and class members' claims for protection in the United States; and Defendants' failure in this District to promptly conduct bond hearings that comport with due process and the Administrative Procedure Act.

## IV.    PARTIES

12.    Plaintiff Yolany Padilla is citizen of Honduras seeking asylum, withholding, and protection under CAT for herself and her 6-year-old son (J.A.) in the United States.

13.    Plaintiff Ibis Guzman is a citizen of Honduras seeking asylum, withholding, and protection under CAT for herself and her 5-year-old son (R.G.) in the United States.

14.    Plaintiff Blanca Orantes is a citizen of El Salvador seeking asylum, withholding, and protection under CAT for herself and her 8-year-old son (A.M.) in the United States.

15.    Plaintiff Baltazar Vasquez is citizen of El Salvador seeking asylum, withholding, and protection under CAT in the United States.

16.    Defendant U.S. Department of Homeland Security ("DHS") is the federal government agency responsible for enforcing U.S. immigration law. Its component agencies include U.S. Immigration and Customs Enforcement ("ICE"); U.S. Customs and Border Protection ("CBP"); and U.S. Citizenship and Immigration Services ("USCIS").

17.    Defendant ICE carries out removal orders and oversees immigration detention. ICE's responsibilities include determining whether individuals seeking protection will be released and referring cases for a credible fear interview and subsequent proceedings before the immigration court. ICE's local field office in Tukwila, Washington, is responsible for determining whether individuals detained in Washington will be released, and when their cases will be submitted for credible fear interviews and subsequent proceedings before the immigration court.

18.    Defendant CBP conducts the initial processing and detention of individuals seeking protection at or near the U.S. border. CBP's responsibilities include determining whether

individuals seeking protection will be released and when their cases will be submitted for a credible fear interview.

19.    Defendant USCIS, through its asylum officers, interviews and screens individuals seeking protection to determine whether to refer their protection claim to the immigration court to adjudicate any application for asylum, withholding of removal, or protection under CAT.

20.    Defendant Executive Office for Immigration Review ("EOIR") is a federal government agency within the Department of Justice that includes the immigration courts and the Board of Immigration Appeals ("BIA"). It is responsible for conducting removal proceedings, including adjudicating applications for asylum, withholding, and protection under CAT, and for conducting individual bond hearings for persons in immigration custody.

21.    Defendant Matthew Albence is sued in his official capacity as the Acting Deputy Director of ICE , and is a legal custodian of class members.

22.    Defendant Elizabeth Godfrey is sued in her official capacity as the ICE Seattle Field Office Director, and is, or was, a legal custodian of the named plaintiffs.

23.    Defendant Kevin K. McAleenan is sued in his official capacity as the Acting Secretary of DHS. In this capacity, he directs DHS, ICE, CBP, and USCIS. As a result, Defendant McAleenan is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103 and is, or was, a legal custodian of the named plaintiffs.

24.    Defendant John Sanders is sued in his official capacity as the Acting Commissioner of CBP.

25.    Defendant L. Francis Cissna is sued in his official capacity as the Director of USCIS.

26.    Defendant William Barr is sued in his official capacity as the United States Attorney General. In this capacity, he directs agencies within the United States Department of Justice, including EOIR. Defendant Barr is responsible for the administration of immigration laws pursuant to 8 U.S.C. § 1103 and oversees Defendant EOIR.

27.     Defendant Steven Langford is sued in his official capacity as the warden of the Northwest Detention Center in Tacoma, Washington.

28.     Defendant Charles Ingram is sued in his official capacity as the warden of the Federal Detention Center in SeaTac, Washington.

29.     Defendant David Shinn is sued in his official capacity as the warden of the Federal Correctional Institute in Victorville, California.

30.     Defendant James Janecka is sued in his official capacity as the warden of the Adelanto Detention Facility in Adelanto, California.

## V.     <u>FACTS</u>

### Legal Background

31.     In 1996, Congress created an expedited removal system and "credible fear" process. 8 U.S.C. § 1225 *et seq*. As enacted by Congress, the expedited removal system involves a streamlined removal process for individuals apprehended at or near the border. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (permitting certain persons who are seeking admission at the border of the United States to be expeditiously removed without a full hearing; 8 U.S.C. § 1225(b)(1)(A)(iii) (authorizing the Attorney General to apply expedited removal to certain inadmissible noncitizens located within the United States); 69 Fed. Reg. 48,877 (Aug. 11, 2004) (providing that the Attorney General will apply expedited removal to persons within the United States who are apprehended within 100 miles of the border and who are unable to demonstrate that they have been continuously physically present in the United States for the preceding 14-day period).

32.     Critically, however, Congress included safeguards in the statute to ensure that those seeking protection from persecution or torture are not returned to their countries of origin. Recognizing the high stakes involved in short-circuiting the formal removal process and the constitutional constraints under which it operates, Congress created specific procedures with detailed requirements for handling claims for protection.

33.     The expedited removal process begins with an inspection by an immigration officer, who determines the individual's admissibility to the United States. If the individual indicates either an intention to apply for asylum or any fear of return to their country of origin, the officer must refer the individual for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. § 235.3(b)(4).

34.     If an asylum officer determines that an applicant satisfies the credible fear standard—meaning there is a "significant possibility" she is eligible for asylum, 8 U.S.C. § 1225(b)(1)(B)(v)—the applicant is taken out of the expedited removal system altogether and placed into standard removal proceedings under 8 U.S.C. § 1229a.

35.     During § 1229a removal proceedings, the applicant has the opportunity to develop a full record before an immigration judge ("IJ"), apply for asylum, withholding of removal, protection under CAT, and any other relief that may be available, and appeal an adverse decision to the BIA and court of appeals. 8 C.F.R. §§ 208.30(f), 1003.43(f) and 1208.30; *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

36.     Until the asylum officer makes the credible fear determination, an applicant in expedited removal proceedings is subject to mandatory detention. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 235.3(b)(4)(ii).

37.     Defendants have a policy or practice of delaying the provision of credible fear interviews to asylum seekers who express a fear of return, and thus unnecessarily prolonging their mandatory detention.

38.     Until recently, BIA case law recognized that noncitizens who were apprehended after entering without inspection and placed in removal proceedings after passing their credible fear interviews are entitled to bond hearings. *Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005), *reversed and vacated by Matter of M-S-*, 27 I&N Dec. 509 (A.G. 2019) (issued April 16, 2019, but effective date stayed until July 15, 2019), (interpreting bond regulations at 8 C.F.R. §§ 1003.19(h)(2) and 1236.1).

39.     Defendants' policy and practice, however, has been both to deny timely bond hearings and to require the noncitizens, rather than the government, to bear the burden of proving at these bond hearings that continued detention is not warranted. These bond hearings have also lacked procedural safeguards such as a verbatim transcript or audio recording, and a contemporaneous written decision explaining the IJ's findings.

40.     Traditionally, those asylum seekers in § 1229a removal proceedings who are not deemed "arriving"—that is, those who were apprehended near the border *after* entering without inspection, as opposed to asylum seekers who are detained at a port of entry—become entitled to an individualized bond hearing before an IJ to assess their eligibility for release from incarceration once they have been found to have a credible fear. *See* 8 U.S.C. §§ 1225(b)(1)(A)(iii), 1225(b)(1)(B)(iii)(IV); 8 C.F.R. §§ 208.30(f), 1236.1(d).

41.     In 2005, Defendant EOIR reaffirmed the availability of bond hearings for this group of asylum seekers. *Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005), *reversed and vacated by Matter of M-S-*, 27 I&N Dec. 509 (A.G. 2019). *See also* 8 C.F.R. § 1003.19(h)(2).

42.     At the bond hearing, an IJ determines whether to release the individual on bond or conditional parole pending resolution of her immigration case. *See* 8 U.S.C. § 1226(a); 8 C.F.R. §§ 1236.1(d)(1), 1003.19. In doing so, the IJ evaluates whether they pose a danger to the community and the likelihood that they will appear at future proceedings. *See Matter of Adeniji*, 22 I&N Dec. 1102, 1112 (BIA 1999).

43.     The detained individual has the right to appeal an IJ's denial of bond to the BIA, 8 C.F.R. § 1003.19(f), or to seek another bond hearing before an immigration judge if they can establish a material change in circumstances since the prior bond decision, 8 C.F.R. § 1003.19(e).

44.     Defendant EOIR places the burden of proving eligibility for release on the detained noncitizen seeking bond, not the government. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006).

45.     Immigration courts do not require recordings of bond proceedings and do not provide transcriptions of the hearing, or even the oral decisions issued in the hearings. Immigration courts also do not issue written decisions unless the individual has filed an administrative appeal of the bond decision. *See, e.g.*, Imm. Court Practice Manual § 9.3(e)(iii), (e)(vii); BIA Practice Manual §§ 4.2(f)(ii), 7.3(b)(ii).

46.     When an IJ denies release on bond or other conditions, she does not make specific, particularized findings, and instead simply checks a box on a template order.

