No. 24-2801

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

YOLANY PADILLA, et al.
Plaintiffs-Appellees,

v.

IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

**REPLY BRIEF FOR APPELLANTS**

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
DAVID M. MCCONNELL
*Director*
EREZ R. REUVENI
SARAH S. WILSON
*Assistant Directors*
LAUREN C. BINGHAM
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-616-4458
DAVID KIM
*Senior Litigation Counsel*
BICHNGOC T. DO
*Trial Attorney*

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................... i

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION .................................................................................1

ARGUMENT ........................................................................................2

   I.  Plaintiffs' claims challenge the government's implementation of the expedited removal statute and are therefore barred by 8 U.S.C. § 1252(a)(2)(A) and (e)(3)..............................................................................................2

   II.  Plaintiffs lack a due process right to bond hearings after seven days of detention pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii). .............................................12

     a.  *Thuraissigiam* reaffirms the principle that Plaintiffs are entitled to no more process than what statute provides. ....................................................13

     b.  Even if *Thuraissigiam* were not dispositive, Plaintiffs' claim of a constitutional entitlement to bond hearings within a strict seven-day time limit lacks any basis in law. ...................................................................19

     c.  The availability of parole and individual habeas petitions reinforces the constitutionality of 8 U.S.C. § 1225(b)(1)(B)(ii). ............................................25

CONCLUSION.....................................................................................28

CERTIFICATE OF SERVICE ..............................................................29

CERTIFICATE OF COMPLIANCE.......................................................30

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Carlson v. Landon*,
    342 U.S. 524 (1952)...................................................................16

*Castro v. DHS*,
    835 F.3d 422 (3d Cir. 2016) ...................................................11

*Clark v. Martinez*,
    543 U.S. 371 (2005)...................................................................2

*Clark v. Smith*,
    967 F.2d 1329 (9th Cir. 1992) ................................................6

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018)......................................26

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) ................................................26

*Demore v. Kim*,
    538 U.S. 510 (2003)............................................... 19, 20, 25

*Department of Homeland Security v. Thuraissigiam*,
    591 U.S. 103 (2020)....................................................1, *Passim*

*Doherty v. Thornburgh*,
    943 F.2d 204 (2d Cir. 1991) ..................................................22

*Jennings v. Rodriguez*,
    583 U.S. 281 (2017)...................................................7, *Passim*

*Landon v. Plasencia*,
    459 U.S. 21 (1982)..................................................................18

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020, Jackson, J.) ......................11

*Make the Road New York v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) ................................................................5

*Mendoza Linares v. Garland*,
51 F.4th 1146 (9th Cir. 2022) ...............................................................8

*Shaughnessy v. United States ex rel. Mezei,*
345 U.S. 206 (1953) ......................................................................... 17, 18

*Shunaula v. Holder*,
732 F.3d 143 (2d Cir. 2013) ................................................................11

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) ......................................................................... 15, 25

*Wal–Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ......................................................................... 10, 11

*Yamataya v. Fisher*,
189 U.S. 86 (1903) ...............................................................................14

*Ysleta Del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) ...............................................................................8

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ................................................................ 16, 20, 24, 25

## ADMINISTRATIVE DECISIONS

*Matter of M-S-*,
27 I. & N. Dec. 509 (A.G. 2019) ..........................................................13

*Matter of X-K-*,
23 I. & N. Dec. 731 (BIA 2005) ..........................................................21