47.     On April 5, 2019, this Court granted Plaintiffs' Motion for Preliminary Injunction and ordered that Defendant EOIR implement key procedural safeguards. In particular, the Court required EOIR to conduct bond hearings within seven days of request by Bond Hearing Class members, place the burden of proof at those hearings on Defendant DHS, record the hearings, produce a recording or verbatim transcript upon appeal, and produce a written decision with particularized determinations of individualized findings at the conclusion of each bond hearing. Dkt. 110 at 19.

### The Attorney General's Decision in *Matter of M-S-*

48.     On October 12, 2018—approximately two months after Plaintiffs filed their amended complaint raising the bond hearing class claims, and around six months before this Court issued its preliminary injunction—former Attorney General Sessions referred to himself a pro se case seeking to review whether "*Matter of X-K-*, 23 I&N Dec. 731 (BIA 2005) . . . should be overruled in light of *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)." *Matter of M-G-G-*, 27 I&N Dec. 469, 469 (A.G. 2018); *see also  Matter of M-S-*, 27 I&N Dec. 476 (A.G. 2018).

49.     On November 7, 2018, former Defendant Sessions resigned as Attorney General.

50.     Subsequently, on February 14, 2019, Attorney General Barr was confirmed by the Senate.

51.     On April 16, 2019, Defendant Barr issued *Matter of M-S-*, 27 I. & N Dec. 509 (A.G. 2018). In this decision, Defendant Barr reversed and vacated *Matter of X-K-*, 23 I&N Dec.

731 (BIA 2005), holding the Immigration and Nationality Act (INA) does not permit bond hearings for individuals who enter the United States without inspection, establish a credible fear for persecution or torture, and are then referred for full removal hearings before the immigration court.

52.    Although existing regulations provide for bond hearings except in limited circumstances not applicable here, Defendant Barr did not formally rescind or modify the regulations or engage in the required rulemaking process.

53.    Defendant Barr stayed the effective date of his decision for 90 days so that DHS may conduct the "necessary operational planning for additional detention and parole decisions" that will result from the elimination of IJ bond hearings. *Matter of M-S-*, 27 I&N Dec. at 519 n.8.

54.    Under *Matter of M-S- ,* asylum seekers will be restricted to requesting release from ICE—the jailing authority—through the parole process. 27 I&N Dec. at 516-17 (citing 8 U.S.C. § 1182(d)(5)). In contrast to a bond hearing before an immigration judge, the parole process consists merely of a custody review conducted by low-level ICE detention officers. *See* 8 C.F.R. § 212.5. It includes no hearing before a neutral decision maker, no record of any kind, and no possibility for appeal. *See id*. Instead, ICE officers make parole decisions—that can result in months or years of additional incarceration—by merely checking a box on a form that contains no factual findings, no specific explanation, and no evidence of deliberation.

55.    In *Matter of M-S-*, Defendant Barr also ordered that the noncitizen in that case, who had previously been released on bond, "must be detained until his removal proceedings conclude" unless DHS chooses to grant him parole. *Matter of M-S-*, 27 I&N Dec. at 519.

56.    Pursuant to *Matter of M-S-*, Defendants will initiate a policy and practice of denying bond hearings to noncitizens seeking protection who are apprehended after entering without inspection, even after being found to have a credible fear of persecution or torture and even after their cases are transferred for full hearings before the immigration court.

**Plaintiff Yolany Padilla**

57.     Yolany Padilla is a citizen of Honduras seeking asylum in the United States for herself and her 6-year-old son J.A.

58.     On or about May 18, 2018, Ms. Padilla and J.A. entered the United States. As they were making their way to a nearby port of entry, they were arrested by a Border Patrol agent for entering without inspection.

59.     When they arrived at the port of entry, an officer there announced to her and the rest of the group that the adults and children were going to be separated. The children old enough to understand the officer began to cry. J.A. clutched his mother's shirt and said, "No, mommy, I don't want to go." Ms. Padilla reassured her son that any separation would be short, and that everything would be okay. She was able to stay with her son until they were transferred later that day to a holding facility known as a *hielera,* or freezer, because of the freezing temperatures of the rooms. Ms. Padilla and J.A. were then forcibly separated without explanation.

60.     While detained in the *hielera*, Ms. Padilla informed the immigration officers that she and her son were afraid to return to Honduras.

61.     About three days later, Ms. Padilla was transferred to another facility in Laredo, Texas. The officers in that facility took her son's birth certificate from her. When she asked for it back, she was told that the immigration authorities had it.

62.     About twelve days later, Ms. Padilla was transferred to the Federal Detention Center in SeaTac, Washington.

63.     For many weeks after J.A. was forcibly taken from her, Ms. Padilla received no information regarding his whereabouts despite repeated inquiries. Around a month into her detention, the Honduran consul visited Ms. Padilla at the detention center, and she explained that she had no news of her 6-year-old son. Soon thereafter, she was given a piece of paper stating that J.A. was in a place called Cayuga Center in New York, thousands of miles away.

64.    On July 2, 2018, more than six weeks after being apprehended and detained, Ms. Padilla was given a credible fear interview. The asylum officer issued a positive credible fear determination, and she was placed in removal proceedings.

65.    On July 6, 2018, Ms. Padilla attended her bond hearing before the immigration judge. During the bond hearing, the immigration judge placed the burden of proof on Ms. Padilla to demonstrate that she is neither a danger nor flight risk. To her knowledge, there is no verbatim transcript or recording of her bond hearing. The immigration judge set a bond amount of $8,000.

66.    Ms. Padilla was released on July 6, 2018, after posting bond.

67.    Pursuant to *Matter of M-S-*, Ms. Padilla now faces the prospect of being re-detained without a bond hearing.

**Plaintiff Ibis Guzman**

68.    Ibis Guzman is a citizen of Honduras seeking asylum in the United States for herself and her 5-year-old son R.G.

69.    On or about May 16, 2018, Ms. Guzman and R.G. entered the United States. When they were apprehended by Border Patrol agents for entering without inspection, Ms. Guzman informed them that she and R.G. are seeking asylum.

70.    After initial questioning, an officer came and forcibly took R.G. from Ms. Guzman, falsely informing her she would be able to see him again in three days. After those three days, Ms. Guzman was transferred to another CBP facility, where officers told her they did not know anything about her son's whereabouts.

71.    Ms. Guzman was then transferred to a facility in Laredo, Texas, where she was detained without any knowledge of the whereabouts of her child and without any means to contact him. She did not receive any information about him during this time, despite her repeated attempts to obtain such information.

72.    About two weeks later, Ms. Guzman was transferred to the Federal Detention Center in SeaTac, Washington. After being held there for about another week, she was finally

informed her child had been placed with Baptist Child and Family Services in San Antonio, Texas, thousands of miles from where she was being held.

73.    On June 20, 2018, Ms. Guzman was transferred to the Northwest Detention Center in Tacoma, Washington.

74.    On June 27, 2018, over a month after being apprehended and detained, Ms. Guzman attended a credible fear interview. The asylum officer determined that she has a credible fear, and she was placed in removal proceedings.

75.    On July 3, 2018, Ms. Guzman attended a bond hearing before immigration judge. At the bond hearing, the immigration judge placed the burden of proof on Ms. Guzman to demonstrate that she qualified for a bond. At the conclusion of that bond hearing, an immigration judge issued an order denying her release on bond pending the adjudication of her asylum claim on the merits. The immigration judge did not make specific, particularized findings for the basis of the denial. The immigration judge circled the preprinted words "Flight Risk" on a form order. To her knowledge, there is no verbatim transcript or recording of her bond hearing.

76.    Ms. Guzman was not released until on or about July 31, 2018, after the government was ordered to comply with the preliminary injunction in *Ms. L v. ICE.*

### Plaintiff Blanca Orantes

77.    Blanca Orantes is a citizen of El Salvador seeking asylum in the United States for herself and her 8-year-old son A.M.

78.    On or about May 21, 2018, Ms. Orantes and A.M. entered the United States. They immediately walked to a CBP station to request asylum, and were subsequently arrested for entering without inspection. Ms. Orantes informed a Border Patrol agent that she and A.M. are seeking asylum.

79.    Ms. Orantes and her son were transported to a CBP facility. Before entering the building, the officers led Ms. Orantes into a *hielera* with other adults, and her son into another part of the station with other children.

80.     Ms. Orantes was later interviewed by an immigration officer. At that time, another officer brought A.M. to her and told her to "say goodbye" to him because they were being separated. A.M. began crying and pleading Ms. Orantes not to leave, but was forcibly taken away from Ms. Orantes.

81.     On or around May 24, 2018, Ms. Orantes was taken to court, where she pled guilty to improper entry under 8 U.S.C. § 1325 and was sentenced to time served. She was then returned to her cell.

82.     About nine days after this, Ms. Orantes was transported to the Federal Detention Center in SeaTac, Washington.

83.     Ms. Orantes was not provided any information about her child until June 9, 2018, when an ICE officer handed her a slip of paper advising that her son was being held at Children's Home of Kingston, in Kingston, New York.