## **STATUTES**

6 U.S.C. § 251 ...................................................................................2

6 U.S.C. § 552(d) ..............................................................................2

8 U.S.C. § 1182(d)(5)(A) ............................................................ 7, 26

8 U.S.C. § 1225(a)(1) .......................................................................15

8 U.S.C. § 1225(b) ........................................................................5, 6

8 U.S.C. § 1225(b)(1) ............................................................ 1, *Passim*

8 U.S.C. § 1225(b)(1)(B)(ii) ................................................... 1, *Passim*

8 U.S.C. § 1226 .................................................................................7

8 U.S.C. § 1226(a) .............................................................................7

8 U.S.C. § 1226(c) ..................................................................... 19, 20

8 U.S.C. § 1226(e) .............................................................................6

8 U.S.C. § 1229(a) ..........................................................................7, 9

8 U.S.C. § 1231 ......................................................................... 7, 16

8 U.S.C. § 1252(a)(2)(A) ......................................................... 1, *Passim*

8 U.S.C. § 1252(a)(2)(A)(i) ......................................................... 3, 4, 8

8 U.S.C. § 1252(a)(2)(A)(ii) ...........................................................2, 3

iv

8 U.S.C. § 1252(a)(2)(A)(iii) .................................................................3

8 U.S.C. § 1252(a)(2)(A)(iv) ......................................................... 2, 3, 8

8 U.S.C. § 1252(e) ...........................................................................2, 3

8 U.S.C. § 1252(e)(3)................................................................. 1, 5, 12

8 U.S.C. § 1252(e)(3)(A) .....................................................................2

8 U.S.C. § 1252(f)(1) ........................................................................10

## <u>REGULATIONS</u>

Securing the Border, 89 Fed. Reg. 48710 (June 7, 2024).......................21

## INTRODUCTION

Plaintiffs, as a class, are defined by three important characteristics. They are: (1) noncitizens, (2) who have recently illegally entered the country, and (3) were processed for expedited removal pursuant to 8 U.S.C. § 1225(b)(1) before expressing a fear of persecution or torture. These characteristics are critical to the resolution of this case. They are why the jurisdictional bars in 8 U.S.C. § 1252(a)(2)(A) and (e)(3) apply, despite Plaintiffs' attempt to reach a different conclusion by cherry-picking from the statute. They are also why the Supreme Court's decision in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020)—and the precedent it reaffirmed—eliminates any basis for Plaintiffs' claims that the Due Process Clause of the Fifth Amendment facially invalidates an act of Congress, 8 U.S.C. § 1225(b)(1)(B)(ii), and grants every noncitizen with those characteristics nationwide the right to a bond hearing after only seven days of detention since demonstrating a credible fear. The fact remains that Plaintiffs' claims are precisely those Congress intended to bar (outside of the District Court for the District of Columbia) under § 1252(a)(2)(A) and (e)(3), and their claims—initially pleaded prior to several important and clarifying shifts in the legal landscape—have no basis in statute or precedent. The district court was wrong to allow this case to continue any longer. This case must be remanded with instructions to dismiss.

## ARGUMENT

I.  **Plaintiffs' claims challenge the government's implementation of the expedited removal statute and are therefore barred by 8 U.S.C. § 1252(a)(2)(A) and (e)(3).**

As the government explained in its opening brief, Plaintiffs' claims are foreclosed by § 1252(a)(2)(A) and (e)(3). Government's Brief (Gov't Br.) 21-30. Section 1252(a)(2)(A) provides that, "except as provided in subsection (e)," no court has jurisdiction over any challenge to, inter alia, any "procedures and policies adopted by the [Secretary] to implement the provisions of section 1225(b)(1)." 8 U.S.C. § 1252(a)(2)(A)(ii), (iv).[1] Section 1252(e), in turn, provides that "[j]udicial review of determinations under section 1225(b) of this title *and its implementation* is available in an action instituted in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(3)(A) (emphasis added).

Plaintiffs first argue that "text and context make clear," Plaintiffs' Brief (Br.) 12, that their challenge falls outside the review bar because they have framed it as one focused "solely on detention."[2] Br. 12. But their statutory analysis cherry-picks

---

[1] Sections 1225(b) and 1252(e) refer to the Attorney General, but those functions have been transferred to the Secretary. *See* 6 U.S.C. §§ 251, 552(d); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[2] It is striking that Plaintiffs characterize their claims as "focus[ed] solely on detention," Br. 12—and, indeed, seek relief declaring that the government has an obligation to provide bond hearings—yet simultaneously claim that this is a "non-habeas" challenge, apparently simply because they did not use those words when filing the latest version of the complaint. *See* Br. 13 n.4.

from the very text and context they say should be relied upon. They attempt to limit the reach of these provisions to "challenges that concern how the agency operates its system of issuing and effectuating expedited removal orders" and assert the provisions do not "encompass challenges to agency actions that prolong detention." Br. 14. In support of this contention, they focus on § 1252(a)(2)(A)(i) and (iii), particularly the references those provisions make to a "determination" regarding individual expedited removal orders and credible fear determinations. Br. 15. Plaintiffs also refer to the title of § 1252(e), "judicial review of orders under section 1225(b)(1)," and note that § 1225(b)(1) uses the terms "determine" or "determination" in reference to "admissibility, CFIs, and expedited removal orders." Br. 16. From that "parallel language," Plaintiffs argue that only such determinations are relevant for purposes of § 1252, a conclusion they say is bolstered by the title of § 1252 and various provisions of § 1252 dealing with removal orders, petitions for review, and other jurisdictional bars. *See* Br. 14–18, 17.

But the actual text of § 1252 does not support such a narrow reading of the review bar. On the contrary, § 1252(a)(2)(A)(ii) and (iv)—two provisions Plaintiffs conspicuously do not even mention in their analysis—are undeniably expansive in their terms. Subsection (ii) bars review of any decision "to invoke the provisions of [§ 1225(b)(1)]," while (iv) forecloses any challenge to "procedures and *policies* adopted . . . to implement the provisions of section 1225(b)(1)" (emphasis added).

3

Plaintiffs avoid engaging with those two critical provisions at all. This is notable given their own characterization of *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019) as the government's "*policy* of not providing bond hearings to class members." 2-ER-49, ¶ 148 (emphasis added); *see* 2-ER-37, ¶ 61 ("Pursuant to *Matter of M-S-*, Defendants have a policy and practice of denying bond hearings to noncitizens seeking protection who are apprehended after entering without inspection."). Furthermore, subsection (i) covers not only "any individual determination," but "any other cause or claim arising from or relating to the implementation or operation" of an order of removal pursuant to § 1225(b)(1)—yet Plaintiffs omit this language from their analysis. Br. 15. Plaintiffs therefore take an overly narrow view of the phrase "an order of removal pursuant to section 1225(b)(1)," as used in § 1252(a)(2)(A)(i), failing to account for the rest of the provision, which supports an interpretation consistent with the broad understanding of the jurisdictional bar that the other subsections—(ii) and (iv)—unquestionably provide.