84.     On June 20, 2018, Ms. Orantes was transferred to the Northwest Detention Center in Tacoma, Washington, still thousands of miles away from her son.

85.     On June 27, 2018, around five weeks after being apprehended, Ms. Orantes was given a credible fear interview. The following day, June 28, 2018, the asylum officer determined that Ms. Orantes established a credible fear, and she was placed in removal proceedings.

86.     Ms. Orantes requested a bond hearing upon being provided the positive credible fear determination.

87.     On July 16, 2018, Ms. Orantes was given a bond hearing before the immigration court. At the bond hearing, the immigration judge placed the burden of proof on Ms. Orantes to demonstrate that she qualified for a bond. At the conclusion of that bond hearing, an immigration judge issued an order denying her release on bond pending the adjudication of her asylum claim on the merits.

88.     In denying Ms. Orantes's request for a bond, the immigration judge did not make specific, particularized findings for the basis of the denial, and even failed to check the box

indicating why she was denied bond on the template order.

89.     She was released from custody on or about July 23, 2018, after the federal government was forced to comply with the preliminary injunction in *Ms. L. v. ICE*, and thereafter reunited her with her child.

**Plaintiff Baltazar Vasquez**

90.     Plaintiff Baltazar Vasquez is a citizen of El Salvador seeking asylum in the United States.

91.     On or about June 1, 2018, Mr. Vasquez entered the United States. He was arrested by a Border Patrol agent for entering without inspection, and informed the agent that he was afraid to return to El Salvador and wanted to seek asylum.

92.     Mr. Vasquez was first transported by officers to a federal holding center near San Diego, California. Around nine days later, he was transferred to a Federal Detention Center in Victorville, California.

93.      On or about July 20, 2018, Mr. Vasquez was transferred to another detention center in Adelanto, California.

94.     On or about July 31, 2018, nearly two months after he was first apprehended, Mr. Vasquez was given a credible fear interview. The asylum officer determined he had a credible fear, and he was placed in removal proceedings.

95.     Mr. Vasquez requested a bond hearing upon being provided the positive credible fear determination.

96.     On August 20, 2018, Mr. Vasquez was given a bond hearing before the immigration court. At the bond hearing, Mr. Vasquez had the burden to prove that he is neither a danger or flight risk, but ultimately, DHS agreed to stipulate to a bond amount of 8,000 dollars. The immigration judge approved this agreement but also required Mr. Vasquez to wear an ankle monitor.

97.     Pursuant to *Matter of M-S-*, Mr. Vasquez now faces the prospect of being re-detained without a bond hearing.

## VI.     CLASS ALLEGATIONS

98.     Plaintiffs brought this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). A class action is proper because this action involves questions of law and fact common to the classes, the classes are so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims of the classes, Plaintiffs will fairly and adequately protect the interests of the respective classes, and Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

99.     Plaintiffs sought to represent the following nationwide classes:

a.  **Credible Fear Interview Class ("CFI Class"):** All detained asylum seekers in the United States subject to expedited removal proceedings under 8 U.S.C. §1225(b) who are not provided a credible fear determination within 10 days of requesting asylum or expressing a fear of persecution to a DHS official, absent a request by the asylum seeker for a delayed credible fear interview.

b.  **Bond Hearing Class ("BH Class"):** All detained asylum seekers who entered the United States without inspection, who were initially subject to expedited removal proceedings under 8 U.S.C. §1225(b), who were determined to have a credible fear of persecution, but who are not provided a bond hearing with a verbatim transcript or recording of the hearing within 7 days of requesting a bond hearing.

100.    On March 6, 2019, the district court certified the following nationwide classes:

a.  **Credible Fear Interview Class:** All detained asylum seekers in the United States subject to expedited removal proceedings under 8 U.S.C. § 1225(b)

who are not provided a credible fear determination within ten days of the later

of (1) requesting asylum or expressing a fear of persecution to a DHS official

or (2) the conclusion of any criminal proceeding related to the circumstances

of their entry, absent a request by the asylum seeker for a delayed credible

fear interview.

b. **Bond Hearing Class:** All detained asylum seekers who entered the United

States without inspection, were initially subject to expedited removal

proceedings under 8 U.S.C. § 1225(b), were determined to have a credible

fear of persecution, but are not provided a bond hearing with a verbatim

transcript or recording of the hearing within seven days of requesting a bond

hearing.

101.    The certified classes currently are represented by counsel from the Northwest

Immigrant Rights Project and the American Immigration Council. Counsel have extensive

experience litigating class action lawsuits and other complex cases in federal court, including

civil rights lawsuits on behalf of noncitizens.

### Credible Fear Interview Class ("CFI Class")

102.    All named Plaintiffs represent the certified CFI Class.

103.    The CFI Class meets the numerosity requirement of Federal Rule of Civil

Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable.

Plaintiffs are not aware of the precise number of potential class members, but upon information

and belief, there are thousands of individuals seeking protection who are subject to expedited

removal proceedings and not provided a credible fear interview within ten days of expressing a

fear of return or desire to apply for asylum. Defendants are uniquely positioned to identify all

class members.

104.    The CFI Class meets the commonality requirement of Federal Rule of Civil

Procedure 23(a)(2). By definition, members of the CFI Class are subject to a common practice

by Defendants: their failure to provide timely credible fear interviews. This lawsuit raises a question of law common to members of the CFI Class, namely whether Defendants' delay in providing credible fear interviews constitutes agency action unlawfully withheld or unreasonably delayed under the APA, the INA, and the Due Process Clause.

105.    The CFI Class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class. All named Plaintiffs were not provided credible fear interviews within 10 days of being apprehended and expressing a fear of return to their countries of origin.

106.    The CFI Class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same relief as the other members of the class—namely, an order that Defendants promptly provide credible fear interviews. In defending their own rights, the named Plaintiffs will defend the rights of all class members fairly and adequately.

107.    The members of the class are readily ascertainable through Defendants' records.

108.    The CFI Class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the class by unreasonably delaying putative class members' credible fear interviews. Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

**Bond Hearing Class ("BH Class")**

109.    Plaintiffs Orantes and Vasquez represent the certified Bond Hearing Class.

110.    The BH Class meets the numerosity requirement of Federal Rule of Civil Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. Plaintiffs are not aware of the precise number of potential class members, but upon information and belief, there are thousands of individuals seeking protection who entered without inspection, were referred to standard removal proceedings after a positive credible fear determination, and were not provided bond hearings either within seven days of requesting the hearing, or whose

bond hearings were not recorded or transcribed. Defendants are uniquely positioned to identify all class members.

111.    The BH Class meets the commonality requirement of Federal Rule of Civil Procedure 23(a)(2). Members of the BH Class are subject to common policies and practices by Defendants: their failure to provide timely bond hearings; their placement of the burden of proof on the detained on the detained individual during bond hearings; their failure to provide a verbatim transcript or recording of the bond hearing; their failure to provide a contemporaneous written decision with particularized findings; and finally, due to *Matter of M-S-*, all class members will be denied bond hearings.

112.    This lawsuit raises questions of law common to members of the BH Class: whether Defendants' failure to provide bond hearings violates class members' right to due process, right to a parole hearing under 8 U.S.C. § 1182(d)(5), and the rulemaking requirements of the Administrative Procedure Act; whether Defendants' failure to provide timely bond hearings constitutes agency action unlawfully withheld or unreasonably delayed under the APA, that is contrary to law under the APA; whether due process requires Defendants to provide bond hearings to putative class members within seven days of a request, and whether due process and the APA requires Defendants to place the burden of proof on the government to justify continue detention, and to provide adequate procedural safeguards during the bond hearings provided to putative class members.

113.    The BH Class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3), because the claims of the representative Plaintiffs are typical of the claims of the class. Plaintiffs Orantes and Vasquez were not provided bond hearings within seven days of requesting a hearing. At the bond hearing, all class representatives were assigned the burden to prove that they are eligible for release under bond. All class representatives were denied a contemporaneous written decision with particularized findings. Defendants are not required to record or provide verbatim transcripts of the hearings and did not advise Plaintiffs Orantes and Vasquez that

recordings had been made until filing their First Amended Complaint, Dkt. 8. Finally, in *Matter of M-S-*, Defendant Barr has announced that, as of July 15, 2019, future Bond Hearing Class members will be deprived of *any* bond hearing.

114.    The BH Class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same relief as the other members of the class: an order requiring Defendants to provide bond hearings within seven days of request, to place the burden of proof on the government during these bond hearings, to provide a verbatim transcript or recording of the hearing, and to provide a contemporaneous written decision with particularized findings at the end of the hearing. In defending their own rights, the named Plaintiffs will defend the rights of all class members fairly and adequately.