The same is true for subsection (iii). Again, Plaintiffs focus on the word "determination"—which they narrowly construe as merely a credible fear determination—at the expense of the provision as a whole, which instructs that no court shall have jurisdiction to review "the *application* of [§ 1225(b)(1)] to individual aliens" (emphasis added). That application refers not only to the credible fear determination process, but to all parts of the process of § 1225(b)(1), including

the detention portion: § 1225(b)(1)(B)(ii). In short, subsection (iii)—no less than the other subsections in § 1252(a)(2)(A)—is fundamentally concerned with protecting the broad grant of authority conferred upon the Executive to implement and govern the expedited removal statute in general. There is no textual basis for the strained and unduly restrictive interpretation Plaintiffs would force upon the review bars in § 1252(a)(2)(A), as the D.C. Circuit—where these claims should be brought—has already recognized. *See Make the Road New York v. Wolf*, 962 F.3d 612, 627 (D.C. Cir. 2020) ("While romanettes (i) and (iii) refer to claims pressed by individuals to whom the expedited removal scheme is being 'appli[ed]' or an order of removal is being 'implement[ed],' the other two romanettes for which review under Subsection 1252(e)(3) is specifically authorized are not textually confined to claims arising from individual removal actions.").

Section 1252(e)(3) is no different. Plaintiffs again point out that the provision includes the term "determinations," as if that fact on its own can or should determine how the whole provision is read. But it addresses review not just of "determinations under section 1225(b)," but also of the statute's "implementation." It goes on to limit such review to the District of Columbia, which may consider whether a written "policy directive," "guideline," or "procedure" "issued … to *implement* [§ 1225b], is not consistent with applicable" law. 8 U.S.C. § 1252(e)(3) (emphasis added). Thus, even within the four corners of the statutory text, there is ample support to

conclude that Plaintiffs' challenge to the agency's *implementation* of § 1225(b)(1)—including the provision governing detention, § 1225(b)(1)(B)(ii)—is unreviewable.

Plaintiffs invoke further statutory "context" in a few other provisions in § 1252. Br. 17–19. But those provisions, including § 1252(a)(1), (a)(2)(D), (b)(9), (c), (d), (f), and (g), do not address the expedited removal process and thus have limited relevance to the review bars applicable to this case. Plaintiffs contend that these various subsections "reflect [§ 1252]'s focus on removal orders," ostensibly to distinguish it from a review bar that, in their telling, would be strictly focused on detention. Br. 18. But § 1252 nowhere makes that rigid distinction between removal and detention. Instead, in every instance where § 1252 references § 1225(b) or 1225(b)(1), it does so without carving out any detention-related aspects from the statute. That is not surprising, where detention is a fundamental part of the expedited removal statute, as reflected by the express provision § 1225(b)(1) makes for the mandatory detention of noncitizens, whether they are found to have a credible fear or not. *See Clark v. Smith*, 967 F.2d 1329, 1331–32 (9th Cir. 1992) (freedom from immigration detention "only a variation" on the interests bound up with entry and removal).

Plaintiffs also rely on 8 U.S.C. § 1226(e) to argue that when Congress has addressed judicial review over detention, it has done so in the section creating the detention authority itself. Br. 18. But this case is not about judicial review over

individual detention decisions, such as those made by immigration judges in cases where individual noncitizens have been detained and considered for bond pursuant to § 1226(a). Rather, it is about whether § 1225(b)(1)(B)(ii) is facially constitutional as to all noncitizens nationwide after only seven days of detention. Indeed, by assigning only power to release by parole, rather than via bond, Congress chose to make the decision a discretionary one that is not subject to judicial review. *See* 8 U.S.C. § 1182(d)(5)(A) (allowing the Secretary to parole, at his or her discretion, applicants for admission on a case-by-case basis). Furthermore, Congress treated the expedited removal process in a fundamentally different way than it did the § 1229a removal process, of which the detention procedures in § 1226 are a part: § 1225(b)(1) governs the entire expedited removal process, from apprehension to detention, credible fear proceedings, and removal. This stands in contrast to a typical non-expedited removal case, where different statutory provisions govern apprehension and detention pending removal proceedings (§ 1226), immigration court hearings (§ 1229a), review (§ 1252), and detention pending removal (§ 1231).

Plaintiffs' second argument is that this Court's and the Supreme Court's precedents weigh decisively in their favor. Br. 19–23. But their reliance on *Jennings v. Rodriguez*, 583 U.S. 281 (2017), continues to be misplaced. The statutory bar at issue there was § 1252(b)(9), which is not as analogous to § 1252(a)(2)(A) and (e)(3) as Plaintiffs assert (claiming "both provisions focus on the removal process").

Br. 20. Section 1252(b)(9) addresses review of questions specifically "arising from any action taken or proceeding brought to remove an alien." Section 1252(a)(2)(A)(i), on the other hand, bars courts from entertaining any "cause or claim arising from *or relating to* the implementation or operation" of an order of expedited removal (emphasis added), and § 1252(a)(2)(A)(iv) does not use the phrase "arising from" at all. Even assuming *arguendo* that the detention here does not "arise from" the expedited removal process, it is certainly "related to" that process. *See generally Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022) (courts "must normally seek to construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted)); *see also Mendoza Linares v. Garland*, 51 F.4th 1146, 1155 (9th Cir. 2022) (§ 1252(a)(2)(A)'s "general prohibition on judicial review covers the 'procedures and policies' that have been adopted to 'implement' the expedited removal process," without exempting any one of those statutory procedures, including the provision for mandatory detention). Plaintiffs (and the district court) also rely on language from *Jennings*' analysis of § 1252(b)(9) that plaintiffs there were "not challenging the decision to detain them in the first place," 538 U.S. at 294–95, yet they fail to rebut the government's argument that Plaintiffs' claims are distinct from those in *Jennings*—which were indeed not a challenge "to detain them in the first place," but instead were triggered