115.    The members of the class are readily ascertainable through Defendants' records.

116.    The BH Class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the class by unreasonably delaying putative class members' bond hearings. Putative class members received an untimely bond hearing in which they had to bear the burden of proof. Defendants generally do not record or provide verbatim transcripts of putative class members' bond hearings, nor issue contemporaneous written decisions with particularized findings. Moreover, after July 15, 2019, class members will not receive any bond hearings. Injunctive and declaratory relief is thus appropriate with respect to the class as a whole.

## VII.    CAUSES OF ACTION

### COUNT I
**(Violation of Fifth Amendment Right to Due Process—Right to Timely Bond Hearing with Procedural Safeguards)**

117.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

118.  The Due Process Clause of the Fifth Amendment provides that "no person . . . shall be deprived of . . . liberty . . . without due process of law." U.S. Const., amend. V.

119.  Named Plaintiffs and all BH Class members were apprehended on U.S. soil after entry and are thus "persons" to whom the Due Process Clause applies.

120.  The Due Process Clause permits civil immigration detention only where such detention is reasonably related to the government's interests in preventing flight or protecting the community from danger and is accompanied by adequate procedures to ensure that detention serves those goals.

121.  Both substantive and procedural due process therefore require an individualized assessment of BH Class members' flight risk or danger to the community in a custody hearing before a neutral decision maker.

122.  The Due Process Clause guarantees that such individualized custody hearings be provided in a timely manner to afford Plaintiffs and BH Class members an opportunity to challenge whether their continued detention is necessary to ensure their future appearance or to avoid danger to the community. Federal courts have consistently held that due process requires an expeditious opportunity to receive that individualized assessment. Defendants' interests in prolonging this civil detention do not outweigh the liberty interests of Plaintiffs and BH Class members.

123.  The Due Process Clause requires that Plaintiffs and BH Class members receive adequate procedural protections to assert their liberty interest. The Due Process Clause requires the government to bear the burden of proof in the custodial hearing of demonstrating that the continued detention of Plaintiffs and BH Class members is justified. Defendants' interests do not outweigh the liberty interests for Plaintiffs and BH Class members.

124.  The Due Process Clause requires that the government provide either a transcript or recording of the hearing and specific, particularized findings of the bond hearing to provide a meaningful opportunity for Plaintiffs and BH Class members to evaluate and appeal the IJ's custody determination. Defendants' interests in issuing decisions without these procedural protections do not outweigh the liberty interests for Plaintiffs and BH Class members.

125.  Pursuant to *Matter of M-S-*, Defendants deprive Plaintiffs and BH Class members the right to any custodial hearing before a neutral arbiter to make an individualized determination of whether they present a danger to the community or a flight risk.

126.  Pursuant to *Matter of M-S-*, Plaintiffs and BH Class members who have been released face the prospect of being re-detained without a bond hearing.

127.  Prior to *Matter of M-S-*, Defendants recognized that BH Class members are entitled to a bond hearing. Defendants have regularly delayed these hearings for several weeks after the credible fear determinations.

128.  Defendants have also failed to provide the other bond hearing procedures required by due process, placing the burden of proof on Plaintiffs and BH Class members and refusing to provide them with a recording or verbatim transcript of the hearing as well as a written decision with particularized findings of the bond hearing.

129.  As a result, by failing to provide prompt bond hearings with adequate procedural safeguards, Defendants violate the Fifth Amendment's Due Process Clause.

## COUNT II
### (Violation of Immigration & Nationality Act—Failure to Provide an Individualized Custodial Hearing)

130.  All of the foregoing allegations are repeated and realleged as though fully set forth herein.

131.  8 U.S.C. § 1225(b)(1)(A) distinguishes BH class members, who are detained after entering the country, from those who are charged as arriving and seeking admission at a port of entry. 8 U.S.C. § 1225(b)(1)(A)(iii)(I) provides that the Attorney General "may" place BH Class members in expedited removal proceedings, but unlike those who are charged as arriving, does not require that they be subject to mandatory detention.

132.  Under 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), asylum seekers are subject to mandatory detention only while "pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."

133.  Plaintiffs and all BH Class members entered without inspection and were placed in expedited removal proceedings under to 8 U.S.C. § 1225(b). All of them established a credible fear of persecution or torture and were thereafter transferred for full hearings before the immigration court.

134.  As such, under the Immigration and Nationality Act, Plaintiffs are entitled to seek a custody hearing where the Attorney General may grant bond or conditional parole. 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(d); 8 C.F.R. § 1003.19(h)(2).

135.  Defendant Barr's decision in *Matter of M-S-* denies Plaintiffs and BH Class members their statutory right to an individualized custody hearing.

### COUNT III
**(Violation of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(d)(5), and Violation of Fifth Amendment Right to Due Process—Failure to Provide an Individualized Parole Hearing)**

136.  All of the foregoing allegations are repeated and realleged as though fully set forth herein.

137.  The Immigration and Nationality Act ("INA")provides that the Attorney General "may . . . in his discretion parole into the United States . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ." 8 U.S.C. § 1182(d)(5)(A). Under the INA and implementing regulations, immigration detention of an asylum seeker must be based on an individualized determination that the asylum seeker constitutes a flight risk or a danger to the community. *See id.*; *see also* 8 C.F.R. § 212.5(b)(5).

138.  Pursuant to implementing regulations, parole reviews are conducted solely by U.S. Immigration and Customs Enforcement ("ICE")—the jailing authority. *See id.*

139.  However, the INA requires an individualized parole hearing before an immigration judge to decide if the asylum seeker constitutes a flight risk or danger to the community.

140.    Defendants' policy and practice of denying Plaintiffs and those similarly situated parole hearings before an immigration judge violates the INA.

141.    To the extent the statute denies parole hearings before an immigration judge, the statute violates due process.

## COUNT IV
### (Violation of Administrative Procedure Act—Failure to Follow Notice & Comment Rulemaking)

142.  All of the foregoing allegations are repeated and realleged as though fully set forth herein.

143.  Regulations that currently govern Defendants DHS and EOIR provide that Plaintiffs and BH Class members may seek review of ICE's custody decision before an IJ. *See* 8 C.F.R. §§ 1003.19(h)(2), 1236.1(d).

144.  *Matter of M-S-* is a final agency action that purports to alter those regulations by adjudication, without engaging in notice and comment rulemaking.

145.  The Administrative Procedure Act requires Defendants to engage in notice and comment rulemaking before undertaking the changes that *Matter of M-S-* purports to make to BH Class Members' rights to a bond hearing. *See* 5 U.S.C. §§ 551(5), 553(b) & (c).

146.  As a result, *Matter of M-S-* is unlawful agency action that this Court should set aside because that decision was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT V
### (Violation of Fifth Amendment Right to Due Process—Delays of Credible Fear Interviews)

147.  All of the foregoing allegations are repeated and realleged as though fully set forth herein.

148.  The Due Process Clause guarantees timely and adequate procedures to test Defendants' rationale for detaining asylum seekers.

149.  Defendants' practice of delaying individuals seeking protection credible fear interviews beyond 10 days prevents Plaintiffs Padilla, Guzman, Orantes, and Vasquez, and the CFI Class from demonstrating that they have a "significant possibility" of obtaining protection and a lawful status in the United States. 8 U.S.C. § 1225(b)(1)(B)(v). That practice thus further lengthens their time in detention without the opportunity to appear before a neutral decision maker to receive an individualized custodial assessment.

150.  Defendants' interests do not outweigh the significant risks that delayed credible fear interviews pose in wrongfully prolonging Plaintiffs Padilla, Guzman, Orantes, and Vasquez , and CFI Class members' detention, nor do they outweigh their protected due process interests in timely demonstrating their right to protection in the United States.

151.  Defendants' practice of delaying credible fear interviews therefore violates the CFI Class's right to due process.

## <u>COUNT VI</u>
### (Administrative Procedure Act—Delays of Credible Fear Interviews and Bond Hearings and Denial of Procedural Protections)

152.  All of the foregoing allegations are repeated and realleged as though fully set forth herein.

153.  The Administrative Procedure Act ("APA") imposes on federal agencies the duty to conclude matters presented to them within a "reasonable time." 5 U.S.C. §555(b).

154.  The APA also permits the CFI and BH Classes to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and prohibits final agency action that is arbitrary and capricious, that violates the Constitution, or that is otherwise not in accordance with law, *id.* § 706(2)(A)-(B).

155.  Both credible fear interviews and bond hearings are "discrete agency actions" that Defendants are "required to take," and therefore constitute agency action that a court may compel. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

156.  Defendants' failure to expeditiously conduct a credible fear interview after detaining Plaintiffs and members of the CFI Class constitutes "an agency action unlawfully withheld or unreasonably delayed" under the APA. *See* 5 U.S.C. § 706(1).

157.  Defendants' failure to promptly conduct a bond hearing for plaintiffs and members of the BH Class within 7 days of a request also constitutes "an agency action unlawfully withheld or unreasonably delayed" under the APA. *See id.*

158.  Defendants' policies regarding (1) the burden of proof in bond proceedings, (2) the lack of recordings and transcripts, (3) the failure to provide specific, particularized findings constitute final agency action.