8

only after detention had become *prolonged*, such that the detention and the decision to initiate removal proceedings were no longer linked. *See* Gov't Br. 28. Plaintiffs' challenge here, by contrast, seeks an *initial* bond hearing (displacing the release mechanism, parole, that is dictated by Congress) that must occur, upon request, after only seven days of detention have elapsed after a noncitizen expresses a credible fear and is transferred to § 1229a removal proceedings. Thus, even under their own theory, a detention-related claim raised by an individual processed for expedited removal cannot be treated apart from the larger expedited removal statute, nor can it fall outside the scope of § 1252's review bars where detention is an integral part of the statutory scheme set out in § 1225(b)(1). In short, not only did *Jennings* analyze a different jurisdictional bar, the claims here challenge the decision "to detain them in the first place" in a way that the claims in *Jennings* did not. *Jennings*, 583 U.S. at 294–95.

Another criticism Plaintiffs raise is that *Jennings* addressed § 1225(b)(1) detention, "notwithstanding" the review bars in § 1252(a)(2)(A) and (e)(3).[3] Br. 21–23. But *Jennings* did not go so far as to recognize judicial review over such questions in spite of the proscriptions in § 1252(a)(2)(A) and (e)(3)—in fact, it did not address those provisions at all. To the extent the *Jennings* Court did consider any question

---

[3] The § 1225(b)(1) class in *Jennings* was comprised of noncitizens who presented at ports-of-entry, as compared to the class here, who entered unlawfully, so there is no overlap in class membership.

involving detention under § 1225(b)(1), it was in the particular context of deciding whether the Ninth Circuit had properly invoked the canon of constitutional avoidance to support its reading of § 1225(b)(1) (as imposing a strict six-month time limit on the length of detention after being transferred from expedited to full removal proceedings). 583 U.S. at 282–84. And as *Jennings* held, the Ninth Circuit "all but ignored the statutory text," since "nothing in the statutory text imposes a limit on the length of detention." *Id.* at 282. In short, *Jennings* did not contravene, repudiate, or even set aside § 1252(a)(2)(A) and (e)(3) in any way; instead, those provisions simply did not factor into the Supreme Court's analysis, given the plaintiffs' failure in that case to posit even a "plausible" interpretation of detention under § 1225(b)(1). *Id.* Plaintiffs argue that the fact that the Supreme Court heard the case at all suggests there is jurisdiction over this (different) case, but that ignores that the Court explicitly did not decide whether all potentially applicable jurisdictional bars applied in *Jennings*, as it remanded with instructions for this Court to determine "whether it continues to have jurisdiction despite 8 U.S.C. § 1252(f)(1),"[4] another jurisdictional bar. *Id.* at 312.

---

[4] Notably, the Supreme Court also remanded with instructions for this Court to "consider whether a Rule 23(b)(2) class action continues to be the appropriate vehicle for respondents' claims" in light of *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), given that case's holding that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* at 360. The *Jennings* Court observed that "may be relevant on remand because the Court of Appeals has already acknowledged that some members of the

Finally, it is worth noting that Plaintiffs disclaim the existence of a conflict in the interpretation of claims involving § 1225(b), on the basis that two cases cited by the government "do not involve 'core' habeas claims challenging 'unlawful executive detention.'" Br. 22. They also claim, however, that this case is a "non-habeas" challenge. Br. 13 n.4. It is unclear how those two statements can be reconciled. Regardless, what is important about the two cases referenced by the government is that they reaffirm that challenges to the legality of any provision of the expedited removal system are barred outside of the district court for the District of Columbia. *See, e.g.*, *Castro v. DHS*, 835 F.3d 422, 427 (3d Cir. 2016); *Shunaula v. Holder*, 732 F.3d 143, 146–47 (2d Cir. 2013). Not only that, Plaintiffs overlook case law in which the District of Columbia—the only court with jurisdiction—has reviewed detention policies and procedures in cases arising under § 1225(b)(1). *See Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 19–20, 34–35 (D.D.C. 2020, K.B. Jackson, J.) (recognizing that expedited removal policies

---

certified class may not be entitled to bond hearings as a constitutional matter" and "then it may no longer be true that the complained-of conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." 583 U.S. at 313 (cleaned up). It also instructed this Court to "consider on remand whether a Rule 23(b)(2) class action litigated on common facts is an appropriate way to resolve respondents' Due Process Clause claims," where it had "stressed repeatedly" that "due process is flexible" and "calls for such procedural protections as the particular situation demands." *Id.* at 314 (cleaned up). These issues are also present in this case.

specifically relating to "detention placement" gave rise to the court's subject matter jurisdiction under § 1252(e)(3)).

## II. Plaintiffs lack a due process right to bond hearings after seven days of detention pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii).