159.  The lack of these procedural protections is contrary to law and violates the constitutional right to due process of noncitizens seeking protection. *See* 5 U.S.C. § 706(2).

## VIII.   <u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully request that this Court enter judgment against Defendants granting the following relief on behalf of the Credible Fear Interview Class and the Bond Hearing Class:

A.  Declare that Defendants have an obligation to provide Credible Fear Interview Class members with a credible fear interview and determination within 10 days of requesting asylum or expressing a fear of persecution or torture to any DHS official.

B.  Preliminarily and permanently enjoin Defendants from not providing Credible Fear Interview Class members their credible fear determination within 10 days of requesting asylum or expressing a fear of persecution or torture to any DHS official.

C.  Declare that Defendants have an obligation to provide Bond Hearing Class members a bond hearing before an immigration judge.

D.  Preliminarily and permanently enjoin Defendants from not providing Bond Hearing Class members a bond hearing before an immigration judge.

E.  Declare that Defendants have an obligation to provide Bond Hearing Class members a bond hearing within 7 days of their requesting a hearing to set reasonable conditions

for their release pending adjudication of their claims for protection.

F. Declare that Defendant DHS must bear the burden of proof to show continued detention is necessary in civil immigration proceedings.

G. Declare that Defendants have an obligation to provide Bond Hearing Class members a bond hearing with adequate procedural safeguards, including providing a verbatim transcript or recording of their bond hearing upon appeal.

H. Declare that in bond hearings immigration judges must make specific, particularized written findings as to the basis for denying release from detention, including findings identifying the basis for finding that the individual is a flight risk or a danger to the community.

I. Preliminarily and permanently enjoin Defendants from not providing Bond Hearing Class members their bond hearing within 7 days of the class members' request.

J. Preliminarily and permanently enjoin Defendants from not providing Bond Hearing Class members bond hearings where Defendant DHS bears the burden of proof to show continued detention is necessary.

K. Preliminarily and permanently enjoin Defendants from not providing Bond Hearing Class members their bond hearing with a verbatim transcript or recording of their bond hearing.

L. Preliminarily and permanently enjoin Defendants from not providing Bond Hearing Class members specific, particularized written findings contemporaneously issued by the immigration judge as to the basis for denying release from detention, including findings identifying the basis for finding that the individual is a flight risk or a danger to the community.

M. Order Defendants to pay reasonable attorneys' fees and costs.

N. Order all other relief that is just and proper.

Dated this 20th day of May, 2019.

s/ Matt Adams
Matt Adams, WSBA No. 28287

s/ Leila Kang
Leila Kang, WSBA No. 48048

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974

NORTHWEST IMMIGRANT RIGHTS
PROJECT
615 Second Avenue, Suite 400
Seattle, WA  98104
(206) 957-8611
matt@nwirp.org
leila@nwirp.org
aaron@korthuis.org


s/ Emily Chiang
Emily Chiang, WSBA No. 50517
ACLU OF WASHINGTON
901 5th Ave #630
Seattle, WA 98164
(206) 624-2184
echiang@aclu-wa.org

s/ Trina Realmuto
Trina Realmuto*

s/ Kristin Macleod-Ball
Kristin Macleod-Ball*

AMERICAN IMMIGRATION COUNCIL
1318 Beacon Street, Suite 18
Brookline, MA 02446
(857) 305-3600
trealmuto@immcouncil.org
kmacleod-ball@immcouncil.org


s/ Judy Rabinovitz
Judy Rabinovitz*

s/ Michael Tan
Michael Tan*

s/ Anand Balakrishnan
Anand Balakrishnan*

ACLU IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2618
jrabinovitz@aclu.org
mtan@aclu.org
abalakrishnan@aclu.org

*Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2019, I had the foregoing electronically filed with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to those

attorneys of record registered on the CM/ECF system.  All other parties (if any) shall be served

in accordance with the Federal Rules of Civil Procedure.

DATED this 20th day of May, 2019.

*s/ Matt Adams*
Matt Adams
NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, Washington  98104
Telephone: (206) 957-8611
Facsimile: (206) 587-4025
Email: matt@nwirp.org

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

YOLANY PADILLA, et al.,

                    Plaintiffs,

        v.

U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT, et al.,

                    Defendants.

CASE NO. C18-928 MJP

ORDER ON MOTION TO DISMISS

The above-entitled Court, having received and reviewed:

1.  Defendants' Motion to Dismiss (Dkt. No. 36),

2.  Plaintiffs' Opposition to Defendants' Motion to Dismiss (Dkt. No. 69),

3.  Defendants' Reply in Support of Motion to Dismiss (Dkt. No. 76),

all attached declarations and exhibits, and relevant portions of the record, and having heard oral

argument on the motion, rules as follows:

        IT IS ORDERED that the motion is PARTIALLY GRANTED and PARTIALLY

DENIED; Plaintiffs' claims relating to violations of the Administrative Procedures Act are

DISMISSED with prejudice (except as to the claims of the Bond Hearing class for certain procedural safeguards); the motion to dismiss the remainder of Plaintiffs' claims is DENIED.

## Background

Plaintiffs bring this action against U.S. Immigration and Customs Enforcement ("ICE"), the U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), the Executive Office for Immigration Review ("EOIR"), and various government officials in their official capacities (collectively, the "government") challenging the legality of (1) "the government's policy or practice of excessively prolonging the detention of asylum seekers placed in expedited removal proceedings by failing to promptly provide them their credible fear interview and determination," and (2) "the government's related policy or practice of excessively prolonging the detention of asylum seekers by failing to promptly conduct the bond hearings required by federal law after an asylum seeker's positive completion of their credible fear interview." (See Dkt. No. 26.)

### I.    Statutory / Regulatory Scheme

The statutes at issue in this litigation are 8 U.S.C. §§ 1225, 1226, and 1252.  In general, these statutes provide as follows:

If an immigration officer determines that an alien arriving in the U.S. is "inadmissible" (as defined in § 1182), the alien is subject to removal without further hearing unless the alien indicates an intention to apply for asylum or a fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(i).  An alien indicating an intention to apply for asylum or a fear of persecution is referred for an interview to determine whether he or she has a credible fear of persecution or torture if returned to their home country (a "credible fear interview").  Id., § 1225(b)(1)(A)(ii).  Any alien subject to

this process "shall be detained pending a final determination of credible fear of persecution."
Id., § 1225(b)(1)(B)(iii)(IV).

An asylum officer conducts the credible fear interview.  If the officer determines that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum."  Id., § 1225(b)(1)(B)(i), (ii).  Aliens awaiting either a credible fear interview or "further consideration of the application for asylum" are included in the category of aliens "pending a decision on whether the alien is to be removed" and are detained pursuant to § 1226(a).  Aliens awaiting further consideration of an application for asylum may be eligible for a custody determination by DHS and then a bond hearing before an immigration judge ("IJ").  8 C.F.R. § 1003.19(h)(2).[1]

Every alien detained pursuant to § 1226(a) is individually considered for release on bond by an ICE officer and served with a custody determination form.  Id., § 236.1(c)(8).  If bond is denied or the detainee believes bond is set too high, he or she may request a "redetermination" of the custody decision by an IJ.  Id., §§ 236.1(d)(1), 1003.19, 1236.1(d)(1).  At the bond hearing the alien has the burden of proving that he or she is not a flight risk or a danger to the community.

The IJ's decision may be appealed to the Board of Immigration Appeals ("BIA").  Id., § 236.1(d)(3)(i), 1236.1(d)(3)(i).  The bond hearings are not usually recorded, but upon appeal, the IJ will prepare a written memorandum outlining the grounds for the decision.

## II.    The Named Plaintiffs

The named plaintiffs in this action are persons seeking asylum in the United States:

---

[1] The statutes contain no time periods within which either the credible fear interview or bond hearing must be held.

- **Yolany Padilla**: Shortly after her apprehension for illegal entry into the United States on May 16, 2018, Ms. Padilla expressed a fear of being removed to her native Honduras. (Dkt. No. 26, Second Amended Complaint ("SAC") at ¶ 40.) Six weeks after her entry, she was interviewed by an asylum officer and was found to have a credible fear, at which point she became eligible for a bond hearing. She was granted a bond hearing two days after her credible fear determination. (Id. at ¶ 66.) Ms. Padilla was awarded bond and was released on July 6, 2018, after this lawsuit was filed. (Id. at ¶¶ 66, 115.)

- **Ibis Guzman**: Ms. Guzman is also from Honduras and underwent a similar process to Ms. Padilla, but was denied bond. (Id. at ¶¶ 32, 99.) She reserved appeal, but was released by ICE in late July 2018. (Id. at ¶ 119.)

- **Bianca Orantes**: Shortly after her apprehension for illegal entry into the United States, Ms. Orantes expressed a fear of returning to her native El Salvador. (Id. at ¶ 44.) About five weeks following her entry, she was interviewed by an asylum officer and found to have a credible fear. (Id. at ¶ 102.) She was granted a bond hearing eleven days after her credible fear determination but was denied bond. Ms. Orantes reserved appeal, but was released on July 24, 2018. (Id. at ¶¶ 121, 123.)