A century of precedent, reaffirmed in *Thuraissigiam*, invalidates Plaintiffs' due process claims. As discussed, they are defined by three characteristics—as (1) noncitizens, (2) who have recently illegally entered the country, and (3) were processed for expedited removal before expressing any fear—which limit them to just those rights provided by statute. And the statute under which they were processed—8 U.S.C. § 1225(b)(1)—provides no right to a bond hearing at all. But even if they could identify an extra-statutory procedural right for inadmissible noncitizens at the threshold of entry, there are no grounds to justify a stringent and unyielding seven-day timeline, along with the rest of their preferred procedures. It is contrary to binding precedent that has repeatedly held that constitutional interests are not even implicated until the six-month mark, even in contexts with greater due process rights and a higher risk of prolonged detention than expedited removal. Because Plaintiffs' claims—and, indeed, their certified class—are pleaded with respect to that deadline, it is the appropriate metric to evaluate and ultimately dismiss all of those claims.

### a. *Thuraissigiam* reaffirms the principle that Plaintiffs are entitled to no more process than what statute provides.

Plaintiffs assert that the district court was correct in finding that they had plausibly alleged a constitutional right to bond hearings within a strict seven-day time period, but 8 U.S.C. § 1225(b)(1) recognizes no such entitlement. On the contrary, Congress specifically chose to provide for the detention of any noncitizen processed under § 1225(b)(1) for the duration of their proceedings, unless released on parole, as explained in *Matter of M-S-*, 27 I. & N. Dec. at 516–17.

Plaintiffs provide a sweeping historical survey of the Due Process Clause—beginning with the "settled usages and modes of proceeding existing in the common and statute law of England" and culminating in "the Supreme Court's modern jurisprudence"—to argue that "a hearing before an impartial adjudicator" is required to uphold due process across a range of "civil detention context[s]." Br. 23–29. Much of this is uncontroversial, where, generally speaking, due process has long served as a check against excessive and arbitrary detention. *See id.* at 23–24 (citing 4 William Blackstone, Commentaries 296–97 (1769); 3 William Blackstone, Commentaries 291 (1768)).

Plaintiffs, however, fail to account for those three characteristics that define their class and are critical to the due process analysis here. Almost all their cited authorities deal with non-immigration matters that have little or no factual or legal overlap with this case. Those that do touch on immigration have limited bearing on

the precise question of detention in the § 1225(b)(1) context. Plaintiffs cite, for instance, a case from the year 1903 for its broad statement that "the fundamental principles" of due process must be observed in the execution of "a statute involving the liberty of persons." Br. 25 (quoting *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903)). But that case involved a habeas application that inquired into the detention of a noncitizen under a warrant from the Secretary of the Treasury requiring her deportation. *Yamataya*, 189 U.S. at 87. Notably, the Supreme Court upheld dismissal, holding that the actions of "the officers charged with the execution of the statutes" to detain the appellant while they completed their investigation into whether she was present illegally were "not subject to judicial review." *Id.* at 100–02. While the Court took care to note that executive or administrative officers did not have "absolute, arbitrary power" to enforce "acts of Congress," at the heart of its ruling was the foundational rule that "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, *are due process of law*" as to noncitizens who have not "even been admitted into the country pursuant to law." *Id.* at 98 (emphasis added).

Thus, when it comes to the constitutionality of § 1225(b)(1)(B)(ii) specifically—which is the proper locus of inquiry for the Court, as opposed to the full gamut of "civil detention"—no precedent requires what Plaintiffs claim as a constitutional entitlement. Nor does § 1225(b)(1) "say[] anything about bond

14

hearings." *Jennings*, 583 U.S. at 282. And where the statute does not provide for bond hearings, Plaintiffs cannot state a claim that they are entitled to those procedures. That is a conclusion borne out by *Thuraissigiam* and the long-standing rule—affirmed in *Yamataya* and others over a century—that "[w]hatever the procedure authorized by Congress is, it is due process as far as" a noncitizen seeking entry is concerned. *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).

Plaintiffs' persistent efforts to distinguish *Thuraissigiam* are unpersuasive. As they read it, *Thuraissigiam* narrowly addresses rights regarding admission, and not any rights that might relate to detention, even if those rights were to arise in the course of processing noncitizens pursuant to § 1225(b)(1)—who are, by statute, deemed to be "applicant[s] for *admission*." 8 U.S.C. § 1225(a)(1) (emphasis added); *see Thuraissigiam*, 591 U.S. at 108 (explaining that Congress "addressed" the problems of flight risk and the high costs of detention "by providing more expedited procedures for certain 'applicants for admission'"). For this, Plaintiffs quote snippets of the decision that reference rights "regarding admission" or the Executive's plenary power to decide which noncitizens "to admit." Br. 30. But at other points *Thuraissigiam* makes broad reference to the "*due process* rights" of noncitizens at the threshold of entry, without drawing any forced distinctions between admission and other key aspects of the immigration process—such as detention—with which

admission is often intertwined. *See* Gov't Br. 34–36 (citing *Thuraissigiam*, 591 U.S. at 139 (emphasis added)); *see generally Carlson v. Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of [the] deportation procedure.").