- **Baltazar Vasquez**: Shortly after his apprehension for illegal entry into the United States, Mr. Vasquez expressed a fear of returning to his native El Salvador. (Id. at ¶ 46.) About eight weeks after his entry, he was interviewed by an asylum officer and found to have a credible fear. (Id. at ¶ 108.) He was granted a bond hearing three weeks after his credible fear determination. Mr. Vasquez stipulated to an $8,000 bond, waived appeal of the bond order, and was released. (Id. at ¶ 125.)

Plaintiffs seek injunctive and declaratory relief and seek to certify the following classes:

- **Credible Fear Interview Class**: "All detained asylum seekers in the United States subject to expedited removal proceedings under 8 U.S.C. §1225(b) who are not provided a credible fear determination within 10 days of requesting asylum or expressing a fear of persecution to a DHS official." (Id. at 30.)

- **Bond Hearing Class**: "All detained asylum seekers who entered the United States without inspection, were initially subject to expedited removal proceedings under 8 U.S.C. §1225(b), were determined to have a credible fear of persecution, but are not provided a bond hearing with a verbatim transcript or recording of the hearing within 7 days of requesting a bond hearing." (Id. at 31.)

Plaintiffs filed their complaint on June 25, 2018 (Dkt. No. 1) and their SAC (Dkt. No. 26) on August 22, 2018. The SAC focuses on the following claims:

- **Count I (Violation of Due Process)**: Both the Credible Fear Interview and Bond Hearing classes claim violations of their due process rights springing from their detention

for "an unreasonable time" awaiting their credible fear interview and, post-credible fear
determination, their bond hearing.  They seek as remedies (1) a ten-day deadline for the
credible fear interview and (2) a bond hearing within seven days of request, where the
government bears the burden of proof and where detainees are provided a verbatim
transcript of the hearing.

- **Count II (Administrative Procedure Act)**: Both classes allege that their credible fear
  interviews and bond hearings are being "unreasonably delayed" and held without
  "appropriate procedural safeguards" in violation of the Administrative Procedure Act
  ("APA"), 5 U.S.C. § 706.

- **Count III (Violation of Asylum Statute)**: The government asserts, and Plaintiffs
  conceded at oral argument, that Plaintiffs have abandoned this claim by virtue of their
  failure to contest the government's arguments for dismissal.

The government now moves to dismiss each of these claims.  (Dkt. No. 36.)

## Discussion

### I.    Standard of Review

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint for "failure to state a
claim upon which relief can be granted."  In ruling on a motion to dismiss, the Court must
construe the complaint in the light most favorable to the non-moving party.  Livid Holdings Ltd.
v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005).  The Court must accept all
well-pleaded allegations of material fact as true and draw all reasonable inferences in favor of
the plaintiff.  Wyler Summit P'ship v. Turner Broad. Sys., 135 F.3d 658, 661 (9th Cir. 1998).

Dismissal is appropriate where a complaint fails to allege "enough facts to state a claim to
relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A
claim is plausible on its face "when the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft
v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  As a result, a complaint must contain "more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do."
Twombly, 550 U.S. at 555.

## II.    Credible Fear Interview Claims

### A.  Jurisdiction

The government first claims that this Court lacks jurisdiction over Plaintiffs' claims
challenging the timing of the credible fear interviews under 8 U.S.C. § 1252(a)(2)(A).  To be
clear, the legislation is replete with subsections limiting judicial review of the government's
actions under the statute.  See 8 U.S.C. § 1252(a)(2)(iv), § 1252(b)(9), § 1252(e)(1), §
1252(e)(3). However, the Court finds that judicial review of the government's policies and
practices under this statutory scheme is permissible based upon a line of cases which have
wound through the Ninth Circuit and the U.S. Supreme Court, culminating in Rodriguez v.
Marin, __ F.3d __, 2018 WL 6164602 (9th Cir. Nov. 19, 2018).

The Rodriguez line of cases concerns a group of aliens who assert, on due process
grounds, that the statutory scheme embodied in §§ 1225 and 1226 does not authorize
"prolonged" detention without a bond hearing where the government would bear the burden of
proving, by clear and convincing evidence, that continued detention is justified.  Jennings v.
Rodriguez, 138 S.Ct. 830, 839 (2018).  While the Supreme Court would not countenance the
Ninth Circuit's use of "constitutional avoidance" to impose certain bond hearing procedural
requirements not contained in the statutes, it nevertheless had no difficulty in concluding that the
restrictive judicial review language of the statute "does not deprive us of jurisdiction."  Id. at
840.

Like the Plaintiffs in this case, the Rodriguez petitioners "[were] not asking for review of
an order of removal. . . [were] not challenging the decision to detain them in the first place or to

seek removal; and . . . [were] not even challenging any part of the process by which their

removability will be determined."  Id. at 841.  In the face of such a challenge, the Supreme Court

found no jurisdictional bar, as the statutory restrictions on judicial review cannot preclude a

challenge to the overall constitutionality of the legislation or whether it is being applied in a

constitutional fashion.  Id. at 840.  The Ninth Circuit followed suit on remand.  See Rodriguez,

2018 WL 6164602.  In light of what it identified as "vital constitutional issues," the Ninth Circuit

was moved to remark that

> We have grave doubts that any statute that allows for arbitrary prolonged
> detention without any process is constitutional or that those who founded our
> democracy precisely to protect against the government's arbitrary deprivation of
> liberty would have thought so.  Arbitrary civil detention is not a feature of our
> American government.

Id. at *3.

While Plaintiffs' factual circumstances and the relief which they seek are not on all fours

with the petitioners in Rodriguez, the Court sees no difference between the two cases in terms of

the constitutional issue ("arbitrary prolonged detention") at stake.  While the outcome of the

litigation is not certain at this point, the Court's jurisdiction to consider the claims of the

Credible Fear Interview class "contesting the constitutionality of the entire statutory scheme

under the Fifth Amendment," Jennings, 138 S.Ct. at 841, is not in question.

The Court recognizes that the existence of Fifth Amendment issues does not, by itself,

confer jurisdiction upon it to hear Plaintiffs' claims.  However, Plaintiffs here seek habeas relief

for their alleged injuries and "[i]t is now clear that 'federal district court has habeas jurisdiction

under 28 U.S.C. §2241 to review'" complaints by detained aliens "for constitutional claims and

legal error.  Although [the immigration statutory scheme] restricts jurisdiction in the federal

courts in some respects, it does not limit habeas jurisdiction over constitutional claims or

questions of law." Leonardo v. Crawford, 646 F.3d 1157, 1160 (9th Cir. 2011)(citing V. Singh v. Holder, 638 F.3d 1196, 1200, 1202 (9th Cir. 2011)).

### B.  Constitutional Rights

In addition to challenging jurisdiction, the government also asserts that, as "non-admitted aliens," the members of the Credible Fear Interview class have no constitutional right to enter the United States or have the determination of their admissibility subject to any procedural safeguards other than those Congress has seen fit to provide.  The issue of whether and to what extent Plaintiffs have any due process rights is dependent on how their status is characterized; simply put, are they "excludable aliens" with little or no due process rights, or are they aliens who are in the country illegally, but nevertheless *in the country* such that their presence entitles them to certain constitutional protections?

There is a string of cases stretching from the 1950s to the present concerning what are known as "excludable aliens" – defined as "those who seek admission but have not been granted entry into the United States."  Garcia-Mir v. Smith, 766 F.2d 1478, 1484 (11th Cir. 1985).  As the Ninth Circuit has stated:

> The Supreme Court has consistently recognized that 'our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality.  In the latter instance, the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'  [ ] In Mezei, the Supreme Court noted that 'aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.'  An excludable alien, however, has no procedural due process rights regarding his admission or exclusion and thus 'stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.' . . . However, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.

Barrera-Echavarria v. Rison, 44 F.3d 1441, 1448-49 (9th Cir. 1995) (citations omitted).

This principle has given rise to the "entry fiction," a legal concept which holds that "excludable aliens," "[e]ven if physically present in this country, . . . are legally detained at the border" and treated as if they have *not* entered the country.  Garcia-Mir, *supra* at 1484.

However, there is also Supreme Court precedent that "once an individual has entered the country, he is entitled to the protection of the *Due Process Clause*."  United States v. Raya-Vaca, 771 F.3d 1195, 1202 (9th Cir. 2014)(emphasis in original).  This concept is reflected in the line of cases following Zadvydas v. Davis, 533 U.S. 678 (2001), where the Supreme Court differentiated between aliens "seeking entry" into the United States and those already within our borders:

> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. . . . [O]nce an alien enters the country, [his/her] legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

Zadvydas, 533 U.S. at 693.