Plaintiffs do not meaningfully address any of this broader language, and instead suggest that in another case, *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court "rejected the same argument the government raises here." Br. 30–31. *Zadvydas* did no such thing. *Zadvydas* concerned a different statute, 8 U.S.C § 1231, governing a separate class of noncitizens at a different stage of their immigration proceedings. And importantly, the Supreme Court noted that "[a]liens who have not yet gained initial admission to this country," such as Plaintiffs here, "would present a very different question," and that the case before it did not "require [the Court] to consider the political branches' authority to control entry into the United States"—exactly what Plaintiffs are seeking with their request for an initial bond hearing, as compared to release after detention becomes prolonged. *Zadvydas*, 533 U.S. at 682, 695. Plaintiffs pass over these crucial distinctions, not to mention the fundamental point that neither *Zadvydas* nor *Thuraissigiam* discusses, let alone recognizes, any right to bond hearings for noncitizens detained pursuant to § 1225(b)(1)(B)(ii).

As for the Supreme Court cases whose relevance Plaintiffs downplay, they rely on select phrases to argue that those decisions were limited in scope to

"admission decisions or the procedures governing [] admission," Br. 33—a continuation of their attempt to sever detention from the larger immigration process that enfolds it. What they fail to note, however, is that *Thuraissigiam* invokes that "century of precedent" to highlight certain "fundamental propositions," as opposed to any fine-grained conceptualization of admission or some narrowly drawn procedural right. 591 U.S. at 139 (highlighting, among others, "the power to set the procedures to be followed in determining whether an alien should be admitted"). And as *Thuraissigiam* points out, those foundational principles constitute a "century-old rule regarding the due process rights of *an alien seeking initial entry*." *Id.* (emphasis added). In other words, the due process limitations articulated by *Thuraissigiam* and its antecedent cases apply to a certain category of individuals— i.e., noncitizens at the threshold of entry—whether those individuals are claiming rights related to admission, detention, or some other related procedure (such as, in *Thuraissigiam*, additional review of a credible fear determination).

The same is true for *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206 (1953), which Plaintiffs admit was not "purely focused on admission" but argue still does not apply because of the national security concerns present in the analysis in that case. Br. 34–35. That argument is unavailing. Plaintiffs ignore the fact that *Thuraissigiam* specifically cited *Mezei* as one of the long line of precedents refuting "the Ninth Circuit's holding" that there was a violation of Thuraissigiam's due

process rights; notably, *Thuraissigiam* does not qualify its reliance on *Mezei* with any caveat about the particular factual circumstances in *Mezei*—circumstances, in any case, that were not present in *Thuraissigiam*. *See Thuraissigiam*, 591 U.S. at 138–39 (citing *Mezei*, 345 U.S. at 212 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." (internal quotation marks omitted))). Plaintiffs also downplay the sheer length of detention in *Mezei*—nearly two years—and the ties that Mezei himself, as a former lawful permanent resident returning from a trip abroad, had to the United States, despite those being important considerations in any due process inquiry. *See, e.g.*, *Landon v. Plasencia,* 459 U.S. 21, 32 (1982) ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."). Thus, while Plaintiffs make much of the specific facts in *Mezei*, that decision, if anything, is most salient for echoing the principle at the heart of *Thuraissigiam* that "an alien on the threshold of initial entry stands on a different footing." 345 U.S. at 212.

To sum, *Thuraissigiam* affirms the long-standing rule that noncitizens are limited to those procedural rights afforded by statute. Because § 1225(b)(1) does not extend any right to bond hearings, Plaintiffs have no claim that they are constitutionally entitled to them.

18

### b. Even if *Thuraissigiam* were not dispositive, Plaintiffs' claim of a constitutional entitlement to bond hearings within a strict seven-day time limit lacks any basis in law.

Because no court has ever gone so far as to say that any noncitizens with Plaintiffs' three critical characteristics are entitled to bond hearings immediately upon demonstrating a credible fear, Plaintiffs instead mischaracterize the relevant precedent, like *Demore v. Kim*, 538 U.S. 510 (2003), as inapposite to this case. Br. 36–42. There are three key points as to why *Demore* is instructive here: (1) It reaffirms that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process," *Demore*, 538 U.S. at 523. (2) It upholds detention as to a class of noncitizens—former lawful permanent residents of the United States—with greater due process rights than noncitizens such as Plaintiffs. *Id*. And (3) it upholds the § 1226(c) scheme where detention is mandatory and expected to last far longer than the seven days at issue in this case. *Demore*, 538 U.S. at 523. Plaintiffs' attempt to minimize these three points falls flat, as do their attempts to distinguish other relevant precedent.

First, they claim *Demore* is distinguishable because in the case of detention under § 1226(c) (the statute at issue there), the government has an interest in "effectuating removal and protecting public safety." Br. 37. But the same purpose of ensuring removals can be executed also undergirds § 1225(b)(1). *See* H.R. Rep. No. 104-469, at 117–18 (1995) (§ 1225(b) motivated in part by the "thousands" of

noncitizens who arrive, seek asylum, and "do not return for their hearings" once "released into the general population"). *Thuraissigiam* highlights those same issues, noting at the outset that the expedited removal system was implemented to "weed[] out patently meritless claims and expeditiously remov[e] the aliens making such claims from the country." 591 U.S. at 106. That record also stresses Congress's assessment that "releasing [all asylum seekers] would present an undue risk that they would fail to appear for removal proceedings." *Id.*