The government argues that Plaintiffs are "excludable" aliens with no inherent due process rights; Plaintiffs naturally argue that they are "Raya-Vaca aliens," detained after crossing over the border of this country and therefore entitled to a wider array of constitutional protections.  The factual allegations regarding the entry circumstances of each Plaintiff are as follows:

- Ms. Padilla "crossed the U.S.-Mexico border" and was arrested as she was "making her way to the closest Port of Entry."  (SAC, ¶ 40.)

- Ms. Guzman "crossed the U.S.-Mexico border" and was arrested by a CBP agent. (Id. at ¶ 42.)

- Ms. Orantes "crossed the U.S.-Mexico border . . . immediately walked to the CBP station to request asylum," and was arrested.  (Id. at ¶ 44.)

- Mr. Vasquez "crossed the U.S.-Mexico border" and was arrested by a CBP agent.  Id. at ¶ 46.)

Faced with a motion to dismiss, this Court must accept all well-plead allegations of material fact as true and draw all reasonable inferences in favor of the plaintiff.  Wyler, 135 F.3d at 661.  Under this standard, the Court concludes that Plaintiffs have adequately plead that they were within the borders of this country without permission when detained, and thus enjoy inherent constitutional due process protections which they are entitled to vindicate through the legal process.  The Court will not dismiss Plaintiffs' claims on the grounds that they do not have a right to the constitutional protections they seek.  Defendants' motion in this regard is DENIED.

### C.  Credible Fear Claims Under the APA

The scope of review under the APA is described at 5 U.S.C. § 706, which states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions and determine the meaning or applicability of the terms of an agency action.  The review court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
  - (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
  - (B)  contrary to constitutional right, privilege, or immunity
  - (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
  - (D)  without observance of procedure required by law;
  - (E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
  - (F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

Plaintiffs bring their claims under § 706(1) and § 706(2)(A) and (B).

### 1. Unreasonable Delay (§ 706(1))

The Court questions whether the issue of "unreasonable delay" is amenable to resolution

by class action lawsuit, as, absent a statutory deadline, the factors which go into a decision of

when to schedule an interview are highly specific and will require individualized factual

inquiries to determine their "reasonableness."  See Diop v. ICE/Homeland Sec., 656 F.3d 221,

233 (3rd Cir. 2011) ("[The determination of the point at which a delay becomes 'unreasonable']

will necessarily be a fact-dependent inquiry that will vary depending on individual

circumstances. We decline to establish a universal point at which [it] will always be considered

unreasonable."); see also Sopo v. U.S. Att'y Gen., 825 F.3d 1199, 1215 (11th Cir. 2016), vacated

on unrelated grounds, 890 F.3d 952 (11th Cir. 2018)[2] ("'[R]easonableness, by its very nature is a

fact-dependent inquiry requiring an assessment of all the circumstances of any given case.' A

bright-line approach strips away the essence of a reasonableness standard.").  Aside from arguing

that there is no Ninth Circuit authority discouraging determinations of "reasonableness" on a

class-wide basis, Plaintiffs have no response to the rationale enunciated by the Third and

Eleventh Circuits in finding that "reasonableness" in this context is not amenable to class-wide

resolution.

The government also contends that Plaintiffs fail to state a claim for relief under § 706(1)

because they have no "live" claims (i.e., they all have been provided with credible fear

interviews and released from detention).  But "inherently transitory" claims such as those

presented by Plaintiffs will not be defeated by such a defense as long as any member of the class

still has standing to bring the claim.  Sosna v. Iowa, 419 U.S. 393, 402 (1975) ("The controversy

---

[2] The case was vacated by stipulation when appellant's removal rendered his appeal moot; its holdings are still valid legal precedent.

may exist, however, between a named defendant and a member of the class represented by the

named plaintiff, even though the claim of the named plaintiff has become moot.").

Nevertheless, the Court is persuaded that the reasonableness or unreasonableness of

delay is not suitable to resolution by means of class action. Accordingly, Defendants' motion to

dismiss Plaintiffs' 706(1) claim is GRANTED.

### 2. No Final Agency Action (§ 706(2))

Unless an agency's actions are made reviewable by statute, they are only reviewable if

they are a "final agency action." 5 U.S.C. § 704. See Norton v. S. Utah Wilderness Alliance,

542 U.S. 55, 61-62 (2004); Navajo Nation v. Dept. of the Interior, 876 F.3d 1144, 1171 (9th Cir.

2017). Whether an agency action is "final" is determined by two factors: (1) whether it

"mark[s] the 'consummation' of the agency's decisionmaking process," and (2) whether the

action is "one by which 'rights or obligations have been determined,'" or from which "legal

consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

The government contends that there is no "final agency action" at issue in this lawsuit,

thus no cause of action under the APA. Plaintiffs make the following arguments:

First, Plaintiffs contend that the credible fear interview marks the culmination of a

decision-making process (i.e., because once the interview is concluded, the matter is transferred

from DHS to EOIR). While this may be the case, Plaintiffs are not seeking a review of the

outcome of a credible fear interview but are instead challenging the *timing* of the interview itself.

*When* the interview is held does not mark the culmination of any decision-making process.

Second, Plaintiffs contend that the credible fear interview is a process by which rights are

determined and from which legal consequences flow. Again, this is correct with regard to the

interview itself (as the decision following the interview will determine whether the applicant will

be able to apply for relief from the immigration court or be subject to expedited removal), but inapplicable to the question of *when* the interview is conducted.

Defendants' motion to dismiss the claim of the Credible Fear Interview class under the APA is GRANTED.

### III.    Bond Hearing Claims

Plaintiffs' claims regarding the bond hearings fall into two categories: (1) the demand for a hearing within seven days of request and (2) the demand for greater procedural rights (i.e., verbatim transcripts or recordings of every hearing, written findings, and that the burden of proof be shifted to the government).  (SAC at ¶¶ 148, 151-152, 163-165.)

#### A.  Constitutional Claims

As an initial matter, the Court is not persuaded by the government's arguments that the Bond Hearing class has failed to state a claim for relief on constitutional grounds.  After reviewing the regulations surrounding the bond hearing process, the government simply asserts that it provides "ample process" and that, in the absence of a statutory deadline,

> leaving scheduling determinations to the immigrations courts appropriately balances the immigration courts' interest in docket management while allowing them the flexibility to adapt to fluctuations in cases and to make prioritization decisions.  Given these considerations, and the fact-specific inquiry required for Plaintiffs' due process (and related APA challenges), they cannot state a claim for an unbending seven-day bond hearing rule.

(Dkt. No. 36 at 15.)   This argument is made without analysis or case citation.

To the contrary, a plethora of district court and Board of Immigration Appeals cases affirm the requirement of a "prompt" or "expeditious" bond hearing for immigrants seeking entry.  See, e.g., Matter of Chirinos, 16 I&N Dec. 276, 277 (BIA 1977); Matter of Valles-Perez, 21 I& Dec. 769, 772 (BIA 1997); Saravia v. Sessions, 280 F. Supp. 3d 1168, 1177 (N.D. Cal.

2017).  The Court is not required at this stage to determine the reasonableness of the precise time limit Plaintiffs seek to impose on the bond hearing process in order to find that they have rights to adjudicate, and will not dismiss their claims on this ground.

With respect to their other due process claims concerning the bond hearing procedure, Plaintiffs have provided no support for their assertion that the government should bear the burden of proof in the bond hearing, or that the Bond Hearing class members are entitled to a "presumption of release".  They simply state that "placing the burden of continued detention on DHS and restoring the presumption of release is consistent with Congressional intent."  (Dkt. No. 69 at 17.)  While Plaintiffs allude to briefing in their pending motion for a preliminary injunction which allegedly supports this position, the Court is not inclined to permit Plaintiffs to evade the page limitations by incorporating arguments from other motions by reference.  By contrast, the government presents several paragraphs laying out how and why the burden of proof shifted from the government to the applicant following the adoption of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).  (Dkt. No. 36 at 16-17.)

The Supreme Court's 2018 opinion in Jennings provides further support for the government's position: Jennings overturned Ninth Circuit decision ordering the government to provide periodic bond hearings for detained immigrants at which the government bore the burden of proving by clear and convincing evidence that continued detention was necessary. Jennings, 138 S.Ct at 836.   The Supreme Court observed in that opinion that "[n]othing in § 1226(a)'s text . . . even remotely supports the imposition of either of those requirements."  Id. at 847.

With respect to Plaintiffs' demand for transcripts and/or recordings and a "particularized" written finding in bond hearings, the government points out that while 8 U.S.C. § 1229a(b)(4)(C) specifically requires a "complete record . . . of all testimony and evidence produced" in removal hearings, there is no equivalent requirement in the statute for preliminary, non-removal hearings including bond determinations.[3]

However, the due process requirements of the Constitution compel certain procedures regardless of whether they are or are not included in a statute. The Ninth Circuit has already found a Fifth Amendment requirement for a contemporaneous record of a bond hearing in similar circumstances:

> [W]e agree that due process requires a contemporaneous record of [immigration bond] hearings and that the memorandum decision presently provided is insufficient. We hold that, in lieu of providing a transcript, the immigration court may record [] hearings and make the audio recordings available for appeal upon request. Although we determine that such audio recordings satisfy due process, and are feasible for the government to provide, we do not decide whether they are the only constitutionally adequate alternative to transcripts.