Second, Plaintiffs take issue with the government's reliance on the legislative record, finding it less "voluminous" than the record before the Supreme Court in *Demore*. Br. 38. But whether a Congressional record is "voluminous" is not the test for determining whether Plaintiffs have stated a claim for a due process violation. Rather, that test is, as *Demore* explained, whether the statute continues to "serve its purported immigration purpose." *Demore*, 538 U.S. at 527 (citing *Zadvydas*, 533 U.S. at 690). In any case, congressional findings refer to the "[t]housands of smuggled aliens" arriving "with no valid entry documents" and claiming asylum only after they are in the country—in short, a class of noncitizen entries without inspection, like Plaintiffs, who claim asylum after entering the country. H.R. Rep. No. 104-469, at 117–18 (emphases added). Thus, as with § 1226(c), Congress in enacting § 1225(b)(1) evinced a concern with the particular risks presented by a clearly defined group of noncitizens, including Plaintiffs here. Plaintiffs try to

dispute the validity of these congressional findings by noting that class members would previously have received bond hearings under an erroneous interpretation of government regulations in *Matter of X-K-*, 23 I. & N. Dec. 731 (BIA 2005). Br. 38. But the issuance of an incorrect agency decision subsequent to those findings does not take away from the fact that Congress did make them, and does not bear on the constitutionality of the statute itself. Plaintiffs go on to downplay the flight risk concerns presented by noncitizens held pursuant to § 1225(b)(1)(B)(ii), and claim that the government has increased detention capacity, but that is another fact irrelevant to the constitutionality of the statue. Br. 39 n.9.[5]

Third, Plaintiffs claim that they face longer periods of detention than what *Demore* indicated mandatory detention typically lasts. Br. 40. But the figures on

_____

[5] Plaintiffs' assertion that bed space has increased ignores the fact that migration numbers have swelled since 1996—the point of demarcation Plaintiffs use to assert that these concerns are now "obsolete"—as well as the various practical constraints agencies face in having to adjust detention capacity to respond to these sharp fluctuations. *See generally* Securing the Border, 89 FR 48710 (June 7, 2024) ("In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal . . . . AOs conducted fewer than 3,000 credible fear interviews. . . . The numbers have changed significantly since that time. In FY 2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB. In February 2024, USBP processed more than 33,000 individuals for expedited removal and USBP processed more than 28,000 in March 2024. Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs." (internal citations omitted)).

which they rely are dated at best.[6] And Plaintiffs overlook the fact that some length of detention is the direct result of choices made by noncitizens to seek asylum, as they seek to exhaust all the opportunities statute affords them. *See, e.g.*, *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991) (holding that petitioner, who had been confined without bail for eight years, had "exercised skillfully his rights under the deportation statute, delaying and perhaps preventing the outcome sought by the government," and that "[a]lthough this litigation strategy [was] perfectly permissible," he could not "rely on the extra time resulting therefrom to claim that his prolonged detention violate[d] substantive due process"). Regardless, what is key is not the exact average length of detention. It is that Plaintiffs themselves chose to plead a case—and seek class certification on—a claim that § 1225(b)(1)(B)(ii) is unconstitutional after only seven days have passed without a bond hearing. Although Plaintiffs claim it is "misleading" to compare 47 days (the average length of detention in *Demore*) to the seven days that they request because the district court did not determine exactly when a bond hearing should occur, they themselves made the demand for seven days in their complaint, rather than asking the district court to

---

[6] Plaintiffs cite the district court's motion to dismiss decision (1-ER-15), which in turn cites a declaration from an ACLU attorney which was submitted in support of their motion to modify the preliminary injunction in this case for these numbers. *See* Declaration of David Hausman, ECF 132. The declaration is from 2019 and relies on cases completion data from 2010-2019. Plaintiffs also cite 2-ER-36 ¶ 59, which is simply a paragraph of their complaint characterizing the parole process.

simply recognize some time constraint on detention; thus, the comparison is not unwarranted, where Plaintiffs have brought it on themselves.

Finally, Plaintiffs again raise *Zadvydas*, this time to draw a distinction between the bond hearings that they request, as opposed to the "stronger remedy" in *Zadvydas*, and to note the "entirely different" sets of interests presented by the noncitizens and the government in that case as compared to this case. Br. 42–43. Those "entirely different" sets of interests are, in Plaintiffs' telling, that the noncitizens in *Zadvydas* have "no claim to remain in the United States," while Plaintiffs here have demonstrated a credible fear, and are therefore permitted to seek asylum in further proceedings. *Id.* Plaintiffs also characterize the government's interest in *Zadvydas* as "ensuring the removal of those with no claim to remain," as opposed to this case, where the interest is in "ensuring those who are litigating their claims to remain are present for those proceedings." Br. 42.

It is a stretch to say that there is a "stronger remedy" in *Zadvydas*—Plaintiffs here also ultimately seek release, just via the procedural mechanism of bond, as opposed to an individual habeas case. And it is difficult to characterize the remedy as "stronger" in *Zadvydas* compared to the seven-day timeline Plaintiffs seek here: the Supreme Court in *Zadvydas* recognized a six-month period of presumptively reasonable detention for "aliens who were admitted to the United States but subsequently ordered removed"—with the qualification that the presumption "does

23

not mean that every alien not removed must be released after six months." 533 U.S. at 701. "To the contrary," the Court held, "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

And while Plaintiffs attempt to distinguish the "entirely different" sets of interests in *Zadvydas*, they downplay the prospect of "potentially permanent" and "indefinite" detention there as a reason to recognize some limits on the government's detention authority in that particular context, not to mention the *Zadydas* plaintiffs' status as former lawful permanent residents, who are therefore endowed with greater due process rights. Those concerns were recognized as significant, yet even so the Supreme Court in *Zadvydas* held that noncitizens could be detained for at least six months without constitutional concerns, and Plaintiffs have not addressed why their interests here—where there is *not* the possibility of potentially indefinite detention, because all immigration proceedings have an end point—justify the extremely short deadline of seven days.