Singh v. Holder, 638 F.3d 1196, 1208 (9th Cir. 2011). As discussed in the preceding section concerning the Credible Fear Interview class, Plaintiffs are entitled to certain constitutional protections simply by virtue of their presence within this country. At this stage, the Court does not determine whether the particular remedies they seek are constitutionally supported, but will allow Plaintiffs to move forward with their claims of constitutional due process violations in the bond hearing procedure.

---

[3] The government goes on to claim that, because "[t]he Supreme Court has declined to impose a contemporaneous verbatim record requirement on *criminal* trials," the Court should not do so in immigration custody redetermination hearings. (Dkt. No. 36 at 18 (emphasis in original).) The problem with this argument is that every case cited in support of this proposition says the *opposite*: that indigent defendants must be provided with "a record of sufficient completeness" (Coppedge v. United States, 369 U.S. 438, 446 (1962) for an appeal or "a complete transcript of the proceedings at trial." United States v. Carrillo, 902 F.2d 1405, 1409 (9th Cir. 1990).

Defendants' motion to dismiss the constitutional claims of the Bond Hearing Class is DENIED.

### B. Administrative Procedures Act (APA)

#### 1. Unreasonable Delay (§ 706(1))

As with the bond hearing claims, the government argues that the issue of "unreasonable delay" is not amenable to resolution on a class-wide basis because there is no "uniform" unreasonable delay, and the length of any delay necessarily requires an individualized inquiry.

The government cites to a D.C. Circuit opinion for the holding that "whether the delay. . . should be deemed 'unreasonable'. . . cannot be decided in the abstract, . . . but will depend in large part, as we have said, upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1102 (D.C. Cir. 2003).  Plaintiffs counter that they are not requesting a decision "in the abstract," but rather a decision based on an analysis of the factors set forth in Telecomms. Res. & Action v. FCC, 750 F.2d 70 (D.C. Cir. 1984) ("TRAC").[4] Those factors, which courts consider in determining whether an agency's delay is "so egregious as to warrant mandamus," include:

> (1) the time agencies take to make decisions must be governed by a "rule of reason;" (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

---

[4] Once again, Plaintiffs refer the Court to their motion for a preliminary injunction motion for analysis of these factors, and once again, the Court will not consider argument from other pleadings incorporated by reference.

Id. at 80 (internal quotations omitted).   Because any analysis of these factors, as well as analysis of the "reasonableness" of delay, will necessarily require individualized inquiry, the Court finds the § 706(1) claim incapable of class-wide resolution.

While Plaintiffs do cite to other cases where a TRAC analysis has been employed in the class action context, these cases are distinguishable from this matter in that both involved an agency's failure to meet regulatory deadlines.  See Roshandel v. Chertoff, Case No. C07-1739MJP, 2008 WL 1969646(W.D. Wash. May 5, 2008); Rosario v. USCIS, Case No. C15-813JLR, 2017 WL 3034447 at *9-10 (W.D. Wash. July 18, 2017)[5].

In the instant case, the absence of any firm regulatory or statutory deadline will require the Court to engage in individualized, fact-dependent inquiries of "reasonableness," and such necessity requires a finding that the Bond Hearing class has failed here to adequately state a claim upon which relief can be granted.  Defendants' motion to dismiss this portion of the Bond Hearing class' claim is GRANTED.

### 2.  No Final Agency Action (§ 706(2))

To state a claim under the APA with respect to their bond hearing claims, Plaintiffs must establish the existence of a "final agency action" which "marks the 'consummation' of the agency's decisionmaking process" and either determines "rights or obligations" or from which "legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1977).

With respect to the Bond Hearing class' attempt to impose a deadline on the bond hearings via the APA, the Court's analysis tracks that of the identical request made by the

---

[5] "'[A court] need not undertake TRAC's six-factor balancing inquiry' where a regulation imposes a firm deadline[]. Accordingly, the court rejects Defendants' argument that the individualized TRAC inquiry undermines commonality."  Id. at *10.

Credible Fear Interview class.  The *timing* of the bond hearing does not represent a "final agency action" and Plaintiffs cannot adequately state a claim for this particular relief under that statute.

The same cannot be said of the Bond Hearing Class' claim that failure to accord them certain procedural safeguards violates the APA.  While the government argues that there is no "policy" with respect to either the timing of the bond hearing or the procedural rights accorded to bond applicants, and therefore no determination of rights or obligations and no "final agency action," the Court disagrees, and concludes that its practice of placing the burden of proof on detainees[6] and not providing either a verbatim record nor particularized written findings for each hearing constitute a "policy" for purposes of this claim.[7]  The procedural defects alleged by the Bond Hearing class are part and parcel of the bond hearing, which is indisputably a "final agency action" from which legal consequences flow.  If Plaintiffs can establish that these alleged defects violate their constitutional rights, they are entitled to relief under the APA.

Defendants' motion to dismiss the claim of the Bond Hearing class under § 706(2) of the APA will be GRANTED IN PART (with respect to the timing of the bond hearing) and DENIED IN PART (with respect to the procedural rights which Plaintiffs seek to impose via this cause of action).

**IV.    Asylum Statutes (§ 1225(b)(1), § 1158(a)(1), 8 C.F.R. §§ 235.3(b)(4), 208.30, 1003.42)**

Plaintiffs indicated at oral argument their intent to abandon this claim, therefore Defendants' motion to dismiss this claim is GRANTED.

---

[6] The Court also is not persuaded by the government's claim that the burden of proof standards are set by statute, not by agency action.  In Jennings, the Supreme Court noted the *absence* of any requirement in § 1226(a) regarding the burden of proof, and its rationale does not defeat Plaintiffs' claim.  138 S.Ct. at 847-48.

[7] Plaintiffs cite BIA case law (Chirinos, supra), EOIR Operating Policies and Procedures Memorandum, and Ninth Circuit precedent that "[a]gency action . . .  need not be in writing to be final and judicially reviewable."  R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 184 (D.C. Cir. 2015) (citing Venetian Casino Resort LLC v. EEOC, 530 F.3d 925, 929 (D.C. Cir. 2008)).

## V.    Injunctive Relief

The government points to § 1252(f)(1)'s "Limit on injunctive relief":

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of chapter 4 of title II [*8 USCS §§ 1121* et seq.] . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such chapter have been initiated.

The government argues that this language bars the injunctive relief sought by Plaintiffs. The Court disagrees. Plaintiffs are not asking the Court to "enjoin or restrain *the operation of the provisions*" of any statute, but instead seek an injunction against actions and policies that violate those statutes and associated constitutional protections. There are a number of cases holding that § 1252(f) is does not bar class-wide relief in this situation. See Rodriguez v. Hayes, 591 F.3d 1105, 1120 (9th Cir. 2010) ("Section 1252(f) prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes . . ."); see also Damus v. Nielsen, 313 F. Supp. 3d 317, 328 (D.D.C. 2018); Johnson, 80 F. Supp. 3d at 184; Abdi v. Duke, 280 F. Supp. 3d 373, 409 (W.D.N.Y. 2017) ("Where, as here, the moving party does not seek to enjoin the operation of §§ 1221-1231, and instead, seeks to enjoin violations of the statutory and regulatory framework, the class-wide prohibition on injunctive relief is inapplicable.") (internal quotation marks omitted).

The government does not argue that Plaintiffs are not entitled to class-wide declaratory relief.

Defendants' request for dismissal of Plaintiffs claims for injunctive and declaratory relief is DENIED.

## Conclusion

The Court has jurisdiction to hear Plaintiffs' lawsuit.  Both the proposed Credible Fear Interview and Bond Hearing classes have succeeded in stating a claim under Count I for constitutional relief from certain alleged violations by Defendants, and Defendants' motion will be DENIED in that regard.  The Credible Fear Interview class has failed to state a claim under the APA for which relief may be granted, and Defendants' motion to dismiss is GRANTED in that regard.

The Bond Hearing class has failed to state a claim for which relief may be granted under § 706(1) or § 706(2) of the APA concerning the timing of their bond hearings; Defendants' motion to dismiss is GRANTED in that regard.  The Bond Hearing class has succeeded in stating a claim for which relief may be granted under § 706(2) of the APA concerning the procedural safeguards (i.e., burden of proof, provision of a verbatim transcript, written findings) to which they allege they are entitled; Defendants' motion is DENIED in that regard.

It is the further finding of this Court that Plaintiffs are entitled to seek injunctive and declaratory relief for the causes of action which they have successfully plead.  Defendants' motion is DENIED in that regard as well.

The clerk is ordered to provide copies of this order to all counsel.

Dated December 11, 2018.

The Honorable Marsha J. Pechman
United States Senior District Court Judge