The way Plaintiffs have presented their claims—tethering their assertion of a constitutional entitlement to a strict, arbitrary timeline—makes clear that this is not a case about allegedly *prolonged* detention, such as was the case in *Zadvydas*, or *Jennings*, or *Demore*, or any number of immigration habeas cases. Instead, this case is about the facial constitutionality of a duly-enacted statute that provides for parole

as the means for release before any detention of any noncitizen can be said to have become prolonged. This departure from previous immigration detention cases is why no support can be found in case law for Plaintiffs' claims. Ultimately, all their points about *Demore* or *Zadvydas* do not take away from the basic principle in those decisions that immigration detention must stay tethered to its intended purpose, as it clearly does in the case of § 1225(b)(1)(B)(ii). *See Demore*, 538 U.S. at 527 (citing *Zadvydas*, 533 U.S. at 690).

### c. The availability of parole and individual habeas petitions reinforces the constitutionality of 8 U.S.C. § 1225(b)(1)(B)(ii).

Plaintiffs suggest that bond hearings are somehow necessary "to safeguard [their] liberty interests," Br. 43, but that does not trump *Thuraissigiam*'s holding that noncitizens on the threshold of entry—like Plaintiffs—are limited to those procedural rights that statute provides. *Thuraissigiam*, after all, does not repudiate the possibility that such noncitizens have some liberty interests; it is simply deliberate in defining the limits on how far those liberty interests can reach—those limits being "[w]hatever the procedure authorized by Congress is." 591 U.S. at 138–39 (citing *Knauff*, 338 U.S. at 544).

In any case, even without bond hearings, noncitizens in expedited removal are not, as Plaintiffs believe, devoid of any means to obtain release from detention. As explained in the government's opening brief, Congress set out "a specific provision authorizing release from § 1225(b) detention" in the form of parole. *Jennings*, 583

25

U.S. at 300. Plaintiffs complain that the parole process is not as robust as they would like, listing certain features that they would prefer to see, such as an administrative appeal or the opportunity to call witnesses. Br. 43. But the mere fact that the parole process devised by Congress is not entirely to their liking is no justification to assert a constitutional right to bond hearings without establishing any basis for it in statute. For decades, thousands of noncitizens have been granted parole pursuant to § 1182(d)(5)(A), and it remains a viable pathway by which noncitizens processed under expedited removal order can secure their release. *See* ECF 19.1, at 49–50.

Plaintiffs object to the government's citation of parole statistics, but those are publicly available data, not subject to reasonable dispute, which the government had previously presented to this Court in the prior appeal in this very case. *Padilla v. Immigration and Customs Enforcement*, No. 19-35565 (9th Cir.), ECF 16-2, at 5. As such, the Court can and should take judicial notice of them. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). Besides, Plaintiffs themselves proffer their own set of statistics, Br. 45, but those numbers—drawn from an out-of-circuit case, *Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018)—are not as relevant as the comprehensive parole data referenced by the government, as they relate to parole decisions from a small handful of field offices over eight months in 2017, and encompass only noncitizens encountered at ports of entry—and not class members in this case. Plaintiffs surmise that parole grants could or should have been

26

higher for those offices during that period, but they take an unduly restrictive view of the relevant timeline for assessing those 2017 figures—their only comparison is to the rates from "a few years before"—and otherwise fail to engage with any longitudinal data that would provide necessary context and framing for those transitory numbers. *See* Br. 45–46. They also fail to appreciate that parole statistics can and do fluctuate, in keeping with the discretionary, case-by-case nature of those determinations.

Finally, parole is decidedly not a "sham," *cf. id.*, but rather an avenue to release that counters any suggestion that noncitizens such as class members here would have no recourse from allegedly prolonged or indefinite detention in the absence of the district court recognizing a constitutional right to bond hearings. And to the extent this Court might have any similar concerns, a determination that Plaintiffs' claims should be dismissed on straightforward statutory grounds—as the government argues *Thuraissigiam* requires—would not lead to any narrowing of options for noncitizens facing expedited removal. Instead, it would simply maintain the status quo, ensuring that detention challenges in the expedited removal context continue to go through the proper statutory channels provided by parole and individual habeas suits.

## CONCLUSION

For all these reasons, the Court should remand this case with instructions to dismiss.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

DAVID M. MCCONNELL
*Director*

EREZ R. REUVENI
SARAH S. WILSON
*Assistant Directors*

By: */s/ Lauren C. Bingham*
LAUREN C. BINGHAM
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel.: 202-616-4458
Email: lauren.c.bingham@usdoj.gov

By: */s/ David Kim*
DAVID KIM
*Senior Litigation Counsel*

BICHNGOC T. DO
*Trial Attorney*

Dated: December 9, 2024          *Attorneys for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel
United States Department of Justice
Civil Division

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Ninth Circuit Rule 32-1 because it contains 6,860 words. This brief complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 32 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

*/s/ Lauren C. Bingham*
LAUREN C. BINGHAM
Senior Litigation Counsel
United States Department of Justice
Civil Division